# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 04-60001-CR-Cooke(s)(s)(s)(s)

18 U.S.C. § 371
18 U.S.C. § 2339A
18 U.S.C. § 956(a)(1)
18 U.S.C. § 922(g)(5)(B)
18 U.S.C. § 1001(a)
18 U.S.C. § 1621(1)
18 U.S.C. § 1505
18 U.S.C. § 924(d)(1)
18 U.S.C. § 2
21 U.S.C. § 853



UNITED STATES OF AMERICA

v.

ADHAM AMIN HASSOUN,
    a/k/a "Abu Sayyaf,"
MOHAMED HESHAM YOUSSEF,
    a/k/a "Abu Turab," and
KIFAH WAEL JAYYOUSI,
    a/k/a "Abu Mohamed,"

                    **Defendants.**

_____/

## FOURTH SUPERSEDING INDICTMENT

The Grand Jury charges that:

## INTRODUCTION

At times material to this Indictment:

1.    In the late 1980's, a loose, transnational network of radical Islamists launched a holy war to drive American military forces from the Arabian peninsula, erode American support of Israel, undermine American support of regimes in the Middle East that were viewed as insufficiently

Islamic, and participate in armed confrontations around the world to establish Islamic states under Sharia, meaning strict Islamic law, as ordained by the Caliph, the name of the successor to the Prophet Mohammad and supreme Islamic ruler.

2.     This network was heavily influenced by Islamic religious fundamentalism, which sought to establish a pure Islamic state and regarded modern Western civilization as a symbol of evil, spreading idolatry and secularism.  Groups espousing this radical Islamic fundamentalism include the Islamic Group, a/k/a "Gama'a al-Islamiya," a/k/a "IG,"a/k/a "AGAI;" Egyptian Islamic Jihad, a/k/a "Islamic Jihad," a/k/a "al-Jihad," a/k/a "EIJ;" and al Qaeda, which oppose countries, governments, institutions, and individuals that do not share their view of Islam.  These groups consider their enemies to be infidels, and embrace the concept of a "violent jihad" or holy war, as a means to oppose the infidels by force and violence.

3.     As used in this Indictment, jihad means "violent jihad," which includes planning, preparing for, and engaging in physical acts of violence against those who are deemed to be enemies of Islamic fundamentalism, which violence includes murder, kidnapping and hostage taking, maiming and other injury, and damage to and destruction of property.

4.     As alleged in this Indictment, **ADHAM AMIN HASSOUN** (hereinafter "**HASSOUN**"), **MOHAMED HESHAM YOUSSEF** (hereinafter "**YOUSSEF**"), and **KIFAH WAEL JAYYOUSI** (hereinafter "**JAYYOUSI**"), with others, operated and participated in a recruiting and fundraising network to send money, physical assets, and individuals to overseas conflicts for the purposes of fighting violent jihad and supporting a terrorist agenda.

2

## COUNT 1

### (Conspiracy to Provide Material Support for Terrorists)

The Introduction set forth in paragraphs 1 through 4 of this Indictment is realleged and incorporated by reference as though fully set forth herein.

5.    Beginning in or about early 1994, and continuing until on or about May 8, 2002, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**
**MOHAMED HESHAM YOUSSEF,**
**a/k/a "Abu Turab,"and**
**KIFAH WAEL JAYYOUSI,**
**a/k/a "Abu Mohamed,"**

within the United States, did knowingly and willfully combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, to commit offenses against the United States, that is, providing material support and resources, as defined in Title 18, United States Code, Section 2339A(b), and concealing and disguising the nature, location, source, and ownership of material support and resources, knowing and intending that they be used in preparation for and carrying out a violation of Title 18, United States Code, Section 956 (a)(1), that is, a conspiracy to murder, kidnap, and maim persons in a foreign country; and did commit one or more acts to effect the purpose and object of the conspiracy.

## PURPOSE AND OBJECT OF THE CONSPIRACY

6.    It was a purpose and object of the conspiracy to advance violent jihad, including supporting, and participating in, armed confrontations in specific locations outside the United States, and committing acts of murder, kidnapping, and maiming, for the purpose of opposing existing

governments and civilian factions and establishing Islamic states under Sharia.

## MANNER AND MEANS OF THE CONSPIRACY

7. The manner and means by which the defendants and their coconspirators sought to accomplish the purpose and object of the conspiracy included the following:

a. Members of the conspiracy would and did recruit, and attempt to recruit, others for the purpose of participating in a violent jihad, which would involve armed confrontations and committing acts of murder, kidnapping, and maiming.

b. Members of the conspiracy would and did solicit and raise monies to support and train the mujahideen fighters who would engage in the violent jihad.

c. Members of the conspiracy would and did transfer monies from places inside the United States to places outside the United States to support the violent jihad.

d. Members of the conspiracy would and did seek support and training to serve as mujahideen fighters in the violent jihad.

e. Members of the conspiracy would and did utilize codes and other techniques to conceal and disguise the true nature of their activities and identities.

## OVERT ACTS

In furtherance of the conspiracy and to effect its purpose and object, at least one of the coconspirators committed, or caused to be committed, at least one of the following overt acts within the United States, in the Southern District of Florida, and elsewhere:

8. On or about June 13, 1994, **HASSOUN** wrote a $1,000 check to **JAYYOUSI** with the memo line stating, "support for the person."

9. On or about Feburary 4, 1995, in a meeting between **JAYYOUSI** and Unindicted

4

Coconspirator #1, Unindicted Coconspirator #1 discussed setting up a for-profit business to fund jihad, "... this business, the profit generated from this business will be for the brothers, I mean we have to support the mujahideen brother, I mean," and Unindicted Coconspirator #1 then described his organization, the Canadian Islamic Association, as a "cover, I mean its's very good."

10.   On or about March 21, 1995, **HASSOUN** participated in a coded conversation with **JAYYOUSI** and Unindicted Coconspirator #1 where **HASSOUN** stressed the importance of coordination stating, "we have a number of people active in the field," and then described their efforts: "All of us are in a chain, if one link of the chain is separated, the movement will not function," and that this concept is particularly important in the field of "tourism."

11.   On or about June 25, 1995, Unindicted Coconspirator #1 participated in a coded conversation with **HASSOUN** and **JAYYOUSI** where Unindicted Coconspirator #1 reported, "Our friend in the first region . . . Has opened up a football court over there . . . because there are matches . . . he wants only to give training for the game."

12.   On or about July 25, 1995, **HASSOUN** wrote an $8,000 check to the Canadian Islamic Association with the memo line stating, "for tourism."

13.   On or about August 2, 1995, **HASSOUN** wrote a $5,000 check to American Worldwide Relief with the memo line stating, "for brothers."

14.   On or about August 31, 1995, **HASSOUN** wrote a $3,000 check to the Canadian I. Association with the memo line stating, "for tourism and tourist."

15.   On or about November 15, 1995, **HASSOUN** wrote a $1,000 check to the Holy Land Foundation with the memo line stating, "for tourism."

16.   On or about January 16, 1996, **HASSOUN** participated in a coded conversation with

YOUSSEF about travel to "an area that is active," such as "Afghanistan . . . Bosnia."

17. On or about February 16, 1996, **HASSOUN** wrote a $600 check to **JAYYOUSI** with the memo line stating, "Chechnya."

18. On or about February 17, 1996, **YOUSSEF** departed the United States for Egypt.

19. On or about April 17, 1996, Unindicted Coconspirator #2 obtained his United States passport in Miami, Florida.

20. On or about May 23, 1996, **HASSOUN** participated in a coded conversation with Unindicted Coconspirator #3, who was in Lebanon, in which **HASSOUN** asked if Unindicted Coconspirator #3 had a way to deliver "stuff to soccer teams in Chechnya or Bosnia."

21. On or about May 30, 1996, **HASSOUN** and **YOUSSEF**, who was in Egypt, discussed their intention to "prepare" Unindicted Coconspirator #2 and send him to Egypt.

22. On or about June 2, 1996, **HASSOUN** participated in a conversation with an individual about **HASSOUN's** plans to deliver a sermon on Chechnya for the purpose of raising funds for Chechnya.

23. On or about June 8, 1996, **HASSOUN** participated in a coded conversation with Unindicted Coconspirator #1, who was in Canada, about Afghanistan, in which they discussed "the ones who want to go out and smell the air."

24. On or about June 11, 1996, **HASSOUN** participated in a coded conversation with **JAYYOUSI** about **YOUSSEF** being someone who wants to "get some fresh air. . . find himself a route."

25. On or about June 16, 1996, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, and told him that there would be a "commercial deal" completed

6

within the month, and **YOUSSEF** responded, "by God, I am ready."

26.   On or about June 30, 1996, **YOUSSEF**, who was in Egypt, participated in a coded conversation with **HASSOUN**, and told **HASSOUN** that while he (**YOUSSEF**) was busy studying the Koran, this study was not his purpose and that he was waiting for the "trade" to take its "natural" course.

27.   On or about September 1, 1996, **YOUSSEF**, who was in Egypt, told **HASSOUN** that he was "ready for the trade immediately," and **HASSOUN** responded, "by God, there is trade in Somalia . . . get ready, get organized, and go down there,  to see . . . we'll open up a market over there."

28.   On or about September 2, 1996, **HASSOUN** participated in a conversation with **JAYYOUSI**, who asked **HASSOUN** to look "for an open window for the Chechens," meaning "an opportunity for us to come over and do something for the Chechens."

29.   On or about September 30, 1996, **HASSOUN** wrote a $2,000 check to Unindicted Coconspirator #1 with the memo line stating, "one for Bosnia one for Libya."

30.   On or about October 23, 1996, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, in which he told **YOUSSEF** to go to Ogaden to "smell fresh air."

31.   On or about October 25, 1996, **HASSOUN** told **YOUSSEF**, who was in Egypt, to "break away and go to the area I told you about . . . brothers have arrived and God willing, you will work with them when you are there . . . let go of your worldly brides and worldly home . . . God will provide for you . . . go forth in the cause of Allah."

32.   On or about November 30, 1996, Unindicted Coconspirator #3, calling from Turkey, participated in a conversation with an individual in the United States, and told the individual to

7

instruct **HASSOUN** not to talk over the phone about sensitive matters, "not even in code like tourism."

33.   On or about December 31, 1996, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, in which **HASSOUN** reported that "56 brothers got married" in Somalia, and asked **YOUSSEF** to get news about Somalia.

34.   On or about January 26, 1997, **HASSOUN** participated in a conversation with Unindicted Coconspirator #3 about jihad in Ogaden, Ethiopia, in which **HASSOUN** reported that "58 brothers died . . . the attack was repelled but the Americans used their airplanes . . . and were bombarding them . . . so the situation was very harmful to the brothers, but thanks to God, they will be repaid two-fold," and that, with regard to fundraising, "whatever, we collect we will be sending over there . . . a few emirs have called specifically concerning the subject . . . emirs of certain war fronts ask for such."

35.   On or about January 26, 1997, **HASSOUN** participated in a coded conversation with Unindicted Coconspirator #1 and another individual, in which **HASSOUN** reported that "because they are playing football in Somalia . . . things are heating up so we are sending soccer uniforms and sneakers."

36.   On or about January 31, 1997, **HASSOUN** wrote a $2,000 check to Unindicted Coconspirator #1 with the memo line stating, "Somalia."

37.   On or about February 8, 1997, **HASSOUN** participated in a coded conversation with an individual about raising funds for Somalia, stating that the "brothers have an urgent need."

38.   On or about April 6, 1997, **YOUSSEF**, who was in Egypt, left a coded message for **HASSOUN**, indicating that it was important for **HASSOUN** to call back because **YOUSSEF** needed

to confirm things before going on a "picnic, God willing."

39.   On or about April 6, 1997, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, and discussed another "brother" who was "going on a picnic," and **HASSOUN** asked if **YOUSSEF** would be going with this "brother," and **YOUSSEF** responded that he planned to join a group of possibly ten others who were going to "smell fresh air and eat cheese."

40.   On or about July 28, 1997, **HASSOUN** participated in a conversation with Unindicted Coconspirator #2, and asked Unindicted Coconspirator #2 if he was "ready" for jihad, and Unindicted Coconspirator #2 replied that "it's gonna happen soon."

41.   On or about May 1, 1998, **HASSOUN** participated in a conversation with an individual about jihad, in which **HASSOUN** instructed the individual not to talk about jihad over the phone.

42.   On or about June 17, 1998, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, about **HASSOUN** sending $5,000 to fund the travel for five "partners."

43.   On or about June 21, 1998, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, about 20 "other partners" and **HASSOUN** wiring **YOUSSEF** money via the Thomas Cooke wire transfer company in Cairo.

44.   On or about June 22, 1998, **HASSOUN** wrote a $5,000 check to cash with **YOUSSEF's** name on the memo line, and then used the funds to purchase an official check from Barnett Bank payable to **YOUSSEF**.

45.   On or about June 24, 1998, **HASSOUN** sent a $5,000 Western Union wire transfer to **YOUSSEF** in Cairo, Egypt.

46.   On or about June 24, 1998, **YOUSSEF**, who was in Egypt, called **HASSOUN**, who

9

reported that the funds were available.

47.   On or about July 5, 1998, **YOUSSEF** traveled to Albania.

48.   On or about July 7, 1998, **YOUSSEF** called **HASSOUN** from Albania en route "to the inside," and **HASSOUN** promised to wire $5,000 to him.

49.   On or about July 13, 1998, **HASSOUN** participated in a conversation with an individual and stated that he had received a report about Kosovo, and asked the individual how much money he had raised for Kosovo.

50.   On or about July 18, 1998, **YOUSSEF** called **HASSOUN** on a satellite telephone, and reported that he had entered Kosovo under bombing from the Serbs, and **HASSOUN** told **YOUSSEF** that he was sending $5,000 with Unindicted Coconspirator #2.

51.   On or about July 18, 1998, **HASSOUN** participated in a coded conversation with an individual, in which he reported that **YOUSSEF** was "playing football yesterday . . . and they had casualties," and **HASSOUN** asked the individual, "are you ready?"

52.   On or about July 28, 1998, **HASSOUN** participated in a coded conversation with an individual, and described **YOUSSEF's** activities in Kosovo as "tourism completely."

53.   On or about July 29, 1998, **HASSOUN** participated in a coded conversation with an individual about jihad areas, and reported that he was "concentrating" on "a new area that opened up" and had some "loved ones that have gone there."

54.   On or about August 3, 1998, **HASSOUN** wrote a $1,300 check to cash with the memo line stating, "Kosovo."

55.   On or about August 10, 1998, **YOUSSEF**, who was in Egypt, called **HASSOUN**, and participated in a coded conversation describing his jihad activities, including the fact that "seventy

got completely married," that they all "went in ambush sites, well equipped and well prepared ambush sites," and that "sports equipment" was used "to launch an attack on the other team."

56.   On or about August 17, 1998, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, in which **HASSOUN** agreed to send Unindicted Coconspirator #2 to him.

57.   On or about August 18, 1998, **HASSOUN** wrote a $5,000 check to Global Relief Foundation (hereinafter "GRF") with the memo line stating, "Kosovo."

58.   On or about August 28, 1998, **HASSOUN** participated in a conversation with an individual, and attempted to solicit a donation for Unindicted Coconspirator #2's travel, to which the individual agreed, and stated that he had already contributed "to his cause" in the past.

59.   On or about September 5, 1998, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, and advised him that Unindicted Coconspirator #2 would be arriving on Sunday, and that **YOUSSEF** should meet Unindicted Coconspirator #2 at the airport.

60.   On or about September 5, 1998, Unindicted Coconspirator #2 flew from Miami International Airport in Miami, Florida, to Cairo, Egypt.

61.   On or about October 20, 1998, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, and inquired about the welfare of Unindicted Coconspirator #2.

62.   On or about February 8, 1999, **HASSOUN** participated in a conversation with **YOUSSEF's** brother, and stated that he provides financial support to both **YOUSSEF** and Unindicted Coconspirator #2, and expressed the importance of **YOUSSEF** "always having money on his side until further notice" to support Unindicted Coconspirator #2 and others like him that were to follow.

11

63.   On or about February 8, 1999, **HASSOUN** participated in a three-way conversation with **YOUSSEF** and Unindicted Coconspirator #2, who were in Egypt, in which **HASSOUN** asked Unindicted Coconspirator #2 about the progress of his studies and if he still had money.

64.   On or about April 5, 1999, **HASSOUN** wrote a $3,000 check to GRF with the memo line stating, "Kosovo."

65.   On or about April 15, 1999, **HASSOUN** wrote a $600 check to GRF with the memo line stating, "to support Kosovo."

66.   On or about July 25, 1999, **HASSOUN** participated in a coded conversation with Unindicted Coconspirator #2, who was in Egypt, in which Unindicted Coconspirator #2 reported that he had requested an "army jacket, book bag, and sleeping bag" because there "was a rumor here that the door was open somewhere."

67.   On or about July 25, 1999, **HASSOUN** participated in a coded conversation with an individual, in which **HASSOUN** discussed a plan to give money to the individual so that the individual's wife can withdraw the money in Egypt to give to Unindicted Coconspirator #2.

68.   On or about August 1, 1999, **HASSOUN** wrote a $1,000 check to an individual with Unindicted Coconspirator #2's name on the memo line.

69.   On or about August 13, 1999, **HASSOUN** wrote a $4,400 check to an individual with the memo line stating, "50 Dagastan."

70.   On or about October 1, 1999, **HASSOUN** wrote a $2,500 check to GRF with the memo line stating, "Tourism, Propaganda, Chechnya."

71.   On or about October 17, 1999, **HASSOUN** participated in a coded conversation with Unindicted Coconspirator #2, who was in Egypt, in which **HASSOUN** told Unindicted

Coconspirator #2 that he must "prepare [himself] financially" so that Unindicted Coconspirator #2 can "move . . . to some close area."

72.   On or about October 20, 1999, **HASSOUN** wrote a $2,500 check to GRF with the memo line stating, "from Al Iman in Chechnya."

73.   On or about November 15, 1999, **JAYYOUSI** participated in a conversation regarding raising funds for "the brothers," during which **JAYYOUSI** stated that they were transferring some funds through Global Relief Foundation.

74.   On or about January 20, 2000, **HASSOUN** wrote a $2,000 check to GRF with the memo line stating, "Chechnya."

75.   On or about April 10, 2000, **HASSOUN** participated in a conversation with Unindicted Coconspirator #2, who was in Egypt, in which they discussed the possibility of Unindicted Coconspirator #2 traveling to Yemen, but Unindicted Coconspirator #2 indicated that he needed a recommendation to go there.

76.   On or about July 24, 2000, Unindicted Coconspirator #2 filled out a "Mujahideen Data Form" in preparation for violent jihad training in Afghanistan.

77.   On or about September 3, 2000, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, who indicated that he would be traveling "there by Usama . . . Khattab's company," and that Unindicted Coconspirator #2 "is a little farther South, he is supposed to be by Usama and then he could be able to go to Kh . . . little farther North."

78.   On or about September 3, 2000, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, and **YOUSSEF** stated that Unindicted Coconspirator #2 "went to the area of Usama."

13

79.   On or about September 3, 2000, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, about sending people to Baku, Azerbaijan.

80.   On or about October 9, 2000, **YOUSSEF**, who was in Saudi Arabia, called **HASSOUN**, and gave **HASSOUN** a telephone number in the Republic of Georgia, at which **YOUSSEF** could be reached in a few days.

81.   On or about October 15, 2000, **HASSOUN** participated in a conversation with individuals who were in the Republic of Georgia, who told **HASSOUN** that **YOUSSEF** is in "Baku," and that Unindicted Coconspirator #1 is "currently in Afghanistan," and **HASSOUN** responded, "I would like to come over by you to get some fresh air."

82.   On or about October 15, 2000, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Baku, Azerbaijan, in which **HASSOUN** told **YOUSSEF** to join Unindicted Coconspirator #2, and **YOUSSEF** responded, "I have already reached the front line, why should I return? And also I [have] previous experience, so why should I go there to get the experience I already have?"

83.   On or about January 12, 2001, **HASSOUN** wrote a $500 check to an individual with the memo line stating, "tourism."

84.   On or about May 16, 2001, **HASSOUN** wrote a $700 check to GRF with the memo line stating, "tourism and travel."

85.   On or about November 1, 2001, **HASSOUN** wrote a $2,000 check to GRF with the memo line stating, "Afghan relief."

86.   On or about May 8, 2002, Unindicted Coconspirator #2 returned to the United States carrying papers containing **HASSOUN's** name and telephone number.

14

All in violation of Title 18, United States Code, Sections 371 and 2339A(a).

## COUNT 2

### (Material Support for Terrorists)

The Introduction set forth in paragraphs 1 through 4 and the Overt Acts set forth in paragraphs 8 through 86 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

Beginning in or about early 1994, and continuing until on or about May 8, 2002, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**
**MOHAMED HESHAM YOUSSEF,**
**a/k/a "Abu Turab,"and**
**KIFAH WAEL JAYYOUSI,**
**a/k/a "Abu Mohamed,"**

within the United States, did provide material support and resources, as defined in Title 18, United States Code, Section 2339A(b), and did conceal and disguise the nature, location, source, and ownership of material support and resources, knowing and intending that they be used in preparation for, and in carrying out, a violation of Title 18, United States Code, Section 956(a)(1), that is, a conspiracy to murder, kidnap, and maim persons in a foreign country; all in violation of Title 18, United States Code, Sections 2339A(a) and 2.

## COUNT 3

### (Conspiracy to Murder, Kidnap, and Maim Persons in a Foreign Country)

The Introduction set forth in paragraphs 1 through 4 and paragraphs 6 through 86 of Count I of this Indictment are realleged and incorporated by reference as though fully set forth herein.

Beginning in or about early 1994, and continuing until on or about May 8, 2002, in Broward

15

County, in the Southern District of Florida, and elsewhere, the defendants,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**
**MOHAMED HESHAM YOUSSEF,**
**a/k/a "Abu Turab,"and**
**KIFAH WAEL JAYYOUSI,**
**a/k/a "Abu Mohamed,"**

at least one of whom having been within the jurisdiction of the United States, did knowingly and

willfully combine, conspire, confederate, and agree with others, known and unknown to the Grand

Jury, to commit at any place outside the United States, acts that would constitute murder, that is, the

unlawful killing of human beings with malice aforethought, kidnapping, and maiming if committed

in the special maritime and territorial jurisdiction of the United States, and did commit one or more

acts within the jurisdiction of the United States, to effect the purpose and object of the conspiracy.

All in violation of Title 18, United States Code, Section 956(a)(1) and 2.

## COUNT 4

### (Unlawful Possession of Firearm)

On or about June 12, 2002, in Broward County, in the Southern District of Florida, the

defendant,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**

being an alien admitted to the United States under a nonimmigrant visa, did knowingly possess a

firearm in and affecting interstate and foreign commerce, that is, a Smith & Wesson 9 millimeter

pistol, in violation of Title 18, United States Code, Section 922(g)(5)(B).

16

## COUNT 5

### (False Statement)

On or about June 12, 2002, in Broward County, in the Southern District of Florida, the defendant,

### ADHAM AMIN HASSOUN,
### a/k/a "Abu Sayyaf,"

in a matter within the jurisdiction of the executive branch of the Government of the United States, that is, the DHS and the FBI, did knowingly and willfully make a materially false, fraudulent, and fictitious statement and representation, in that **HASSOUN** stated to a Special Agent of the DHS and to a Special Agent of the FBI that:

(1) he neither encouraged nor assisted an individual named Mohamed Youssef regarding travel to any foreign country, when in truth and in fact, and as the defendant then and there well knew, he encouraged Youssef to travel to Somalia and Ethiopia, and provided funds for Youssef to travel to Kosovo for the purpose of fighting in a jihad; and

(2) he was not aware of Mohamed Youssef visiting any foreign country other than Egypt, when in truth and in fact, and as the defendant then and there well knew, Mohamed Youssef had traveled to Kosovo, and had actually entered that country under heavy bombing by Serbian forces, for the purpose of fighting in a jihad.

All in violation of Title 18, United States Code, Section 1001(a).

## COUNT 6

### (Perjury)

On or about July 22, 2002, in Miami-Dade County, in the Southern District of Florida, the defendant,

17

### ADHAM AMIN HASSOUN,
### a/k/a "Abu Sayyaf,"

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration Judge, in a case in which a law of the United States authorizes an oath to be administered, that is, an Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did knowingly, willfully, and contrary to such oath, state and subscribe material matters which he did not believe to be true, concerning his recruitment of Mohamed Youssef to fight in a jihad and discussions about jihad over the telephone with Mohamed Youssef, as herein set forth below:

Q.   And was he one of your recruits as has been said in the affidavit?

A.   I never recruited him.

Q.   And how - what's your phone contacts with Mr. Yousef?

A.   At that time after he left to Egypt?

Q.   Yes.

A.   When he left to Egypt he kept in touch and he used to call to ask about how the community doing over here and how the family is doing and that was it.

The aforementioned testimony by **HASSOUN** as he then and there believed, was a false material statement, in that **HASSOUN** did recruit Mohamed Youssef to fight in a jihad and did discuss jihad over the telephone with Mohamed Youssef.

All in violation of Title 18, United States Code, Section 1621(1).

### COUNT 7

### (Perjury)

On or about July 22, 2002, in Miami-Dade County, in the Southern District of Florida, the defendant,

18

### ADHAM AMIN HASSOUN,
### a/k/a "Abu Sayyaf,"

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration Judge, in a case in which a law of the United States authorizes an oath to be administered, that is, an Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did knowingly, willfully, and contrary to such oath, state and subscribe material matters which he did not believe to be true, concerning his purpose for providing financial assistance to Mohamed Youssef, as herein set forth below:

Q.   And did you ever provided anything - any monetary financial assistance to him?

A.   At one point he wanted money to prepare a land that he has, this is what he said, and that land, I believe, is close to the Suez canal, somewhere like that.  And he asked if the community can help him to fix the land and the community responded and we helped him.

Q.   Okay.  And was there any other purpose other than the land that you owned there?

A.   This is what he asked and this is what we respond.

* * * *

Q.   Right. And you said the money was for what?

A.   To fix his land, fix his house.

The aforementioned testimony by **HASSOUN**, as he then and there believed, was a false material statement, in that **HASSOUN** did provide financial assistance to Mohamed Youssef for the purpose of fighting in a jihad.

All in violation of Title 18, United States Code, Section 1621(1).

19

## COUNT 8

### (Perjury)

On or about July 22, 2002, in Miami-Dade County, in the Southern District of Florida, the

defendant,

### ADHAM AMIN HASSOUN,
### a/k/a "Abu Sayyaf,"

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration Judge,

in a case in which a law of the United States authorizes an oath to be administered, that is, an

Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did knowingly,

willfully, and contrary to such oath, state and subscribe material matters which he did not believe

to be true, concerning his use of coded language with other individuals, including Mohamed

Youssef, when discussing jihad activities, as herein set forth below:

Q. Did you speak with him in code language?

A. Never.

Q. Do you have any code languages with any –

A. No, I don't.

* * * *

Q. And in 1998 it's alleged that you have a conversation, you talk about you have soccer

equipment. Did you recall any conversation like that?

A. No. I know he wanted - he wanted to open a business, you know, and he wants to get

something from here, buy equipment and stuff like that.

Q. Do you recall what equipment he was talking about?

A. Soccer maybe, or football, something like that. But I asked him to come over here and

20

pick up whatever he wants.

* * * *

Q.   Sir, in your - you talked about this in direct examination, but in your - one of your telephone conversations in 1998 with Mr. Yousef you discussed soccer equipment?

A.   He discussed, yes.

Q.   Okay.  Well –

A.   Yes, go ahead.

Q.   - he discussed it with you?

A.   Uh-huh.

Q.   Right. And your assertion is that he was directly speaking just of soccer equipment?

A.   Yes, he gave me the impression that he wants to open a business and he wants to do some trade.  In my - you want to hear my (unintelligible).

Q.   No.  Sir, isn't it true that during that conversation you also asked, even though you were speaking about soccer equipment, you asked him if he had enough to launch an attack on the enemy?

A.   What enemy?

Q.   Did you say those words or something close to those words?

A.   Not that I recall.

Q.   Do you recall discussing with him an attack?

A.   Where was he, in Egypt?

Q.   Yes.

A.   What enemy?

21

Q.    Well I'm asking you, sir.

A.    No.

Q.    Did you discuss with him having enough equipment to engage an enemy?

A.    I don't recall that.

Q.    But you may have?

A.    I don't recall that.

Q.    Well --

A.    I'm trying to put where you're going.  If I may --

Q.    Well, it's a very specific question, sir.

A.    Go ahead.

Q.    The question is: In your conversation in 1998 with Mr. Yousef in which he discussed soccer equipment did you or did you not talk to him about having enough equipment to engage an enemy?

A.    No.

Q.    You did not?

Q.    Did you discuss with him anti-armor tools?

A.    I don't recall.

Q.    But you might have?

A.    What is that again?

Q.    Anti-armor tools.  Did you discuss tools with him?

A.    I don't recall what we spoke.  I know that we spoke that he wants to trade and he wants to have a soccer team and stuff like that.  Other than that, I don't recall.  I know that part.

22

The aforementioned testimony by **HASSOUN**, as he then and there believed, was a false material statement, in that **HASSOUN** did speak in coded language with other individuals, including Mohamed Youssef, when discussing jihad activities.

All in violation of Title 18, United States Code, Section 1621(1).

## COUNT 9

### (Perjury)

On or about July 22, 2002, in Miami-Dade County, in the Southern District of Florida, the defendant,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration Judge, in a case in which a law of the United States authorizes an oath to be administered, that is, an Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did knowingly, willfully, and contrary to such oath, state and subscribe material matters which he did not believe to be true, concerning his conversations with Mohamed Youssef about the experience of fighting in a jihad conflict, as herein set forth below:

Q.    Sir, have you ever discussed with Yousef in any phone call his experiences on the front lines?

A.    What front lines?

Q.    Front lines of any battle.

A.    What battle?

Q.    Any battle, any armed conflict.

A.    He never spoke to me about any armed conflict.

Q.   So you've never discussed  with him his activities on the front lines in any armed struggle or conflict?

A.   I don't recall any of that happening.

Q.   But it could have?

A.   Not really.  No.

The aforementioned testimony by **HASSOUN**, as he then and there believed, was a false material statement, in that **HASSOUN** did participate in conversations with Mohamed Youssef about the experience of fighting in a jihad conflict.

All in violation of Title 18, United States Code, Section 1621(1).

## COUNT 10

### (Perjury)

Beginning on or about July 22, 2002, and continuing until on or about August 1, 2002, in Miami-Dade County, in the Southern District of Florida, the defendant,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration Judge, in a case in which a law of the United States authorizes an oath to be administered, that is, an Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did knowingly, willfully, and contrary to such oath, state and subscribe material matters which he did not believe to be true, concerning his participation in conversations about killing a woman in Lebanon, as herein set forth below:

Q.   Now you have read the allegations in the affidavit provided by the Government written by Officer Arena -

24

A.    Yes, I did.

Q.    - FBI Agent.  I'm going to direct your attention to that affidavit.  First, we're going to go to Paragraph 17 where it has the allegation that sometime in August, 1997, you had a conversation with someone identified as an associate concerning a female, the way I understood, was stuck in Lebanon, and the Government, in cooperation with CIA and State Department, was trying to bring her here.  And you made some comments.  Do you recall any of those comments?

A.    No.

Q.    Do you recall any female stuck in Lebanon -

A.    No, I don't.

Q.    - In 1997?

A.    No.

Q.    Do you recall you ordering the assassination of that female?

A.    Never.

Q.    I remind you are under oath.

A.    I am under oath.

Q.    And I want you to - five, six, years ago, which incident has been explained here, and do you recall saying that "I have to speak with brothers in Lebanon to take care of her."

A.    Never.

Q.    Do you recall any conversation?

A.    Never.  Never happened.

* * * *

Q.    Do you recall any of this, which is said in paragraph 17, if it ever happened?

A.    Never happened.  I read it many times through the weekend, through the whole week since I had this, none of that happened.

* * * *

Q.    And, sir, do you still claim that at no time you had a conversation about a female who had traveled from the United States to the Middle East, that conversation discussing the issue of having her killed?

A.    Do I what?

Q.    Did you ever have a conversation with somebody about killing a woman?

A.    No, no, never.

* * * *

Q.    Hassoun, you know that there's a - someone named "associate" mentioned in - in paragraph 17 of Agent Arena's declaration.  Do you know who that person is?

A.    No.

Q.    Have you ever spoken to anyone who can say I overheard you saying that you want to kill someone, plot to kill someone?

A.    No.

Q.    Did you ever have in your mind ill - will against anyone?

A.    Never.

Q.    Do you know this female mentioned in paragraph 17?

A.    I have no idea.

Q.    So it's an absolute denial?

A.   Absolute denial.

Q.   You under oath.

A.   I am under oath.

The aforementioned testimony by **HASSOUN**, as he then and there believed, was a false

material statement, in that **HASSOUN** did participate in conversations about killing a woman in

Lebanon.

All in violation of Title 18, United States Code, Section 1621(1).

## COUNT 11

### (Obstruction of Proceedings)

Beginning on or about June 12, 2002, and continuing until on or about September 30, 2002,

in Broward and Miami-Dade Counties, in the Southern District of Florida, the defendant,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**

did knowingly and willfully corruptly endeavor to influence, obstruct, and impede the due and proper

administration of law under which a pending proceeding, that is, an Immigration Court proceeding,

was being had before a department and agency of the United States, in violation of Title 18, United

States Code, Section 1505.

## FORFEITURE

1.    The allegations in Count 4 of this Indictment are re-alleged and by this reference fully

incorporated herein for the purpose of alleging forfeitures to the United States of America of

property in which the defendant has an interest, pursuant to the provisions of Title 18, United States

Code, Section 924(d)(1), as incorporated by Title 28, United States Code, Section 2461(c), and the

procedures outlined in Title 21, United States Code, Section 853.

2.     Upon the conviction of any knowing violation of Title 18, United States Code, Section 922(g)(5)(B), the defendant, **ADHAM AMIN HASSOUN**, shall forfeit to the United States any firearm involved in or used in the commission of said violation.

3.     The property subject to forfeiture includes, but is not limited to, a Smith & Wesson 9 millimeter pistol seized from the defendant on June 12, 2002.

All pursuant to Title 18, United States Code, Section 924(d)(1), as incorporated by Title 28, United States Code, Section 2461(c), and the procedures outlined in Title 21, United States Code, Section 853.

A TRUE BILL

_____
FOREPERSON

_____
MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

_____
RUSSELL R. KILLINGER
ASSISTANT UNITED STATES ATTORNEY

_____
STEPHANIE K. PELL, TRIAL ATTORNEY
COUNTERTERRORISM SECTION
UNITED STATES DEPARTMENT OF JUSTICE

_____
JULIA A. PAYLOR
ASSISTANT UNITED STATES ATTORNEY

28

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA

CASE NO.   04-60001-CR-Cooke(s)(s)(s)(s)

vs.

CERTIFICATE OF TRIAL ATTORNEY*

ADHAM AMIN HASSOUN,
MOHAMED HESHAM YOUSSEF, and
KIFAH WAEL JAYYOUSI,

_____ **Defendants** _____/

**Superseding Case Information:**

**Court Division:** (Select One)

_X_ Miami   ____ Key West
____ FTL   ____ WPB ___ FTP

New Defendant(s)            Yes _X_   No ____
Number of New Defendants        __1__
Total number of counts        __11__

I do hereby certify that:

1.  I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.  Interpreter:   (Yes or No)   ___No___

    List language and/or dialect   _____

4.  This case will take   _90_   days for the parties to try.

5.  Please check appropriate category and type of offense listed below:
    (Check only one)                                    (Check only one)

| | | | | | |
|---|---|---|---|---|---|
| I | 0 to 5 days | _____ | Petty | _____ |
| II | 6 to 10 days | _____ | Minor | _____ |
| III | 11 to 20 days | _____ | Misdem. | _____ |
| IV | 21 to 60 days | _____ | Felony | __X__ |
| V | 61 days and over | __X__ | | |

6.  Has this case been previously filed in this District Court? (Yes or No)   _Yes_
    If yes:
    Judge: ____Cooke____   Case No. __04-60001-CR-Cooke(s)(s)(s)__
    (Attach copy of dispositive order)
    Has a complaint been filed in this matter?   (Yes or No) _____Yes_____
    If yes:
    Magistrate Case No. ___04-3565-RLD_____
    Related Miscellaneous numbers: _____
    Defendant(s) in federal custody as of _____March 27, 2005_____
    Defendant(s) in state custody as of _____
    Rule 20 from the _____   District of _____

    Is this a potential death penalty case? (Yes or No)   _No_____

7.  Does this case originate from a matter pending in the U.S. Attorney's Office prior to April 1, 2003?   _X_ Yes ___ No

8.  Does this case originate from a matter pending in the U. S. Attorney's Office prior to April 1, 1999?   ___ Yes _X_ No
    If yes, was it pending in the Central Region? ___ Yes ___ No

9.  Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003? ____ Yes _X_ No

10. Does this case originate from a matter pending in the Narcotics Section (Miami) prior to May 18, 2003 ?   ____ Yes _X_ No

_____
RUSSELL R. KILLINGER
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 312851

Penalty Sheet(s) attached

REV.1/14/04

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name:** ADHAM AMIN HASSOUN, a/k/a "Abu Sayyaf"

**Case No:** 04-60001-CR-COOKE (s)(s)(s)(s)

Count #: 1

  Conspiracy to Provide Material Support to Terrorists

   18 U.S.C. § 2339A and 371

**\* Max.Penalty:**          Fifteen (15) years'  imprisonment

Count #: 2

  Providing Material Support to Terrorists

   18 U.S.C. § 2339A

**\*Max. Penalty:**          Fifteen (15)  years' imprisonment

Counts #: 3

  Conspiracy to Murder, Kidnap and Maim individuals in a Foreign Country

   18 U.S.C. § 956

**\*Max. Penalty:**          Life imprisonment

Counts #: 4

  Unlawful Possession of a Firearm

   18 U.S.C. § 922(g)(5)(B)

**\*Max. Penalty:**          Ten (10) years' imprisonment


Counts #: 5

  UMaking a False Statement

   18 U.S.C. § 1001(a)

**\*Max. Penalty:**          Five (5) years' imprisonment

Counts #: 6, 7, 8, 9 and 10

  Perjury

   18 U.S.C. § 1621(l)

**\*Max. Penalty:**          Five (5) years' imprisonment

Counts #: 11

  Obstruction of Justice

   18 U.S.C. § 1505

**\*Max. Penalty:**          Five (5) years' imprisonment

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name**: MOHAMED HESHAM YOUSSEF, a/k/a "Abu Turab"

**Case No**: 04-60001-CR-COOKE (s)(s)(s)(s)

Count #: 1

  Conspiracy to Provide Material Support to Terrorists

  18 U.S.C. § 2339A and 371

**\* Max.Penalty**:      Fifteen (15) years'  imprisonment

Count #: 2

  Providing Material Support to Terrorists

  18 U.S.C. § 2339A

**\*Max. Penalty**:      Fifteen (15)  years' imprisonment

Counts #: 3

  Conspiracy to Murder, Kidnap and Maim individuals in a Foreign Country

  18 U.S.C. § 956

**\*Max. Penalty**:      Life imprisonment

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name**: KIFAH WAEL JAYYOUSI

**Case No**: 04-60001-CR-COOKE (s)(s)(s)(s)

Count #: 1

Conspiracy to Provide Material Support to Terrorists

18 U.S.C. § 2339A and 371

**\* Max.Penalty**:     Fifteen (15) years'  imprisonment

Count #: 2

Providing Material Support to Terrorists

18 U.S.C. § 2339A

**\*Max. Penalty:**     Fifteen (15)  years' imprisonment

Counts #: 3

Conspiracy to Murder, Kidnap and Maim individuals in a Foreign Country

18 U.S.C. § 956

**\*Max. Penalty:**     Life imprisonment

# United States District Court

**SEALED**

_____ **SOUTHERN** _____ **DISTRICT OF** _____ **FLORIDA** _____

UNITED STATES OF AMERICA

V.

KIFAH WAEL JAYYOUSI

## WARRANT FOR ARREST

**CASE NUMBER:** 04-3565 RLD

To: The United States Marshal
and any Authorized United States Officer

**YOU ARE HEREBY COMMANDED** to arrest _____ **KIFAH WAEL JAYYOUSI** _____

Name

and bring him or her forthwith to the nearest magistrate to answer a(n)

☐ Indictment  ☐ Information  ☒ Complaint  ☐ Order of Court  ☐ Violation Notice  ☐ Probation Violation Petition

**charging him or her with** (brief description of offense)

knowingly and willfully combine, conspire, confederate, and agree with others to provide material support (as defined in 18 U.S.C. § 2339 A (b)) and to conceal and disguise the nature, location, source, and ownership of material support and resources, knowing and intending that they be used in preparation for, and in carrying out, a violation of Title 18, United States Code, Section 956(a)(1); and did

knowingly and willfully combine, conspire, confederate, and agree with others to commit at any place outside the United States, acts constituting murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States, and did commit one or more acts within the jurisdiction of the United States.

in violation of Title _____ 18 _____ United States Code, Sections(s) 2339A, 956(a)(1), 371 and 2.

**ROBERT L. DUBÉ**
**UNITED STATES MAGISTRATE JUDGE**
_____
Name of Issuing officer

_____
Signature of Issuing Officer

**UNITED STATES MAGISTRATE JUDGE**
Title of Issuing Officer

**MIAMI, FLORIDA**
_____
Date and Location

Bail fixed at $_____ by _____

Name of Judicial officer

MIED (Rev. 1/04) Notice of Transfer Pursuant to Fed. R. Crim. P. 40

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

          Plaintiff,          CASE NO. 05-mj-80311

v.

                         MAGISTRATE JUDGE WHALEN

Kifah Wael Jayyousi,       *04-3565-Dube*

          Defendant(s).

_____/

## NOTICE OF TRANSFER PURSUANT TO RULE 40
## OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

TO: United States District Court
     301 N. Miami Avenue
     Miami, FL 33128

     Enclosed please find certified copies of the Order returning this case to your

Court pursuant to Fed. R. Crim. P. 40 and the docket sheet. The case record

is a combined paper and electronic file. View at PACER.MIED.USCOURTS.GOV

     Please acknowledge receipt of these documents by returning a time-stamped

copy of this Notice to:

               Clerk's Office
               United States District Court

### CERTIFICATION

     I hereby certify that this Notice was served on the parties and/or counsel of

record.

               DAVID J. WEAVER, CLERK OF COURT

Date:  April 1, 2005         By s/Nicole Hollier
                    Deputy Clerk

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

F I L E D

MAR 3 0 2005

CLERK'S OFFICE
DETROIT

UNITED STATES OF AMERICA,

Plaintiff,

v.

Kifah Wael Jayyousi,

Defendant.

_____/

**COMMITMENT TO ANOTHER DISTRICT**

CASE NO. **05 - 80311**
ORIGINATING NO. 04-3565RLD

The above-named defendant is charged on a Complaint charging a violation of Title 18, United States Code, Sections 2339A, 956, 371 and 2:  knowingly and willfully combine, conspire, confederate, and agree with others to provide material support and to conceal and disguise the nature, location, source and ownership of material support and resources;  knowingly and willfully combine, conspire, confederate, and agree with others to commit at any place outside the United States, acts constituting murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States and did commit one or more acts within the jurisdiction of the United States.

The defendant has been unable to obtain release under the Bail Reform Act of 1984.

**To the United States Marshal:**

You are hereby commanded to take custody of the above named defendant and to transport that defendant with a certified copy of this commitment forthwith to the district of offense as specified above and there deliver the defendant to the United States Marshal for that District or to some other officer authorized to receive the defendant, all proceedings required by Fed. R. Crim. Pro. 5(c)(3) having been completed.

_3/30/05_
Date

_____
United States District Magistrate Judge

| RETURN | | |
|---|---|---|
| THIS COMMITMENT WAS RECEIVED AND EXECUTED AS FOLLOWS | | |
| Date commitment order received | Place of Commitment | Date Defendant |
| Date | United States Marshal | (By) Deputy Marshal |

I hereby certify that the foregoing is a true copy of the original on file in this office.

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

_____
Deputy

CLOSED

# U.S. District Court
## Eastern District of Michigan (Detroit)
## CRIMINAL DOCKET FOR CASE #: 2:05-mj-80311-RSW-ALL
### Internal Use Only

Case title: USA v. Jayyousi

Other court case number: 04-3565RLD USDC - Southern District of Florida

Date Filed: 03/28/2005

---

Assigned to: Honorable R. Steven Whalen

**Defendant**

**Kifah Wael Jayyousi** (1)
*TERMINATED: 03/30/2005*

represented by **William W. Swor**
645 Griswold Street
Suite 3060
Detroit, MI 48226
313-967-0200
Email: wwswor@wwnet.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Pending Counts**

None

**Highest Offense Level (Opening)**

None

**Terminated Counts**

None

**Highest Offense Level (Terminated)**

**Disposition**

**Disposition**



None

| Complaints | Disposition |
|---|---|
| REMOVAL PETITION FROM THE SOUTHERN DISTRICT OF FLORIDA | COMMITMENT OF DEFENDANT TO THE SOUTHERN DISTRICT OF FLORIDA |

**Plaintiff**

**USA**                                          represented by **Bruce C. Judge**
United States Attorney's Office
211 W. Fort Street
Suite 2001
Detroit, MI 48226-3211
313-226-9100
Fax: 313-226-9122
Email: bruce.judge@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: U.S. Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/28/2005 | 1 | PETITION by Bruce C. Judge for removal hearing as to Kifah Wael Jayyousi (1). (EBut, ) (Entered: 03/28/2005) |
| 03/28/2005 |  | Minute Entry for proceedings held before Honorable R. Steven Whalen : Initial Appearance in Rule 5(c)(3)/Rule 40 Proceedings as to Kifah Wael Jayyousi held on 3/28/2005. Detention Hearing set for 3/30/2005 01:00 PM. Removal Hearing set for 3/30/2005 01:00 PM. (Tape #: RSW 3/28/05) (Defendant Attorney: to retain John Posner) (AUSA: Bruce Judge) (EBut, ) (Entered: 03/28/2005) |
| 03/28/2005 | 2 | ORDER OF TEMPORARY DETENTION as to Kifah Wael Jayyousi. Signed by Honorable R. Steven Whalen. (DPer, ) (Entered: 03/29/2005) |
| 03/30/2005 |  | Minute Entry as top Kifah Jayyousi for proceedings held before Honorable R. Steven Whalen : Removal Hearing waived on 3/30/2005. (Tape #: RSW 3/30/05) (Defendant Attorney: William Swor) (AUSA: Russell Killinger) (SJef, ) |

| | | (Entered: 03/31/2005) |
|---|---|---|
| 03/30/2005 | ● | Minute Entry for proceedings held before Honorable R. Steven Whalen : Detention Hearing as to Kifah Wael Jayyousi held on 3/30/2005. Disposition: bond denied (Tape #: RSW 3/30/05) (Defendant Attorney: William Swor) (AUSA: Russell Killinger) (SJef, ) (Entered: 03/31/2005) |
| 03/30/2005 | ●3 | ATTORNEY APPEARANCE: William W. Swor appearing for Kifah Wael Jayyousi. (NHoll, ) (Entered: 04/01/2005) |
| 03/30/2005 | ●4 | ORDER OF DETENTION PENDING TRIAL as to Kifah Wael Jayyousi Signed by Honorable R. Steven Whalen. (NHoll, ) (Entered: 04/01/2005) |
| 03/30/2005 | ●5 | WAIVER of Rule 32.1 Hearings by Kifah Wael Jayyousi (NHoll, ) (Entered: 04/01/2005) |
| 03/30/2005 | ●6 | COMMITMENT TO ANOTHER DISTRICT Defendant committed to District of USDC - Southern District of Florida. Signed by Honorable R. Steven Whalen. (NHoll, ) (Entered: 04/01/2005) |
| 03/31/2005 | ●7 | MEMORANDUM regarding Jurisdiction to Review Magistrate's Detention Order by Kifah Wael Jayyousi. (NHoll, ) (Entered: 04/01/2005) |
| 03/31/2005 | ●8 | JURISDICTIONAL MEMORANDUM of Law by USA as to Kifah Wael Jayyousi. (NHoll, ) (Entered: 04/01/2005) |
| 03/31/2005 | ●9 | ORDER Directing Transfer of Defendant by 4/4/2005 as to Kifah Wael Jayyousi. Signed by Honorable Arthur J Tarnow. (NHoll, ) (Entered: 04/01/2005) |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. _____ 0 4- 3 5 6 5 - Duke

UNITED STATES OF AMERICA

v.

__Kifah Wael JAYYOUSI_____



FILED by _____ D.C.
MAG. SEC.

APR - 6 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.   MIAMI

## WAIVER OF PRELIMINARY EXAMINATION

The defendant, having been advised of his right to a preliminary hearing or examination as to probable cause, and the defendant, having refused and waived a preliminary examination,

The defendant now signs this **Waiver of Preliminary Examination** through 4/19/05 _____.

DATED: __4/5/05_____         _____

                                        Defendant

## MAGISTRATE JUDGE'S CERTIFICATE

The United States Magistrate Judge certifies that the defendant, after being advised of his right to a preliminary examination, stated he refused and waived such preliminary examination and signed the foregoing Waiver of Preliminary Examination.

**IT IS ORDERED** that a preliminary examination in the above-entitled matter is waived through April 19, 2005.

DATED: __4/6/05_____   at   Miami, Florida____

                                _____
                                **PATRICK A. WHITE**
                                UNITED STATES MAGISTRATE JUDGE

TAPE NO. 05B- 12-1611

c: AUSA
   Defense Counsel
   Pretrial Services
   U.S. Marshal

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FILED by _____ D.C.
MAG. SEC.

**APR 6 - 2005**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.   MIAMI

CASE NO. __04-3565-DUBE'_____

UNITED STATES OF AMERICA,

vs.                                    **ORDER ON HEARING TO**

KIFAH WAEL JAYYOUSI,_____          **REPORT RE COUNSEL**

     The above named defendant having appeared before the Court as
ordered and reported efforts to retain counsel, it is thereupon

ORDERED as follows:

_____ Private counsel_____
          appeared in open court and is noted as permanent
          counsel of record.

_____ The defendant requested Court appointed counsel, was
          found eligible, and counsel will be appointed by
          separate order.

_____ The defendant requested Court appointed counsel but
          was found ineligible, and shall appear before the
          Court on _____
          at 10:00 a.m. to report regarding his/her further
          efforts to retain counsel, unless counsel notices a
          permanent appearance before that date.

___✓_____ The defendant requested further time to retain
          counsel and shall appear before the Court on
          _April 19, 2005_____ at 10:00 a.m. to report
          regarding his/her further efforts to retain counsel,
          unless counsel notices a permanent appearance before
          that date.

     **DONE AND ORDERED** at Miami, Florida this _6_ day of _APRIL_
2005.

TAPE 05B-_12-1611_

                              _____
                              PATRICK A. WHITE
                              **UNITED STATES MAGISTRATE JUDGE**

c. Defense Counsel
   Pretrial Services
   U.S. Marshal
   AUSA



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES of AMERICA,

V.

Case Number 04-3565 – Dube

KIFAH WAEL JAYYOUSI,

FILED by ____ D.C.
MAG. SEC.

APR - 6 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.   MIAMI

_____ /

### TEMPORARY APPEARANCE

Please enter my Temporary Appearance on behalf of KIFAH WAEL JAYYOUSI,

Defendant in the above entitled case.

Respectfully Submitted,

WILLIAM W. SWOR
Attorney for Kifah Jayyousi
3060 Penobscot Building
645 Griswold Street
Detroit, Michigan 48226
(313) 967-0200
(313) 961-4926 fax

Dated:  April 5, 2005

SCANNED





## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA
                    Plaintiff

CASE NUMBER: CR: _04 - 3565 RL-O_
(SEALED)

-vs-

REPORT COMMENCING CRIMINAL
ACTION

_JAYYOUSI, Kifah_
                    Defendant

_39551039_
USMS NUMBER

TO: CLERK'S OFFICE   (MIAMI)   FT. LAUDERDALE   W. PALM BEACH
U.S. DISTRICT COURT          (CIRCLE ONE)

NOTE: CIRCLE APPROPRIATE LOCATION FOR APPEARNACE IN MAGISTRATES COURT ABOVE.

COMPLETE ALL ITEMS.  INFORMAION NOT APPLIOCABLE ENTER  N/A.

(1) DATE AND TIME OF ARREST: _4/4/05 signatureairline P/4_ A M _____ P M _____

(2) LANGUAGE SPOKEN: _ENG_

(3) OFFENSE (S) CHARGED: _Consp to commit murder_

(4) DATE OF BIRTH: _12/18/61_

(5) TYPE OF CHARGING DOCUMENT:      (CHECK ONE)
    {   } INDICTMENT      {   } COMPLAINT TO BE FILED/ALREADY FILED
    {   } BENCH WARRANT FOR FAILURE TO APPEAR
    {   } PROBATION VIOLATION WARRANT
    {   } PAROLE VIOLATION WARRANT
    ORINGINATING DISTRICT: _____

(6) REMARKS: _____

(7) DATE : _4/4/05_____ ( 8) ARRESTING OFFICER: _____

(9) AGENCY: _USMS_____ (10) PHONE: _305 536 5677_

(11)COMMENTS: _____

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.   04-3565-DUBE' (SEALED)

UNITED STATES OF AMERICA

        Plaintiff,

v.

**KIFAH WAEL JAYYOUSI**

**DOB:**12/18/61   (J)39551-039

        Defendant.

_____/

FILED by ____ D.C.
MAG. SEC.
APR 0 4 2005
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

### ORDER ON INITIAL APPEARANCE

AUSA___, __ _____     Language _ENGLISH_____
Agent _USMS_____     Tape No. 05B-_9 - 2572  & 05B-9-3162_

      The above-named defendant having been arrested on _04/04/05_____ having appeared before the court for initial appearance **on** _____**04/04/05**_____and proceedings having been held in accordance with **Fed.R.Cr.P.  r. 5 or 40(a)**, it is thereupon
      **ORDERED** as follows:
1. _____ appeared as permanent/temporary counsel of record.
      Address:_____
      Zip Code: _____ Telephone: _____
2. _____ appointed as permanent counsel of record.
      Address: _____
      Zip Code: _____ Telephone: _____
3. The defendant shall attempt to retain counsel and shall appear before the court at 10:00 a.m. on
_____ _4/6_ _____, 2005.
4. Arraignment/Preliminary/~~Removal/Identity~~ hearing is set for _10am_   _4/18_____, 2005.
5. The defendant is held in temporary pretrial detention pursuant to 18 U.S.C. Section 3142 (d) or (f)
      because _Detention hrng held in Detroit. Dft was Ordered PTD_.
      A detention hearing, pursuant to 18 U.S.C. Section 3142(f), is set for _10am_____, 2005.
6. The defendant shall be released from custody upon the posting of the following type of appearance bond,
      pursuant to 18 U.S.C. Section 3142:

_____
_____

      This bond shall contain the standard conditions of bond printed in the bond form of this Court and, in addition, the defendant must comply with the special conditions checked below:
___a. Surrender all passports and travel document to the Pretrial Services Office.
___b. Report to Pretrial Services as follows:___times a week by phone, ___time a week in person;
      other: _____
___c. Submit to random urine testing by Pretrial Services for the use of non-physician-prescribed substances prohibited by law.

## KIFAH WAEL JAYYOUSI

___d. Maintain or actively seek full time gainful employment.

___e. Maintain or begin an educational program.

___f. Avoid all contact with victims of or witnesses to the crimes charged.

___g. Refrain from possessing a firearm, destructive device or other dangerous weapon.

___h. Comply with the following curfew: _____

___ _i. Avoid all commercial transportation facilities; no airports, no marinas, no bus terminals.

___j. Comply with the following additional special conditions of this bond:

_____

_____

   This bond was set: At Arrest _____

               On Warrant _____

               After Hearing _____

   If bond is changed from that set in another District, the reason pursuant to Rule 40(f) is _____

_____

_____

_____

_____ If this space is checked, an evidentiary hearing pursuant to United States v. Nebbia, 357, F.2d 303 (2 Cir. 1966) shall be held prior to the posting of the bond.  Such hearing shall be scheduled promptly upon notification to the court that the defendant is ready to post bond.

7. The defendant has been advised by the court that if he or she is released on bond pursuant to the conditions set forth herein or those later ordered by the court, the defendant is subject to arrest and revocation of release  and to various civil and criminal sanctions for any violation of those conditions. These various sanctions and penalties are set forth more fully in the Appearance Bond itself.

8. The defendant is committed to the custody of the United States Marshal until an appearance bond has been executed in accordance with this or subsequent court order.

     **DONE AND ORDERED** at Miami,  Florida_ this _4TH___ day of _APRIL___, 2005.

                              PATRICK A. WHITE

                         **UNITED STATES MAGISTRATE JUDGE**

c: Assistant U.S. Attorney

   Defense  Counsel

   **Pretrial Services**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  04-3565-DUBE'
                              (SEALED)

UNITED STATES OF AMERICA,

vs.

KIFAH WAEL JAYYOUSI

FILED by ___ D.C.
MAG. SEC.
APR 0 4 2005
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D OF FLA. MIAMI

_____

   This cause came before the Court and pursuant to proceedings
held, it is thereupon

   **ORDERED AND ADJUDGED** as follows: PURSUANT TO THE ARREST OF
THE ABOVE NAMED DEFENDANT, THIS CASE IS HEREBY UNSEALED.

   **DONE AND ORDERED** at Miami, Florida this _____4TH_____ day of
_____APRIL_____, 20_05_____ .

TAPE NO:05B-9-2575
        05B-9-3162

                              _____
                              **UNITED STATES MAGISTRATE JUDGE**
                              PATRICK A. WHITE

c: AUSA
   Defense Counsel
   Pretrial Services

AO 442 (Rev. 12/85) Warrant for Arrest

# United States District Court

**SOUTHERN** _____ **DISTRICT OF** _____ **FLORIDA** _____

UNITED STATES OF AMERICA

## WARRANT FOR ARREST

V.

CASE NUMBER: 04-3565 RLD

**KASSEM DAHER**

To: The United States Marshal
   and any Authorized United States Officer

> FILED by _____ D.C.
> M/G. SEC.
>
> CL____ E. ____DDOX
> CLERK U.S. DIST. CT.
> S.D. OF FLA.   MIAMI

**YOU ARE HEREBY COMMANDED** to arrest _____ **KASSEM DAHER** _____

Name

and bring him or her forthwith to the nearest magistrate to answer a(n)

☐ Indictment  ☐ Information  ☒ Complaint  ☐ Order of Court  ☐ Violation Notice  ☐ Probation Violation Petition

charging him or her with (brief description of offense)

knowingly and willfully combine, conspire, confederate, and agree with others to provide material support (as defined in 18 U.S.C. § 2339 A (b)) and to conceal and disguise the nature, location, source, and ownership of material support and resources, knowing and intending that they be used in preparation for, and in carrying out, a violation of Title 18, United States Code, Section 956(a)(1); and did

knowingly and willfully combine, conspire, confederate, and agree with others to commit at any place outside the United States, acts constituting murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States, and did commit one or more acts within the jurisdiction of the United States.

in violation of Title _____ **18** _____ United States Code, Sections(s) **2339A, 956(a)(1), 371 and 2** _____

ROBERT L. DUBÉ
UNITED STATES MAGISTRATE JUDGE

Name of Issuing officer

**UNITED STATES MAGISTRATE JUDGE**

Title of Issuing Officer

_____
Signature of Issuing Officer

**MIAMI, FLORIDA**

Date and Location

Bail fixed at $ _____   by _____

Name of Judicial officer

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### BOND RECOMMENDATION

DEFENDANT: **KASSEM DAHER**

Pretrial Detention

(Surety) (Recognizance) (Corp. Surety) (Cash) (Jail)
(CSB) (No Bond) (Warrant) (Summons) (Marshal's Custody)

By: _RUSSELL KILLINGER_

**RUSSELL KILLINGER**
**ASSISTANT UNITED STATES ATTORNEY**

Last Known Address: Le Duc, Canada

What Facility:

Agent(s): FBI (Miami Field Office) 16320 N.W. 2nd Ave., Miami, FL

Special Agent John Kavanaugh, Jr.

(FBI) (SECRET SERVICE) (DEA) (IRS) (CUSTOMS) (**OTHER**)

# United States District Court

__SOUTHERN__ DISTRICT OF __FLORIDA__

UNITED STATES OF AMERICA

v.

KIFAH WAEL JAYYOUSI

## WARRANT FOR ARREST

CASE NUMBER: 04-3565RLD

To: The United States Marshal
and any Authorized United States Officer

FILED by _____ U.C.
MAB. SEC.

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. FLA. MIAMI

YOU ARE HEREBY COMMANDED to arrest ____ KIFAH WAEL JAYYOUSI

Name

and bring him or her forthwith to the nearest magistrate to answer a(n)

☐ Indictment   ☐ Information   ☒ Complaint   ☐ Order of Court   ☐ Violation Notice   ☐ Probation Violation Petition

charging him or her with (brief description of offense)

knowingly and willfully combine, conspire, confederate, and agree with others to provide material support (as defined in 18 U.S.C. § 2339 A (b)) and to conceal and disguise the nature, location, source, and ownership of material support and resources, knowing and intending that they be used in preparation for, and in carrying out, a violation of Title 18, United States Code, Section 956(a)(1); and did

knowingly and willfully combine, conspire, confederate, and agree with others to commit at any place outside the United States, acts constituting murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States, and did commit one or more acts within the jurisdiction of the United States.

in violation of Title ____ 18 ____ United States Code, Sections(s) 2339A, 956(a)(1), 371 and 2.

ROBERT L. DUBÉ
UNITED STATES MAGISTRATE JUDGE
Name of Issuing officer

UNITED STATES MAGISTRATE JUDGE
Title of Issuing Officer

Signature of Issuing Officer

MIAMI, FLORIDA
Date and Location

Bail fixed at $ _____ by _____

Name of Judicial officer

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### BOND RECOMMENDATION

DEFENDANT: **KIFAH WAEL JAYYOUSI**

Pretrial Detention

(Surety) (Recognizance) (Corp. Surety) (Cash) (Jail)
(CSB) (No Bond) (Warrant) (Summons) (Marshal's Custody)

By: *Russell R. Killinger*

**RUSSELL KILLINGER**
**ASSISTANT UNITED STATES ATTORNEY**

Last Known Address: Detroit, Michigan

What Facility:

Agent(s): FBI (Miami Field Office) 16320 N.W. 2nd Ave., Miami, FL

Special Agent John Kavanaugh, Jr.

(FBI) (SECRET SERVICE) (DEA) (IRS) (CUSTOMS) (**OTHER**)

AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

_____ SOUTHERN _____ DISTRICT OF _____ FLORIDA _____

UNITED STATES OF AMERICA

V.

KIFAH WAEL JAYYOUSI
KASSEM DAHER

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

CASE NUMBER: 04-3565 RLD

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.  From in or about 1994 and continuing through in or about 2002, in Broward County, in the  Southern District of Florida and elsewhere, the defendants Kifah Wael Jayyousi and Kassem Daher did:

knowingly and willfully combine, conspire, confederate, and agree with others to provide material support (as defined in 18 U.S.C. § 2339 A (b)) and to conceal and disguise the nature, location, source, and ownership of material support and resources, knowing and intending that they be used in preparation for, and in carrying out, a violation of Title 18, United states Code, Section 956(a)(1); and did

knowingly and willfully combine, conspire, confederate, and agree with others to commit at any place outside the United States, acts constituting murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States, and did commit one or more acts within the jurisdiction of the United States

in violation of Title 18_ United States Code, Sections 2339A , 956, 371 and 2 .

I further state that I am a  Special Agent of the Federal Bureau of Investigation, and that this complaint is based
                                               Official  Title
on the following facts:

(SEE ATTACHED AFFIDAVIT.)

FILED BY _____ D.C.
M/G. SEC.

CLA___ ___DDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.   MIAMI

Continued on the attached and made a part hereof:       ☒ Yes   ☐ No

_John T. Kavanagh, Jr._
John T. Kavanuagh, Jr., Special Agent
Federal Bureau Of Investigation

Sworn to before me, and subscribed in my presence,

_____ at
Date   ROBERT L. DUBÉ
       UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

Miami-Dade County, Florida
City and State

_____
Signature of Judicial Officer

## AFFIDAVIT

I, Special Agent John T. Kavanaugh, Jr.,  Federal Bureau of Investigation, being first duly sworn, do hereby depose and state as follows:

## I.  INTRODUCTION

1.  I am a Special Agent with the Federal Bureau of Investigation (hereinafter "FBI") currently assigned to the Joint Terrorism Task Force (JTTF) for the Southern District of Florida since February 2002.  I have been employed by the FBI for approximately five and one-half (5½) years. My duties and responsibilities as a member of the JTTF include the investigation of terrorism, terrorist organizations and the material support of terrorist organizations.  I make this affidavit in support of a criminal complaint charging KIFAH WAEL JAYYOUSI a/k/a Abu Mohamed (hereafter "JAYYOUSI") and KASSEM DAHER a/k/a Abu Zurr (hereafter DAHER) with providing and conspiring to provide material support and resources and concealing and disguising the nature, location, source and ownership of the material support and resources knowing and intending that they were to be used in preparation for and in carrying out a violation of Title, 18 U.S.C. § 956(a)(1), that is, a conspiracy to kill, kidnap, maim and injure persons in a foreign country, and for conspiring and aiding and abetting a conspiracy to kill, kidnap, maim and injure persons in a foreign country; all in violation of Title 18, U.S.C. §§ 2339A(a), 956(a)(1), 371 and 2.  This affidavit is submitted for the limited purpose of establishing probable cause, and therefore does not set forth all the facts of the investigation known to me.  This affidavit is based upon my own personal knowledge, facts related to me by other law enforcement officers and government officials, as well as other information obtained through research during the course of this investigation.  A significant amount of information has been derived from court-authorized electronic surveillance.

1

## II. **HISTORICAL BACKGROUND OF INVESTIGATION**

2. The conspiracy described below is rooted in the wider Salafist violent jihad movement. In the late 1980's, a loose, transnational network of radical Islamists launched a holy war to drive American military forces from the Arabian peninsula, erode American support of Israel, undermine American support of regimes in the Middle East that were viewed as insufficiently Islamic, and participate in armed confrontations around the world to establish Islamic states under Sharia, meaning strict Islamic law, as ordained by the Caliph, the name of the successor to the Prophet Mohammad and supreme Islamic ruler.

3. This network was heavily influenced by Islamic religious fundamentalism, which sought to establish a pure Islamic state and regarded modern Western civilization as a symbol of evil, spreading idolatry and secularism. Groups espousing this radical Islamic fundamentalism include the Islamic Group, a/k/a "Gama'a al-Islamiya," a/k/a "IG;" Egyptian Islamic Jihad, a/k/a "Islamic Jihad," a/k/a "al-Jihad," a/k/a "EIJ;" and al Qaeda, which oppose countries, governments, institutions, and individuals that do not share their view of Islam. These groups consider their enemies to be infidels, and embrace the concept of violent jihad, or holy war, as a means to oppose the infidels by force and violence. Members of these Muslim extremist groups have taken credit for many international terrorists acts, including the 1981 assassination of Egyptian President Anwar Sadat; the 1997 massacre of more than fifty foreign tourists at Luxor, Egypt; and the 1995 attempted assassination of Egyptian President Hosni Mubarak in Ethiopia.

4. Many ideological advocates of violent jihad sought refuge in various Western democratic countries. Relevant to this investigation are Sheikh Rahman (the spiritual leader of IG), Sheikh Talaat Fouad Qassem, a/k/a Abu Talal al-Qasimy (IG leader until his disappearance in 1995), Sheikh

2

Anwar Shaaban (director of the Islamic Cultural Institute in Milan Italy, active supporter of IG and spiritual leader of the Arab mujahideen in Bosnia until his death in 1995) and Sheikh Shawqi Mohammed (IG leader in Vienna, Austria). In July 1993, Sheikh Rahman was arrested, indicted, and later convicted for his participation in a failed plot to bomb a series of New York City landmarks and soliciting the murder of Egyptian President Hosni Mubarak.

5. By the time of Sheikh Rahman's arrest, a number of followers and supporters of Sheikh Rahman had established a North American support network (U.S. and Canada) that supplied money, financial services (fundraisers), personnel (fighters), transportation, false documentation or identification, training, communications equipment, and other physical assets to military components of the Salafist violent jihad movements in Afghanistan, Bosnia, Chechnya, Eritrea, and Somalia, among others.

6. In addition to the extremist spiritual leaders described above, the Salafist violent jihad movement was led by a number of military commanders on the ground, including Abdelkader Mokhtari, a/k/a Abu al-Ma'ali, the Algerian-born military commander (Emir) of the foreign mujahideen in Bosnia; Shamil Basayev, the military commander of the Chechen rebels; Samir Saleh Abdullah Al-Suwailem, a/k/a Ibn Omar al-Khattab (Khattab), the Saudi-born military commander of the Majlis al-Shura of the Mujahideen of Chechnya and Dagestan until his death in 2002; and Fathi Mohamed Habib, a/k/a Sheikh Fathi Shishani (Sheikh Fathi), a leader in the *Jama'at Islami* and preacher of violent jihad in Chechnya. Sheikh Fathi was also a major conduit for providing material support to the Chechen rebels. Sheikh Fathi died of natural causes in Chechnya in 1997.

3

### III. THE JAYYOUSI, DAHER, HASSOUN NORTH AMERICAN SUPPORT NETWORK

7.   The investigation of JAYYOUSI, DAHER and Adham Amin Hassoun (Hassoun) began in late 1993 and revealed that they had formed a network across North America to fundraise for and recruit mujahideen to train and fight in various jihad areas including but not limited to Bosnia, Kosovo, Chechnya, and Somalia.[1]  An early focus of this investigation was Mohamed Zaky (Zaky), a San Diego based supporter and follower of Sheikh Rahman.  Zaky founded and operated two non-government, not-for-profit organizations (Save Bosnia Now and the Islamic Information Center of the Americas), which he used as a cover to facilitate his violent jihad activities.  In 1995, Zaky changed the name of Save Bosnia Now (SBN) to American Worldwide Relief (AWR) in order to facilitate his expanded support for violent jihad worldwide.  SBN (and later AWR) maintained offices in La Jolla, California; Travnik, Bosnia; Sarajevo, Bosnia; Freiburg, Germany; and Zagreb, Croatia.  In the United States, Zaky, JAYYOUSI, DAHER, and Hassoun would use the cover of these ostensibly charitable organizations to raise money and recruits for violent jihad. The overseas offices served as safe-houses for individuals on route to fight violent jihad.  Zaky fought with the Arab mujahideen in Afghanistan in the 1980's.

8.   Zaky also participated in fighting with Bosnian Muslims on two occasions between 1993 and 1994. He specialized in making videotapes of the fighting which he then used as part of his fundraising activities in the United States to support violent jihad.  In May 1995, Zaky was killed

_____

[1]

Adham Amin Hassoun (Hassoun) a/k/a Abu Sayyaf has been in U.S. custody since June 12, 2002. He was ordered removed from the United States, and on October 7, 2004, was indicted by a federal grand jury in the Southern District of Florida (04-60001-Cr-Cooke(s)(s)(s)) for conspiracy to provide and providing material support to terrorists and conspiracy and aiding and abetting a conspiracy to kill, kidnap, and maim persons in foreign countries, in violation of Title 18, U.S.C. §§ 2339A(a), 956(a)(1), 371 and 2.  Hassoun is more fully described in paragraph 19.

4

while fighting against the Russians in Chechnya.

9. JAYYOUSI is a Jordanian national and naturalized American citizen. He was a close associate of Zaky and a supporter and follower of Sheikh Rahman. Shortly after the arrest of Sheikh Rahman, JAYYOUSI founded the American Islamic Group (AIG). AIG, through JAYYOUSI, published a newsletter, the Islam Report, in which he promoted violent jihad and reported on developments in the prosecution of Sheikh Rahman, which he editorialized as the case of the U.S. v. Islam. The Islam Report was published at least as early as April 1994 and continued through as late as July 1996. Similar to SBN and AWR, AIG touted itself as a "non-profit, religious service institution primarily established to protect the rights of Muslims and to provide economic, humanitarian, educational assistance to the needy." It described the purpose of its monthly publication, Islam Report, as "a humanitarian Islamic organization aim[ed] to expose and analyze threats against Islam and Muslims Worldwide." Islam Report, Vol. II, Issue 8, December 1994. In reality, the main purpose of AIG and the Islam Report was to recruit fighters and solicit money to support the Salafist violent jihad movement. JAYYOUSI described AIG as "the voice of the mujahideen." He also used the Islam Report to disseminate accomplishments of mujahideen in various "theatres of jihad" describing in graphic detail murders, executions and massacres committed by them.

10. JAYYOUSI was active in fundraising for violent jihad on behalf of SBN and AWR, and after Zaky's death took over the operation of AWR. JAYYOUSI used the Islam Report to solicit funds to support violent jihad by advertising AIG, SBN, and AWR. JAYYOUSI published, "Victory for mujahideen will only come from the Almighty, however every Muslim must do his part in support of Islam, in support of Mujahideen Families, in support of Martyrs Families, and in support

5

of Muslim prisoners, torture victims and Scholars." <u>Islam Report</u>,Vol. II, Issue 8, December 1994. AIG'S calls for monetary support for violent jihad were published worldwide over the internet at <u>islam@powergrid.electriciti.com.</u>   Also in the same <u>Islam Report</u> above, JAYYOUSI described Mahmud Abouhalima, one of several coconspirators convicted for bombing the World Trade Center in 1993, as "A Good Citizen and a Muslim Hero."   From 1994 through late 1995, JAYYOUSI also had direct telephone conversations with Sheikh Rahman from prison.[2]  JAYYOUSI would update the Sheikh with jihad news, many times reading accounts and statements issued directly by terrorist organizations such as IG in Egypt and the Armed Islamic Group (GIA) in Algeria.

11.   During one call on February 5, 1995, in which JAYYOUSI and DAHER both participated, DAHER connected Sheikh Rahman to speak to Sheikh Shawqi Mohammed in Vienna, Austria.  During their conversation Sheikh Shawqi asked Sheikh Rahman if he would like to convey anything to Abu Talal (Talaat Fouad Qassem, an IG leader in Europe).  Sheikh Rahman replied, "May Allah facilitate your affairs."   JAYYOUSI was always very deferential to Sheikh Rahman during these conversations and consistently pledged his eternal support for him.

12. During the course of this investigation JAYYOUSI resided in San Diego, California; Los Angeles, California; Detroit, Michigan; and Baltimore, Maryland.  JAYYOUSI moved to Egypt in 2003.

13. DAHER is a Lebanese national with Canadian residency status.  DAHER was also a close associate of Zaky, JAYYOUSI, and Hassoun, as well as a supporter and follower of Sheikh Rahman.  During the times relevant to this investigation, DAHER resided in Le Duc, Canada.

---

[2]

Unless otherwise noted, all references to conversations or discussions are court authorized electronic intercepts.

DAHER also assisted in distributing the Islam Report.

14.    In a March 31, 1994 conversation between DAHER and JAYYOUSI, DAHER instructed JAYYOUSI not to send the Islam Report to the brothers in Austria since he was a regular "customer" with them. DAHER further advised JAYYOUSI to leave Europe to him as he (DAHER) had been in touch with the brothers in Europe for the past two years.  Subsequent conversations revealed that DAHER was closely connected to IG leadership in Europe (Sheikh Talaat Qassem in Denmark and Sheikh Shawqi Mohammed in Austria).

15.   On or about February 5, 1995, DAHER traveled to San Diego where he stayed with JAYYOUSI.   While there, DAHER, JAYYOUSI and Zaky discussed many aspects of their respective participation in the Salafist violent jihad movement.   DAHER informed Zaky and JAYYOUSI that he had stayed at Sheikh Abu Talal's house in Denmark.  Zaky told DAHER that when he was in Bosnia, Abu Al Harith (the first Emir or leader of the Arab mujahideen in Bosnia) wanted him "to go to Indonesia to see the brothers ... who wanted to go do jihad in Bosnia."  Zaky and DAHER discussed the fighting then going on in Chechnya and agreed that Chechnya "comes first."  Zaky told DAHER that he still wanted to go to Indonesia and Malaysia and "if there are a lot of people who want to go, we will try to direct them to Chechnya."  DAHER told Zaky that he had been to Dagestan to "study the situation."  Both men then discussed the problem of funding and how many mujahideen, including themselves, have to return from fighting jihad to take care of their families.  DAHER told Zaky "we have brothers in Lebanon who are ready to go to Chechnya but there's no money."  DAHER told Zaky that they needed someone they could trust in Azerbaijan and Dagestan to be in charge.  Zaky told DAHER that if "we were in Bosnia or any other place in Europe, one will have some freedom, then the jihad front line which exists in Europe will be made

7

between Bosnia and the Chechens and then Chechnya will expand, Dagestan will join, and that will open up, God willing."

16.   In the same February 5, 1995 conversation, DAHER told Zaky, "most of what was written about the Chechens comes to us from London now."   DAHER told Zaky that "we send everything to brother Kifah here."   Zaky informed DAHER he knows a brother that represents the brothers in Eritrea and another brother who represents Ogaden in a movement in Somalia.   DAHER explained to Zaky that he gets Al Ansar from Algeria, the Al Murabitoun from Egypt, and the Al Mujahideen from the group of the Jihad in Egypt.   Your affiant knows that the Al Ansar, Al Murabitoun and Al Mujahideen publications served as media outlets for communiques issued by the terrorist groups the Armed Islamic Group (GIA) in Algeria; The Islamic Group (IG) in Egypt; and the Egyptian Islamic Al Jihad Group in Egypt, respectively.   DAHER told Zaky that, we are in charge of it in Canada.   Zaky replied, "I know. He told me ... I was talking to Shawqi when I went this year ... he told me that you're in charge to send you everything. He told me that it would be better if you send me these things."   Later in the conversation, DAHER told Zaky and JAYYOUSI, "We know all the leaders of the Islamic Group in Egypt ...the Islamic Group in Algiers ... everyone. I mean, the majority I mean, we don't have, I mean, that's it, we (UI) we help everyone."   Zaky responded, "Thank God. That is what we want."   DAHER then stated, "as long as there is slaughtering, we're with them. If there's no slaughtering, there's none ... that's it, buzz off." DAHER then told Zaky and JAYYOUSI he was going to publish a booklet titled Terrorism Is A Duty and Force Is An Obligation and have it distributed to the whole world.   In referencing this booklet, DAHER mentioned "this is the first Murabitoun issue."   Your affiant knows that during the investigation into the World Trade Center bombing in 1993, searches of two of the participant's

8

property (Ahmad Ajaj and Mahmud Abouhalima) revealed that they possessed this same article that was published in Al Murabitoun.

17. DAHER and JAYYOUSI also discussed setting up a for-profit business in order to fund jihad. DAHER stated, "Uh ... this business ... the profit generated from this business will be for the brothers, I mean we have to support the mujahideen brothers, I mean." JAYYOUSI agreed.   In discussing their current situation, Zaky told DAHER and JAYYOUSI that he wanted to "make an amendment to it (referring to changing the name of his organization SBN to AWR), because we did it for Bosnia, so it was meant for a specific objective." DAHER then mentioned his organization, the Canadian Islamic Association, which he described as a "cover, I mean it's very good." In a later conversation on April 1, 1995, with a new representative for AWR in New Jersey, Zaky described one of his organizations, the "Islamic Information Center Of The Americas," as a "covering ... because they are tightening it on us, especially the fundraising story and all these things."

18. In May 1998, DAHER departed Canada for Lebanon where he remains today.[3]

19. Adham Amin Hassoun a/k/a Abu Sayyaf (Hassoun) is a Palestinian national born in Lebanon. He came to the U.S. in 1989. At all times material to this investigation, Hassoun worked and resided in Broward County, Florida within the Southern District of Florida. Hassoun was a close associate of Zaky, JAYYOUSI, and DAHER. Hassoun was the East Coast representative of AIG

_____

[3]

    Effective October 26, 2001, pursuant to §§ 808 and 809 of the PATRIOT ACT, the statute of limitations for violations of 18 U.S.C. §§ 2339A and 956(a)(1) was extended from five years to eight years. Section 808 expanded the definition of a federal crime to terrorism found at §2332(b)(g)(5)(B) to include §956(a)(1), and § 809 extended the statute of limitations to 8 years for any federal crime of terrorism listed in §2332(b)(g)(5)(B) . Section 809 further states that the amendments made by this sections shall apply to the prosecution of any offense committed before, on, or after the date of the enactment of this section.

and AWR and assisted JAYYOUSI in distributing the <u>Islam Report</u> in South Florida. Zaky, JAYYOUSI, DAHER and Hassoun communicated frequently and coordinated their violent jihad activities from their respective geographical locals. Hassoun has been in U.S. custody since June 12, 2002. He has been ordered removed from the United States, and on October 5, 2004, was indicted by a federal grand jury in the Southern District of Florida (04-60001-Cr-Cooke(s)(s)(s)) for conspiracy to provide and providing material support to terrorists and conspiracy and aiding and abetting a conspiracy to kill, kidnap, and maim persons in foreign countries, in violation of Title 18, U.S.C. §§ 2339A(a), 956(a)(1), 371 and 2.

20. A strong illustration of the triangulated support provided by JAYYOUSI, DAHER and Hassoun to the Salafist violent jihad movement is a three-way conversation among them on March 21, 1995. During the conversation, Hassoun stressed the importance of coordination when, as he stated, "we have a number of people active in the field." Hassoun then described their efforts: "All of us are in a chain, if one link of the chain is separated, the movement will not function." Hassoun then stated that this concept is particularly important in the field of "tourism." Your affiant knows from other conversations and witnesses that "tourism" is a code word utilized for violent jihad. All three also discussed the importance of maintaining contact with Zaky, who was preparing to travel to Chechnya to participate in violent jihad.

21. In a subsequent phone call between Zaky and DAHER on April 14, 1995, DAHER asked Zaky to make sure that he transmits to Hassoun all the information that he acquires abroad. DAHER explained to Zaky that it does not matter to whom the information is transmitted because they are all "one and the same."

22. Each member of this network also worked within their respective geographical location

to develop and nurture a close-knit cadre of violent jihad followers, several of whom actually traveled overseas to fight in Bosnia, Chechnya and Kosovo.  In or around 1995 through 1996, JAYYOUSI recruited and sent at least two individuals overseas in support of violent jihad.  One recruit, among other things, assisted him with providing at least two satellite phones to Chechen commanders.  One of the phones went to Sheikh Fathi.  Another recruit was an American convert to Islam who fought in both Bosnia and Chechnya.  After the U.S. invasion of Afghanistan in October 2001, the FBI obtained an application (Mujahideen Data Form) dated July 24, 2000, for one of Hassoun's jihad recruits (Ibrahim) for training at a camp in Afghanistan.  In a September 2000, telephone call between Hassoun and another of his jihad recruits who was in Egypt, the recruit told Hassoun "there is a way" and that "God willing, we will be there by Saturday or Thursday."  The recruit further described his destination as, "there by Usama ... Khattab's company."  When asked by Hassoun the whereabouts of Ibrahim, the caller stated, "Ibrahim is a little further south ... he is supposed to be there by Usama and then he could be able to go to Kh... little further north."  Based on the above your affiant believes that the recruit, Ibrahim, was attending a training camp in Afghanistan in preparation for fighting in Chechnya under Khattab and that the other recruit was preparing to travel to Chechnya to fight under Khattab's command.

## IV. <u>ADDITIONAL MATERIAL SUPPORT AND RESOURCES</u>[4]

23. In addition to the specific forms of material support described throughout this complaint,

---

[4]

As defined in 18 U.S.C. § 2339A(b) during the period at issue, material support and resources means currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.

the following acts are illustrative of the types of funds and assets that JAYYOUSI, DAHER, Hassoun provided or conspired to provide to the mujahideen in various violent jihad theatres overseas:

24. Between June 1994 and January 1997, Hassoun remitted checks totaling at least $19,000 to JAYYOUSI, DAHER, or alleged charitable organizations associated with JAYYOUSI and DAHER, which contained coded notations such as "Support for the person," "for tourism," "for brothers," and "for tourism and tourist." These checks were intended to assist and fund persons engaged in violent jihad. For example, on or about June 13, 1994, Hassoun sent a $1,000 check to JAYYOUSI with a memo "Support for the person." This money was intended as support for Zaky's family while he was participating in violent jihad in Bosnia. On or about January 28, 1995, JAYYOUSI stated that money donated would be used to purchase airline tickets for "brothers" traveling to Chechnya to do "jihad."

25. In 1995 through 1996, JAYYOUSI sought to procure and deliver a variety of communication devices (satellite phones, walkie- talkie radios, and a global position device) to the Chechen mujahideen. For example, in or around June 1995, JAYYOUSI instructed a representative of AWR in Baku, Azberbaijan to use $22,000 to purchase items needed for Sheikh Fathi's mujahideen. The same representative advised JAYYOUSI that the "head of the company on the inside" (one of the mujahideen commanders) needed a satellite phone. From mid-1995 through early 1996, JAYYOUSI and others procured and provided two satellite phones to Chechen mujahideen leaders. These phones were eventually identified and their signals cut off by the Russian government. On or about February 18, 1996, JAYYOUSI ordered two walkie-talkie radios to be sent to Chechnya. And, on or about February 26, 1996, a representative of AWR advised JAYYOUSI

12

that the GPS (global positioning system) would be on its way (to Chechnya) soon.

26. JAYYOUSI, DAHER, and Hassoun had ongoing discussions with each other and other people about the opportunities for jihad training and violent jihad in various regions of the world (including Afghanistan, Bosnia, Somalia and Chechnya) and their support for these violent jihad efforts. For example, on or about June 25, 1995, DAHER advised JAYYOUSI and Hassoun that a military training camp was being opened in Afghanistan for whoever wanted to train. On or about August 30, 1996, JAYYOUSI advised two individuals that a group of mujahideen that had been in Bosnia had fought a group of Ethiopians in Somalia during which ten mujahideen and ninety Ethiopians were killed. On or about September 1, 1996, Hassoun instructed an individual who was in Egypt to go to Somalia because "there is jihad" in Somalia. On or about January 27, 1997, Hassoun told DAHER "because they are playing football (soccer) in Somalia ... we are sending soccer uniforms and sneakers." Your affiant knows that "playing football" is a code word used by the conspirators to refer to violent jihad. On or about April 16, 1998, DAHER described to Hassoun a videotape he called an "entrusted thing" that was only be given to "those who can be trusted," and "every penny raised from this tape should get to . . . to Khattab."

27. JAYYOUSI continued to focus on Chechnya up until at least November 15, 1999, when he had a conversation with a former representative of AWR who was overseas. This individual told JAYYOUSI that he was raising funds for "the brothers" (in Chechnya) and wanted JAYYOUSI to do the same. JAYYOUSI told this individual that they were transferring some funds through "Global Relief Foundation." This individual confirmed that he was also. Your affiant knows that the "Global Relief Foundation" was ostensibly an Islamic charitable organization similar to AWR. The Global Relief Foundation, Inc. was designated as a "Specially Designated Terrorist Entity" on

13

October 18, 2002, pursuant Executive Order 13224 issued under the authority of Title 50. U.S.C. § 1701, *et. seq.*, the International Emergency Economic Powers Act.

## V. **CONCLUSION**

28. Based upon the information contained in this affidavit, there is probable cause to believe that KIFAH WAEL JAYYOUSI, KASSEM DAHER and others have committed violations of Title 18, United States Code, Sections 2339A(a) (providing material support to terrorists), 956(a)(1) (conspiracy to kill, kidnap, maim, or injure persons in a foreign country), 371 (conspiracy), and 2 (aiding and abetting the listed offenses). Affiant requests a warrant issue for their arrest.

**FURTHER YOUR AFFIANT SAYETH NAUGHT**

John T. Kavanaugh, Jr.
Special Agent, Federal Bureau of Investigation

Sworn and subscribed to
before me this ⎯1⎯ day of
December, 2004

ROBERT L. DUBÉ
UNITED STATES MAGISTRATE JUDGE

14

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. *04-3565 RLP*

FILED by _____ D.C.
MAG. SEC.

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.   MIAMI

**IN RE SEALED COMPLAINT**

_____ /

### SEALED ORDER

The United States of America, having applied to this Court for an Order sealing the Complaint, arrest warrants, and this order and the Court finding good cause:

IT IS HEREBY ORDERED that the indictment, arrest warrants, and this order shall be filed under seal until the arrest of the defendants or until further order of this Court, however, the United States Attorney's Office may obtain copies of the Complaint, arrest warrant, or other sealed document for purposes of arrest, extradition, or any other necessary cause.

DONE AND ORDERED in chambers at Miami, Florida, this \_\_ day of December, 2004.

ROBERT L. DUBÉ
UNITED STATES MAGISTRATE JUDGE

cc: Russell R. Killinger, AUSA



## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. *04-3565 RLD*

IN RE: SEALED COMPLAINT

_____/

FILED by _____ D.C.
MAG. SEC.

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.  MIAMI

### MOTION TO SEAL

NOW COMES the United States of America, by and through its undersigned attorney, and respectfully requests that the Complaint, arrest warrants, and any resulting order be SEALED until the arrest of the defendants or until further order of this court, excepting the United States Attorney's Office which may obtain copies of the Complaint, arrest warrant, or other sealed document for purposes of arrest, extradition, or any other necessary cause, for the reason that the named defendants may flee, the integrity of the ongoing investigation might be compromised, and the safety of certain witnesses could be compromised should knowledge of this Complaint become public.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

By:  _Russell R. Killinger_

RUSSELL R. KILLINGER
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 312851
99 N.E. 4th Street
Miami, FL 33132
(305) 961- 9437 Office
(305) 536- 4675 Facsimile
russell.killinger@usdoj.gov