UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.  04-60001-CR-COOKE/Brown

UNITED STATES OF AMERICA,

Plaintiff,

vs.

ADHAM AMIN HASSOUN, et al.,

Defendants.

_____ /

ORDER DENYING DEFENDANTS'
MOTIONS FOR NEW TRIAL

THIS MATTER is before the Court upon defendants' motions for new trial, specifically,

defendant Hassoun's 'Motion for New Trial on Five Specific Grounds' [D.E. 1216] and Hassoun's

'Omnibus Post-trial Motion for New Trial 'In the Interest of Justice'' [D.E. 1217],[1] both filed on

October 1, 2007,[2] defendant Padilla's 'Motion for Acquittal Pursuant to Federal Rule of Criminal

Procedure 29 or for New Trial Under Rule 33' [D.E. 1230], filed on October 11, 2007, and defendant

_____

[1] Hassoun's counsel submitted two separate motions for new trial.  For the sake of clarity, when referencing arguments made in either of the two motions generally, I will collectively refer to them as 'Hassoun's Motion for New Trial.'  When citing specifically to one of the motions, I will refer to Hassoun's 'Motion for New Trial on Five Specific Grounds' [D.E. 1216] as 'Hassoun's First Motion for New Trial' and Hassoun's 'Omnibus Post-trial Motion for New Trial 'In the Interest of Justice'' [D.E. 1217] as 'Hassoun's Second Motion for New Trial.'

[2] Hassoun additionally filed an untimely 'Motion for New Trial based on Government's late disclosure of Brady evidence' on November 8, 2007.  As explained in my November 9, 2007 Order denying Hassoun's Motion, defendant Hassoun's third motion for a new trial was filed almost a month after the deadline for new trial motions, which had already been substantially extended twice [D.E. 1262].  Furthermore, Hassoun provided no credible justification—or any justification at all—for the untimely filing.  Accordingly, Hassoun's November 8, 2007 motion was denied in my November 9, 2007 Order, and will not be considered here.

Jayyousi's 'Motion for a New Trial' [D.E. 1235], filed on October 12, 2007.  The government filed its 'Consolidated Opposition to Defendants' Motions for New Trial' [D.E. 1247] on October 29, 2007.  Defendants Padilla and Hassoun filed their Replies on November 5, 2007 [D.E. 1255 and 1256 respectively].  This Court has reviewed these pleadings and finds as follows:

## I.    FACTS AND PROCEDURAL HISTORY

Following a four-month jury trial,[3] on August 16, 2007, defendants Adham Amin Hassoun, Jose Padilla and Kifah Wael Jayyousi were convicted of the three counts charged in the Fifth Superseding Indictment (hereinafter "the Indictment").[4]  Count One charged the defendants with violating 18 U.S.C. §956(a)(1), conspiring to commit acts of murder, kidnaping or maiming outside of the United States, while committing one or more overt acts in furtherance thereof within the United States.[5]  Count Two charged the defendants with violating 18 U.S.C. §371, conspiring to

---

[3] Jury selection in this matter commenced on April 16, 2007 [D.E. 1010], opening arguments commenced on May 14, 2007 [D.E. 1054] and the jury reached their verdict on August 16, 2007 [D.E. 1193].

[4] Eight counts charging solely Hassoun, initially included in the Indictment, have all since been severed.  See Order Adopting Magistrate's Report and Recommendation and Granting Defendant Hassoun's Motion to Sever Count 4 [D.E. 483] and Order Denying Defendant Hassoun's Motion to Dismiss Counts 5-11, the Falsity Counts and Granting Hassoun's Motion to Sever the Falsity Counts [D.E. 901].

[5] Specifically, 18 U.S.C. §956(a)(1) provides:

> Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnaping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2).

violate section 2339A(a) (i.e., conspiring to provide material support to terrorists).[6]  Count Three

charged the defendants with violating 18 U.S.C. §2339A, providing material support or resources,

or concealing the nature thereof, all while knowing or intending that they be used in preparation for,

or in carrying out  a violation of section 956 (i.e., a conspiracy to murder, kidnap or maim on foreign

soil).[7]  In other words, the defendants were convicted of committing a section 956 conspiracy (Count

One); the substantive 2339A(a) offense, which had as its object the 956 conspiracy (Count Three);

and a section 371 conspiracy to commit the substantive 2339A(a) offense (Count Two).

---

[6]  18 U.S.C. §371 provides, in pertinent part: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."

[7]  Specifically, 18 U.S.C. §2339A(a) provides:

> Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section . . . 956 . . . or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

Section 2339A(b) goes on to define "material support or resources" as used in the section, as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials[.]

Following their convictions, the defendants each filed Rule 33 motions seeking new trials. Each defendant subsequently adopted those portions of their co-defendants Rule 33 motions applicable to them.[8]  Due to the similar issues raised in these motions, I will address the merits of all of the defendants' Rule 33 arguments in this Order.  For the reasons addressed in this Order, the defendants' Motions for New Trial are **DENIED.**

## II.  LEGAL STANDARD

Pursuant to Fed. R. Crim. Pro. 33(a), the district court may "grant a new trial if the interest of justice so requires."  This broad standard may encompass unsound and legally erroneous rulings at trial, as well as instances of evidence preponderating "sufficiently heavily against the verdict [such] that a serious miscarriage of justice may have occurred." United States v. Martinez, 763 F.2d 1297, 1312 (11th Cir. 1985) (citation omitted). See, e.g., United States v. Vicaria, 12 F.3d 195 (11th Cir. 1994).  While the district court is imparted broad discretion to order a new trial, the Eleventh Circuit cautions that it "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." Martinez, 763 F.2d at 1312-13 (reversing district court's decision to grant a new trial).

Unlike a Rule 29 motion for judgment of acquittal, a trial court need not view the evidence in the light most favorable to the verdict for Rule 33 motions. Id. (noting that when considering Rule 29 motions, the court "assumes the truth of the evidence offered by the prosecution").  Rather, when considering a Rule 33 motion for a new trial, a district court may weigh evidence and consider the

---

[8]  See 'Defendant Hassoun's Motion to Adopt Portions of Co-defendants' Post-Trial Motions' [D.E. 1238]; 'Jose Padilla's Motion to Adopt [Hassoun's Motions for New Trial]' [D.E. 1219]; 'Jose Padilla's Motion to Adopt [Jayyousi's Motion for New Trial]' [D.E. 1239]; 'Kifah Jayyousi's Corrected Motion to Adopt [Hassoun's Motions for New Trial]' [D.E. 1229]; 'Kifah Jayyousi's Motion to Adopt [Padilla's Motion for New Trial]' [D.E. 1231].

credibility of witnesses.  See Butcher v. United States, 368 F.3d 1290, 1297 (11th Cir. 2004).

However, "[t]he grant of new trial based on the weight of the evidence is more closely scrutinized

than the grant of new trial on other grounds."  United States v. Hernandez, 433 F.3d 1328 (11th Cir.

2005) (quoting Butcher, 368 F.3d at 1297).  New trial motions based on the weight of the evidence

are not favored.  See Martinez,  763 F.2d at 1313.  Consequently, "[c]ourts are to grant them

sparingly and with caution, doing so only in those really 'exceptional cases.'"  Id.   By setting this

threshold high, the Eleventh Circuit ensures that the trial court judge does not simply substitute her

judgment for that of the jury.  Id.  In any event, grants of new trial are only proper when demanded

by the interests of justice, and any such decision will be "closely scrutinized" by the Eleventh Circuit.


**III.   ANALYSIS**

    **A.   New Trial Arguments Affecting Multiple Defendants[9]**

        **1.   Jury Instructions**

In their motions, Hassoun and Jayyousi contest the Court's instruction that:

> [I]f you find beyond a reasonable doubt that the acts constituting the crimes charged were committed by the defendant voluntarily with specific intent to do something the law forbids, then the element of 'wilfulness' as defined in these instructions has been satisfied even though the Defendant may have believed that the conduct was religiously, politically, or morally required, or that ultimate good would result from such conduct.

Tr. 8/13/07 at 11.  Defendants argue that this instruction contradicts the Eleventh Circuit Pattern

Instruction on specific intent which was also read to the jury.  Defendants' argument must fail.

    The preceding motive instruction compliments, rather than contradicts, the Eleventh Circuit

---

[9] In this section, I have grouped together issues—regardless of who raised them—that pertain to more than one defendant.  Subsequent sections will address arguments that are uniquely applicable to individual defendants.

pattern instruction on specific intent.  The charge reiterates the jury's obligation to find the requisite specific intent for each of the charged offenses.  The intent element of the charged crimes was specifically addressed in other portions of the instructions, and the jurors are required to view the instructions as a whole.  See United States v. Turner, 871 F.2d 1574, 1578 (11th Cir. 1989) (citing United States v. Silverman, 745 F.2d 1386, 1395 (11th Cir. 1984) (noting that the "[d]istrict court has broad discretion in formulating a jury charge so long as the charge as a whole accurately reflects the law and the facts").  When read in context, this instruction does nothing more then clarify the distinction between intent and motive.  The jury is instructed that if they find the requisite specific intent laid out in the other instructions, the defendant's religious, political or moral *motives* are irrelevant.[10]

Furthermore, the source of this instruction is Eleventh Circuit Instruction 9.1, which is especially tailored to be read in conjunction with the standard pattern instruction on wilfulness.  See Eleventh Circuit Pattern Jury Instructions: Criminal Cases (2003) at 51.  Despite the instruction being drawn from a pattern instruction designed for tax cases, the Eleventh Circuit has made clear that it may be applied in other contexts where applicable.  See, e.g., United States v. Paradies, 98 F.3d 1266 (11th Cir. 1996) (deeming the charge appropriate to compliment the specific intent charge with respect to mail fraud); United States v. Anderson, 872 F.2d 1508 (11th Cir. 1989) (finding the charge proper in a trial where defendants were convicted of conspiracies to possess unregistered firearms, to transfer unregistered firearms, and to sell United States property).  Within the framework of this trial, where appreciating the distinction between motive and intent was crucial for the jury, the instruction was proper.

---

[10]  In fact, after being presented with this particular charge, I revised the pattern language and deleted other language proposed by the government in order to ensure that the instruction was fair. See Transcript 8/9 at 59-60.

The other arguments related to jury instructions were all set forth solely by Hassoun and require little discussion here. I entertained lengthy argument on these contentions during trial and approved many defense instructions objected to by the government. I also declined or altered numerous governmental submissions at the defendants' insistence. See, e.g., Tr. 7/17/07 at 185 (multiple conspiracies); 7/19/07 at 60 (First Amendment), 86 (absent evidence), 90 (absent co-conspirators); 8/9/07 at 25-26 (premeditation), 136 (Pinkerton), 162 (tapes), 188-89 (reasonable doubt/lack of evidence). The individual jury instructions were appropriate standing alone. More importantly, when read together, the disputed instructions were appropriate in light of the numerous instructions I gave at defense request. The instructions read to the jury were the product of exhaustive argument and the collaborative efforts of the Court and all parties to this litigation. The charge as a whole was consistent with the law and the evidence presented in this case, and does not entitle the defendants to a new trial.

## 2.    Trial Publicity

In his motion, Jayyousi argues that the Court erred by not inquiring on a daily basis whether jurors had, contrary to the Court's instructions, read or heard something about the case. Jayyousi notes the "widespread and readily accessible" coverage attendant to this trial. However, he provides no evidence to support the contention that any members of the jury accessed this information or allowed it to prejudice their opinions in any fashion.[11] Due to the media attention surrounding this case, it was imperative to empanel a fair and impartial jury that would base their decision solely on the evidence presented in court during trial. I believe that through the laborious and tedious effort

---

[11]   In his motion Jayyousi claims that a juror was removed because he was "exposed to [media] coverage that he felt would render him partial." See Jayyousi's Motion for New Trial at 22. This assertion is incorrect. During voir dire, a *prospective* juror was removed because of exposure to pre-trial publicity that he believed rendered him partial. This only exemplifies the candor of the jurors and the fastidious nature of the voir dire undertaken by this Court.

of this Court and counsel on both sides, that goal was effectuated.

Juror questionnaires were initially disseminated to roughly 3,000 potential jurors in the South Florida area. Responses to these questionnaires were reviewed by this Court and counsel. Various potential jurors were removed from the pool based on their inability, if selected as jurors, to set aside personal views and knowledge gleaned from the media. This Court then embarked on a month-long voir dire where an eighteen person jury was carefully selected from the already pared down pool.[12] I instructed the jury during voir dire, prior to opening statements and again at closing to avoid publicity and to base their decision solely on the evidence presented in court. See, e.g., Tr. 5/2/07, at 243-44; 5/14/07 at 35; 8/13/07 at 12. Additionally, I admonished the jury each day, with special emphasis prior to extended breaks, to avoid any outside information about the case.[13] See, e.g., Tr.

---

[12] During the voir dire, I allowed counsel for each defendant to question the potential jurors. Additionally, when I questioned the jurors individually, I allowed counsel to present me with questions to pose to each juror. Every potential juror was asked a set of pre-trial publicity questions to assess what they had heard about the case and determine whether their preexisting knowledge would impede their ability to sit as an impartial juror. Furthermore, I provided defense counsel with considerably more peremptory challenges than that allotted to them under Fed. R. Crim. P. 24(b)(2). Rule 24(b)(2) provides 10 peremptory challenges when the defendant or defendants are jointly charged with a crime punishable by imprisonment of more than one year. I provided the defense with 36 peremptory challenges, almost four times the amount allotted them under Rule 24. These additional safeguards were all meant to ensure that the jury seated in this case were free from bias *and* would we be able to remain free from bias during the course of the trial.

[13] Jayyousi cites various cases in support of his contentions regarding the allegedly prejudicial publicity surrounding the trial. Jayyousi's reliance on this caselaw is misplaced. In fact, the cases Jayyousi cites squarely support the method I employed to deal with the publicity attendant to this trial.

In United States v. Herring, relied upon by Jayyousi, the court did not provide daily admonitions to the jury touching upon their duty to avoid trial publicity. Furthermore, in Herring, where only one admonition was given during the entire course of the trial, the Eleventh Circuit additionally noted that "it is certainly arguable that the text of this instruction did not explicitly direct the jury to shun any publicity about the case." See United States v. Herring, 568 F.2d 1099, 1101 n.6 (5th Cir. 1978). The court observed, based on the trial court's instruction, that "[i]t seems . . . that a juror could assimilate any publicity in the case with a firm resolve not to be affected by it, and then in good conscience believe that he had followed the court's instructions to the letter." Id. The Eleventh Circuit went on to list some of the important factors to consider when deciding whether trial

7/3/07 at 59-60.

Jayyousi's concerns are understandable. However, as I noted during trial, daily questioning runs the risk of having an adverse effect on the jury. Persistent questioning regarding what the jurors read and where they read it may create the presumption, in the jurors' minds, that there is something they *should* have heard or read. When conducting a trial of this length and magnitude, it becomes increasingly difficult for a jury to disregard the pink elephant in the room when the court continually focuses their attention in that direction. Therefore, throughout the course of the trial, I focused on ensuring that the jury remained free of prejudicial taint, while at the same time being as unintrusive as possible.

The jury is presumed to follow the instructions that I provided during trial. See United States

---

publicity has had a prejudicial impact on the jury, and noted the significance of focusing on the trial judge's instructions on the matter. "Has the court told the jury not merely to disregard but *not to examine at all* any external information on the case, especially that which appears in the news media? Has the court so instructed the jury on a regular basis, and how much time has elapsed since the court's last directive and the dissemination of the material in question?" Id. at 1105.

Unlike Herring, I provided the jury with very specific daily admonitions not to watch anything about the trial on television, listen to anything about the trial on the radio, read—in print or on the internet— anything about the trial, or discuss the trial amongst themselves or with others. These are precisely the types of daily admonitions that the Eleventh Circuit felt were lacking in Herring. Jayyousi overlooks this significant distinction when arguing that circumstances in Herring were "virtually identical" to those in this case. See Jayyousi's Motion for New Trial at 26. On the contrary, the circumstances in this trial were more akin to Williams v. Griswald, 743 F.2d 1533 (11th Cir. 1984), another case cited by Jayyousi in his motion. In Griswald, the Eleventh Circuit found that the defendant failed to provide a cognizable claim in support of a new trial due to prejudicial trial publicity. In support of its holding, the court specifically distinguishes Griswald from a prior case were the Fifth Circuit observed that "no specific instruction was given to the [jury] to disregard [a prejudicial news report] . . ., nor were they instructed that the report was not evidence of guilt." See Griswald, 743 F.2d at 1540 (quoting Williams 568 F.2d 464, 466 (5th Cir. 1978)). The court added that unlike Williams, in Griswald, after learning that the jury had been exposed to publicity, the trial court specifically instructed the jury that they should disregard it. I reiterate, that unlike Griswald, there was absolutely no evidence that any juror was exposed to any publicity surrounding this case during trial. However, the specific instructions I gave to the jurors "not merely to disregard but *not to examine at all*" any publicity they may have come into contact with, comports with the Eleventh Circuit's directive. See Herring, 568 F.2d at 1105.

v. Stone, 9 F.3d 934, 938 (11th Cir. 1993) (noting that "[f]ew tenets are more fundamental to our

trial jury system than the presumption that juries obey the court's instructions"). I furnished the jury

with very explicit daily instructions to avoid contact with publicity—in any form—about this case.

There is nothing in the record that suggests the jury treated these instructions any differently than the

numerous other instructions they were asked to follow during the course of the trial.[14] Defendants

have provided no evidence suggesting that the jurors were exposed to any publicity about this case

during trial, or that such information had any bearing on their verdict. Accordingly, defendants'

arguments regarding trial publicity are unpersuasive and do not entitle them to a new trial.[15]

### 3.    Prosecutorial Statements During Closing Arguments

Defendants also contend that they are entitled to a new trial based on various alleged

prosecutorial misstatements made to the jury. Defendants claim that these statements impinged their

due process rights by misleading, confusing and inflaming the jury.[16] These contentions are meritless.

---

[14] In fact, the emphasis placed on these instructions in conjunction with the repeated reminders to heed their warnings likely suggested that following these instructions was of particular significance.

[15] Defendant Jayyousi's argument for a new trial based on the prejudicial impact of security precautions during jury selection and trial is similarly unavailing. Jayyousi correctly observes that certain security measures may have a prejudicial impact on a jury. However, aside from objecting to my empaneling an "anonymous jury," Jayyousi does not specify which security measures affected him adversely or precisely why the measures had such effect. Furthermore, Jayyousi's complaint about my empaneling an "anonymous jury" is misguided. There were no requests by either side for an anonymous jury, and I did not empanel an anonymous jury as that term is used in the caselaw. Compare United States v. Ross, 33 F.3d 1507 (11th Cir. 1993).

[16] Jayyousi lodges various bald claims against the prosecution that will not be considered at length here. Jayyousi correctly identifies that allowing a jury to consider a defendant's racial, ethnic or cultural background when determining his guilt is fundamentally improper. However, aside from unsubstantiated claims bemoaning the "injection of ethnicity into the trial by the government," Jayyousi provides absolutely no evidence—in the record or otherwise—that this occurred. On the contrary, the government made it clear throughout the course of the trial that the defendants were being tried for their actions and not their religion. The government repeatedly noted that Islam is a religion of peace throughout the trial. See, e.g., Tr. 8/13/07 at 47-48. Jayyousi's failure to cite to

"While due process of law mandates that a fair trial be provided to the appellants, there is no constitutional right to a perfect trial." See United States v. Blasco, 702 F.2d 1315, 1329 (11th Cir. 1983) (quoting United States v. Ragsdale, 438 F.2d 21 (5th Cir. 1971)).

Considering the length of the trial and the volume of evidence, it was to be expected that improper statements would be made on occasion. However, the nature of the alleged instances of misconduct "were so minor that they could not possibly have affected the outcome of the trial." See United States v. Campa, 459 F.3d 1121, 1153 (11th Cir. 2006) (vacating panel's opinion ordering new trial in Cuban Spies case) (quoting United States v. Alvarez, 755 F.2d 830, 859 (11th Cir. 1985)). Furthermore, where a prosecutorial misstatement was made, I gave clear instructions to the jury to disregard it, thus ameliorating any purported prejudicial effect.[17] See Campa, 459 F.3d at

_____

even one instance in the record where the government "injected ethnicity into the trial" is indicative of this argument's weakness.

[17]   The majority of misstatements objected to by defendant Hassoun were quickly cured by instructions I gave to the jury. See United States v. Simon, 944 F.2d 1082, 1087 (11th Cir. 1992). When the government noted that the theory of defense instructions were prepared by the attorneys, I instructed the jury that "[A]ll of the instructions in this case are prepared by the Court as a whole. You are to consider them as such. The last phrase from counsel is stricken and you are to disregard it." Tr. 8/13/07 at 101. When the government noted that "[t]hese words . . . say it all," with regard to the words uttered by Osama Bin Laden during the CNN interview, I sustained the defense objection and instructed the jury to disregard the remark. When the government stated that Hassoun's November 1, 2001 "Afghan relief" check was intended to support the efforts against the American military, I gave an immediate curative instruction, directing that the jury disregard the statement.

The prosecutorial statements that did not receive curative instructions did not merit them because they were proper. The government remarked that when listening to defendants' closing arguments the jury should "see if [the defense] can answer some of the questions raised by the evidence." Tr. 8/13/07 at 106. Contrary to defendant Hassoun's contention, this is not a burden-shifting argument. The statement simply asks the jury to consider the strength of the evidence presented by the government, and determine whether the questions raised by the evidence have been answered. This by no means suggests that the defendants have a burden to carry or must prove their innocence. If jurors were not permitted to question the caliber of the government's evidence, or answer questions posited by the evidence, it would be considerably difficult for a defendant to ever be found not guilty. Lastly, Hassoun contends that the government's rebuttal argument indicating that there was no trial evidence of a humanitarian crisis in Afghanistan, was improper. Hassoun

1153 (noting that "the prosecution's closing arguments did not prejudice the defendants because the court granted the defendants' objections and specifically instructed the jury to disregard the improper statements"). Nothing about the government's closing arguments warrant a new trial.

## 4.      Agent Kavanaugh's Opinion Testimony

Defendants object to the Court's admission of Special Agent John Kavanaugh's Rule 701 "lay opinion" testimony. Rule 701 permits law enforcement officers to testify based upon their specialized knowledge and experience gained through investigation and training. See United States v. Novaton, 271 F.3d 968, 1008-09 (11th Cir. 2001). I specified that this would be the extent of Agent Kavanaugh's 701 testimony during the extensive discussion and debate on this issue prior to and during his testimony. Tr. 6/7/07:40-42, 147-51; 6/8/07 at 20; 6/12/07 at 54-58. Throughout the course of the testimony, I monitored the issue very carefully, and upheld defense objections when Agent Kavanaugh exceeded the 701 parameters. See, e.g., Tr. 6/7/07 at 130; 6/8/07 at 121, 123; 6/12/07 at 27, 67 129; 6/14/07 at 45, 74, 79, 80; 6/21/07 at 125; 6/22/07 at 5,7, 22, 24, 26. The Eleventh Circuit has sanctioned this form of scrupulous judicial gate-keeping in instances of very similar 701 testimony. See, e.g., United States v. Novaton, 271 F.3d 968, 1009 (11th Cir. 2001) (holding that the agents' opinion testimony regarding the meaning of code words employed by the defendants in their intercepted telephone conversations was properly based on their perceptions and experiences as police officers); United States v. Awan, 966 F.2d 1415, 1431 (11th Cir. 1992)

---

points to a statement made by government witness Dr. Rohan Gunaratna allegedly suggesting otherwise. Dr. Gunaratna never explicitly stated that there was a "humanitarian crisis" going on in Afghanistan. Rather, Gunaratna discussed suffering in the region and relayed some of the hardships faced by women and children. While defendants were free to argue that this characterization indicated that a "humanitarian crisis" existed, the government was free to argue otherwise. Furthermore, I sustained the defendants' objection and instructed the jury to disregard this argument twice immediately after the initial utterance. See Tr. 8/14/07 at 163. Thus, even if the argument was improper, the jury was instructed to disregard it and its potential effect on their verdict was "so minor that [it] could not possibly have affected the outcome of the trial." See Campa, 459 F.3d at 1153.

(holding that the agent's 701 testimony was proper, noting that the district court vigorously policed the introduction of unwarranted interpretations by the 701 witness and repeatedly sustained defense objections when the witness exceeded the 701 scope); United States v. Davis, 787 F.2d 1501, 1505 (11th Cir. 1986) (affirming admission of Rule 701 opinion testimony expressing that when defendant stated that he "wanted to make a trip," he was referring to an illegal act).

Furthermore, I gave very wide latitude to the defense to conduct their own 701-based inquiry of Agent Kavanaugh during cross-examination. See, e.g., Tr. 6/14/07 at 115-118, 123-24, 153-54; 6/15/07 at 4-5; 6/18/07 at 28-30; 6/21/07 at 17, 28. Much of the defendants' contention with Kavanaugh's testimony went to its weight and not its admissibility. Accordingly, cross-examination was the fitting mechanism to expose any deficiencies in the Agent's testimony. See United States v. Myers, 972 F.2d 1566, 1577 (11th Cir. 1992) (allowing the officer to provide 701 opinion testimony based on his job experience and noting that"[t]o the extent that [the officer's] opinion lacked a technical/medical basis, [the defendant] had the opportunity to expose this on cross-examination").

Lastly, I proscribed Agent Kavanaugh from using the term 'violent jihad' during the course of his testimony due to its inflammatory connotations. Agent Kavanaugh adhered to that directive. Defendant Hassoun contended that when viewed in conjunction with other testimony, the jury was left with the impression that the form of jihad that the defendants were referencing was 'violent jihad.' This argument misses the point. Agent Kavanaugh was permitted to testify, based upon his specialized knowledge and experience gained through investigation and training, that he believed certain code words that the defendants were using meant jihad. If the jury agreed with this interpretation, they were free to weigh the other evidence, as well as both lay and expert testimony, and determine whether defendants subscribed to violent or non-violent jihad. Nothing about Agent Kavanaugh's testimony merits a new trial for the defendants.

### 5. Government Translator Testimony

Defendant Jayyousi contends that the government violated Brady's mandate by failing to disclose a January 2005 executive summary of a Department of Justice report entitled 'A Review of the FBI's Actions in Connection With Allegations Raised by Contract Linguist Sibel Edmonds' [hereinafter "DOJ Report Summary"].[18] See Jayyousi's Motion for New Trial, Exhibit A. Jayyousi claims that the executive summary suggests that the FBI translation program was "rife with problems, lack of quality control, and skewed its translations to meet political goals." See Jayyousi's Motion for New Trial at 15. Jayyousi correctly argues that knowledge is imputed to the government even if its agents *should have known* about the existence of exculpatory material. Id. at 16 citing Kyles v. Whitley, 514 US 419 (1995). Jayyousi's argument must fail, however, because the executive summary does not exculpate Jayyousi or his co-defendants.

Jayyousi misconstrues the exculpatory import of the document in question and erroneously gives its value undue weight. The DOJ Report Summary does not discuss the translators involved in this case or any of the translations prepared for this case. The report predominantly deals with isolated actions of individuals in the FBI's translation program. The individuals and actions discussed are not relevant to the translations in this case. Furthermore, the report does not impugn the credibility of the FBI's translation program nearly to the extent that Jayyousi claims. Thus, the value of this report to the defendants' cross-examinations was negligible, and the government's failure to turn it over could not have possibly affected the outcome of this trial.[19]

---

[18] The DOJ Report is classified. However, Jayyousi attached the 40 page executive summary to his Motion for New Trial as Exhibit A.

[19] Defendant Jayyousi asserts that "[i]t is inconceivable that the prosecution could not have known about this information" and calls the government's failure to make discovery "part of an ongoing and bad faith effort . . . to prejudice the Defendants." Jayyousi's Motion for New Trial at 16. Jayyousi's claim is meritless. Jayyousi presents no evidence to support the bald assertion that

### 6.      Testimony of Dr. Rohan Gunaratna

Defendant Hassoun lodges various objections to the substance of government expert Dr. Rohan Gunaratna's testimony.  None of these contentions merit a new trial.  Hassoun takes offense to Gunaratna's testimony expressing that Usbat al Ansar—an Al Qaeda associated group—bombed civilian targets in Lebanon during the 1990's.  Hassoun argues that this testimony exceeds the Bill of Particulars' scope.  Hassoun misapprehends the degree of specificity that a Bill of Particulars demands.

First, the Indictment itself asserts that defendants lent support to groups espousing radical Islamist ideologies including "violent jihad groups in . . . Lebanon."  See Indictment at 2.  Second, the Indictment went on to specify that "[f]ollowers and supporters of this movement adhered to a radical Salafist ideology that encouraged and promoted 'violent jihad' to be waged by 'mujahideen' using physical force and violence to oppose governments, institutions, *and individuals* that did not share their view of Islam." Id. (emphasis added).  Third, multiple FISA intercepts that defendants had notice of well before trial addressed violence in Lebanon.  The calls were relevant to defendants' ties to these radical Islamist groups and were appropriately admitted as evidence.  See, e.g., GX79 (discussing Hassoun's affilliation with the "Abu Mohjin" group which Dr. Gunaratna identified as

_____

the government's failure to turn the document over was in "bad faith."  Additionally, he provides no documentation to suggest that the government actually knew about this information or actively "suppressed" it.  In fact, in its 'Consolidated Opposition to Defendants' Motion for New Trial,' the prosecution asserts that it was unaware of the report, and notes that it was readily available to the defense prior to trial.  See Gov. Consol. Resp. at 11.  Most importantly, the report is not exculpatory.  Thus, any alleged government knowledge of the report, imputed knowledge of the report, or failure to disclose the report are all moot points.  Brady only compels disclosure of evidence that is favorable to the accused and material to guilt or punishment.  See Moore v. Illinois, 408 US 786, 794 (1972).  The executive summary at issue here does not meet this requirement.  Consequently, the prosecution was under no obligation to turn over the DOJ Report Summary regardless of whether or not it was known to them.

Usbat al Ansar); GX35 (discussing the assasination of a moderate Islamic leader and the arrest of radical Islamic terrorists who bombed liquor stores and nightclubs in Lebanon).  Fourth, in January of 2007, in response to defendants' Daubert motion, the government specified that "Dr. Gunaratna will further address the formation of militant, Al Qaeda-affiliated terrorist groups in various countries, including . . . Lebanon . . . .  He will testify regarding the key membership and violent tactics employed by these groups as discussed on the intercepts . . . including . . . Asbat Al Ansar and Abu Mojhin in Lebanon."  D.E. 835 at 4.

The purpose of a bill of particulars is threefold: to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense.  See United States v. Anderson, 799 F.2d 1438, 1441 (11th Cir. 1986).  The Bill of Particulars is meant to provide notice to the defendant with regard to the charged crimes, not to "compel the Government to provide detailed exposition of its evidence or to explain the legal theory upon which it intends to rely."  United States v. Burgin, 621 F.2d 1352 (5th Cir. 1977).[20]  In this instance, defendants had adequate notice with regard to the scope of Dr. Gunaratna's testimony.  The defendants were on notice that the government was going to be offering proof regarding radical Islamist violence in Lebanon.  When viewed in conjunction, the Indictment, Bill of Particulars and FISA transcripts sufficiently put the defendants on notice regarding the scope of Dr. Gunaratna's Lebanon testimony.

Hassoun also takes offense to Dr. Gunaratna not revealing confidential sources referred to in his writings.  This argument is misplaced.  Dr. Gunaratna never declined to identify the basis of any testimony he provided in Court.  See Tr. 6/29/07 at 80; 7/2/07 at 36-37.  The defense's questioning

---

[20]  In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit, in an *en banc* decision, adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

focused on Dr. Gunaratna revealing sources utilized in his writing that were not referenced or relied upon for Dr. Gunaratna's in-court testimony.  Id. at 40-43 and 51-56.  Accordingly, defendant Hassoun's questioning was irrelevant, and Dr. Gunaratna was under no obligation to provide the requested information.

Hassoun also contends that he was unfairly precluded from pursuing a line of inquiry regarding the legality of killings.  This line of inquiry was improper for this witness.  Dr. Gunaratna was not offered as an expert in the law of war, and accordingly, I struck any testimony and precluded questioning on that subject.  See Tr. 7/2/07 at 133.  Hassoun also objects to my preclusion of lines of questioning that ran directly against my prior rulings on justification.  See Tr. 7/2/07 at 118-33; 7/17 at 195.  Hassoun persistently attempted to explore this area of questioning even after I explained that such inquiry ran afoul of my prior rulings.  Despite defendant Hassoun's argument to the contrary, questioning regarding "historical facts and circumstances concerning atrocities committed against Muslims by other groups and governments which led to or occurred during various armed 'jihad' conflicts," See Hassoun's Second Motion for New Trial, invites specifically the type of justification testimony my rulings sought to avoid.

Lastly defendant Hassoun objects to an occasion where Dr. Gunaratna referenced US law enforcement's response to the acts of 9/11.  Hassoun fails to acknowledge that those references were not initiated by government questioning, but rather, were responsive to questioning by Jayyousi's counsel.  See Tr. 7/10/07 at 97-98; 7/12/07 at 12. In fact, Dr. Gunaratna's answers were contained in the very speech that Jayyousi's counsel was inquiring about.  Id.  Furthermore, Hassoun misconstrues the nature and intended effect of my limitations on testimony and evidence referencing 9/11.  The impetus behind this limitation was to prevent any juror speculation or confusion regarding the defendants participation in 9/11.  It was made very clear both before and during trial that the

defendants had no involvement in planning or carrying out the events of 9/11.  In fact, on numerous occasions during trial, I admonished the jury specifically to that regard.  See, e.g., Tr. 6/26/07 at 33. My ruling on this topic, issued just prior to jury selection, only bolsters this point.  I made clear that "any idea, through inference or otherwise, that these defendants are connected to 9/11 is not available to the government in this case."  Tr. 4/16/07 at 22.  This ruling did not preclude any reference to 9/11; I specified before trial that there were certain instances where 9/11 references were proper. See, e.g., Tr. 4/16/07 at 12.  The references that I was concerned with were those that suggested the defendants in this case played a role in the events of 9/11.  Dr. Gunaratna's statements did not fall into this category, and consequently, comported with my ruling.

Defendant Jayyousi's arguments regarding Dr. Gunaratna's testimony were addressed at length during trial and require little discussion here.   Jayyousi lodges various attacks at Dr. Gunaratna's credibility and candor, and argues that the government's failure to disclose evidence evincing these alleged "professional flaws" amounted to a Brady violation.  Defendant Jayyousi's claim is baseless.  Once again, defendant Jayyousi misconstrues the government's Brady obligations. Jayyousi makes numerous bald assertions, but does not provide evidence to support his accusations. Furthermore, Jayyousi and his co-defendants had the opportunity to discredit Dr. Gunaratna's credibility—and exhaustively attempted to do so—during their cross-examinations.[21]

I gave the defendants considerable latitude to discredit Dr. Gunaratna based on the very undisclosed evidence that defendant Jayyousi claims entitles him to a new trial.  See, e.g., Tr. 7/10/07 at 80-81, 104-09 (Johnson project).  Jayyousi overstates the discrediting import of the disputed evidence.  Jayyousi's counsel had his own interpretation of various events in Dr. Gunaratna's past.

---

[21]   At times, I even allowed counsel to introduce documents and call witnesses to buttress their cross examination and attempt to impugn Dr. Gunaratna's credibility.  Tr. 8/7/07 at 50.

He was entitled to present this viewpoint to the jury during cross-examination.  The fact that Dr. Gunaratna disputed Jayyousi's conjectured interpretation of these events does not mean the government did not comport with its Brady and Giglio obligations.  In fact, the jury's verdict, reached despite having heard the evidence that purportedly discredited Dr. Gunaratna's credibility, illustrates that this evidence was not determinative of guilt or innocence.  Both Brady and Giglio only require disclosure of evidence that is material to guilt or punishment.  See Brady v. Maryland, 373 U.S. 83, 87 (1963); Giglio v. United States, 405 U.S. 150, 154 (1972).  Accordingly, the government's failure to turn over this evidence to the defendants does not run afoul of Brady or Giglio.  Defendants are not entitled to a new trial based on Dr. Gunaratna's testimony.

### 7.    CNN Bin Laden Video

Defendants object to the admission of a CNN video depicting an interview with Osama Bin Laden.[22]  Significant time during trial was spent devoted to determining the admissibility of this video.  Defendants advance the same contentions presented at trial for precluding the interview's admittance into evidence.  For the reasons discussed during trial, their arguments are unpersuasive.

Defendant Hassoun contends that the video "lacked any probative value pursuant to Rule 401 of the Federal Rules of Evidence" and that the contents of the interview have "nothing to do with the charges in this case."  See Hassoun's First Motion for New Trial at 6; Hassoun's Second Motion for New Trial at 6-7 (emphasis in original).  Defendants misapprehend the purpose of playing the videotape for the jury.  The videotape was not admitted to imply a personal association between the defendants and Osama Bin Laden, the events of 9/11, or the specific acts of violence Bin Laden discusses in the video.  The jury instruction that proceeded the video's exhibition made this clear.  The

---

[22]  The interview, government exhibit 705, was conducted by CNN correspondent Peter Arnett and was broadcast on CNN on May 11, 1997.

instruction read:

> Ladies and gentlemen, you are about to view a videotape. The videotape is not offered to prove the truth of the statements made in the interview. You may consider the video as it bears on the state of mind of defendants Adham Hassoun and Kifah Jayyousi only.
>
> There is no evidence that Mr. Padilla viewed, heard, commented on or endorsed the videotape. I am instructing you that you shall not consider this videotape exhibit in determining Mr. Padilla's state of mind with regard to the charged offenses.
>
> I also further instruct you that the events of September 11, 2001, should not be considered by you in reaching a decision in this case.

Tr. 6/26/07 at 33.

The instruction makes it clear that the jury is not to consider the video for the truth of the statements asserted in the interview. The video was solely to be considered for its bearing on Hassoun and Jayyousi's states of mind. The transcripts of the calls make it clear that both Hassoun and Jayyousi saw the video. The jury heard phone calls where Jayyousi and Hassoun discuss the video and Bin Laden's ideology. In a trial where so much significance was placed on which interpretation of jihad the defendants subscribed to, the video was necessary to shed light on the defendants' subsequent conversations. Defendants spent considerable time arguing that they did not endorse a violent interpretation of jihad and argued that, to them, jihad was not commensurate with use of undue force. Defendants' conversations, where they discussed the jihadist ideology espoused in the video, were relevant to determining what form of jihad the defendants adopted. Accordingly, the video was crucial to better assess Hassoun and Jayyousi's states of mind when having these conversations.[23]

---

[23] There was absolutely no evidence regarding whether defendant Padilla ever viewed the video or was aware of its contents. The jury was specifically instructed to this effect and advised "not [to] consider this videotape exhibit in determining Mr. Padilla's state of mind with regard to the charged offenses." Tr. 6/26/07 at 33.

The defendants' divergent interpretations of the phone calls at issue only affirm the importance of playing the video to the jury.  See Tr. 6/1/07 at 77-80 (suggesting that Hassoun's telephonic comments were only directed at President Clinton's policies); 6/19/07 at 186-87 (suggesting that when Hassoun said "may Allah protect him" on a call discussing the video, he was referring to Peter Arnett and not Bin Laden); Id. at 201 (claiming that Jayyousi had never seen the videotape despite a call where Jayyousi specifically comments on images of Somalia exhibited during the broadcast).  The jury was charged with determining whether defendants possessed the specific intent to commit the crimes charged.  In order to conduct this analysis they were required to carefully assess defendants' states of mind.  The calls themselves were admitted to lend the jury assistance in deciphering the defendants' states of mind.

Any purported prejudice suffered by the defendants was significantly diminished by: I) the video edits which removed prejudicial portions of the video not necessary for lending context to defendants' phone calls; ii) the limiting instruction stressing that the video was only to be considered for its bearing on Hassoun and Jayyousi's states of mind; iii) the limiting instruction specifying that there is no evidence that Padilla was aware of the videotape and therefore it should not be considered to assess his state of mind; and iv) the limiting instruction reiterating that the events of September 11, 2001 should not be considered in the jury's decision.  These safeguards ensured that the video's relevance outweighed any prejudicial consequence of playing it for the jury.  Accordingly, the video's exhibition was proper and does not merit a new trial.

**B.**   **New Trial Arguments Pertaining Only to Hassoun**

**1.**   **Trial alongside Padilla**

Hassoun renews his severance argument on the same grounds advanced prior to trial.  The severance issue was briefed and argued exhaustively prior to trial, and will not be discussed at length

here.  Hassoun's argument is unpersuasive for the same reasons expressed in my April 15, 2007 Order denying severance [D.E. 992].  In that Order, I explained that Hassoun failed to present persuasive justification to depart from the "well-settled principle that it is preferred that persons who are charged together should be tried together" which is "particularly true in conspiracy cases."  See United States v. Morales, 868 F.2d 1562, 1571 (11th Cir. 1989).  None of the grounds for denying severance are any less compelling post-trial.  In fact, repeated instructions during trial reminding the jury to decide the case solely on the evidence presented in court and to consider the guilt of each defendant separately, provided an additional safeguard to avoid spillover prejudice.  Accordingly, Hassoun's severance claim is unpersuasive and he is not entitled to a new trial on this ground.

### 2.        Precluding the Uways Statement

Next, Hassoun raises another issue which was briefed and argued exhaustively pre-trial.[24] Hassoun sought admission of an unclassified summary of a hearsay statement made by Abdallah Salih al-Rimi, aka Uways.  Since the unclassified summary of Uways' hearsay statement is itself a hearsay statement—made out of court and being offered for the truth of the matter asserted—it was properly excluded from trial since Hassoun did not provide a cognizable exception to the hearsay rule in support of its admission.  Hassoun sought admission under Rule 807's residual exception to the hearsay rule.  Trustworthiness is a <u>sine</u> <u>qua</u> <u>non</u> of admission under Rule 807.[25]  There was no

---

[24]  See Order on Defendant Hassoun's Motion to Compel the Appearance as Defense Witness at Trial the Two Witnesses Disclosed in the Court's § 4 CIPA Order [D.E. 914] or for Substitute Relief [D.E. 930].  D.E. 1052.

[25]  For a more robust discussion of Rule 807 and its trustworthiness requirement, see this Court's sealed 'Order on Defendant Hassoun's Notice Pursuant to CIPA § 5 of Intent to Use Statements Made in the Course of Government Interrogation (D.E. 872).'  D.E. 1053.

evidence presented to this Court evincing indicia of trustworthiness pertaining to Uways' statement.[26] Accordingly, the evidence failed to meet Rule 807's stringent trustworthiness requirement,[27] and its admission was properly precluded at trial.[28]

### 3.   Sighting of Hassoun in Shackles

Hassoun reaffirms his objection to the Court's failure to declare a mistrial or remove any juror(s) on account of a brief, inadvertent sighting of him, in shackles, en route from the courthouse to the FDC. After this incident was brought to my attention, I took various precautionary measures to ensure that the inadvertent sighting did not prejudice Hassoun in any way. I individually questioned all ten jurors that were seated in the van that passed by Hassoun, questioning two jurors a second time where more inquiry was needed; individually reminded each juror about the

---

[26]   Hassoun argues that his inability to review classified documents indicating the circumstances surrounding the taking of this statement has prejudiced him. This argument is unpersuasive. Prior to trial, I reviewed a sealed ex parte filing in camera and determined that, based on the statement's attendant circumstances, it was untrustworthy and hence, inadmissible. Accordingly, Uways' statement was properly excluded at trial, and Hassoun is not entitled to a new trial on this ground. See D.E. 1052 (excluding Uways' statement based on its untrustworthiness). Hassoun's arguments with regard to Padilla's statements made in the course of government interrogation, are meritless for the same reasons. See D.E. 1053 (excluding Padilla's statements made in the course of government interrogation based on their inherent untrustworthiness).

[27]   Even if assuming arguendo that Hassoun's proffered evidence did meet Rule 807's trustworthiness requirement, its exculpatory thrust is not nearly as forceful as Hassoun suggests. Evidence indicating Padilla's recruitment to attend an Al Qaeda camp by an individual in Saudi Arabia does not disaffirm the government's case. Hassoun could have recruited and convinced Padilla to conduct violent jihadist activity abroad and, once there, Padilla could have been further recruited by another or multiple individuals. As I expressed in my April 15, 2007 Order Denying Padilla and Jayyousi's motions for severance [D.E. 992], there was no requirement that Hassoun was the only recruiter.

[28]   Hassoun also renewed his objection to my sealed 'Order on Defendant Hassoun's Notice Pursuant to CIPA § 5 of Intent to Use Statements Made in the Course of Government Interrogation (D.E. 872)' [D.E. 1053]. The Order thoroughly covered the grounds for excluding the statements at issue during trial. There was no evidence adduced during or post-trial that justifies parting with the reasoning set forth in the Order.

presumption of innocence;[29] and questioned as a group the occupants of the other van to ensure that they had not seen Hassoun.    Again, this issue was covered extensively during trial, and I considered substantial argument from each side.  I made specific findings at the time, considered Eleventh Circuit caselaw on the issue and concluded that Hassoun had suffered no prejudice due to the inadvertent sighting.  See Tr. 6/28/07 at 21-25, 81-82, 85-86.  No subsequent event merits revisiting this issue here.

### 4.        Exclusion of Certain Defense Exhibits

Hassoun renews his objection to the exclusion of certain defense exhibits purportedly offered as exculpatory evidence of his "state of mind."  I devoted two days to argument about these proposed hearsay exhibits, and considered them not merely call by call, but, in many instances, line by line.  See generally Tr. 7/19/07; 7/20/07.  Where appropriate, I allowed Hassoun to admit relevant excerpts from selected conversations.  However, more often than not, the recorded conversations could not overcome hearsay or relevance hurdles.  Hassoun's attempt to indiscriminately cloak all of these conversations with the 'circumstantial guarantees of trustworthiness' necessary to rebut the hearsay rule oversteps the bounds of Rule 803(4)'s 'State of Mind'  exception.  Furthermore, there is a relevancy hurdle to many of these conversations.  The government never disputed—and in fact, willfully conceded—that in addition to the 'bad acts' (i.e., the charged offenses), Hassoun was also committed to 'good acts' (i.e., humanitarian support and charity).  That Hassoun at various points in time, over the course of many years, was discussing 'good acts,' does not necessarily shed light on Hassoun's state of mind at other points in time when he was discussing 'bad acts.'  Likewise, the

---

[29]  I also instructed the jury about the presumption of innocence and the requirement that they could only consider what they heard and saw in the courtroom in reaching their verdict at the trial's start and finish as well as during the trial.  See, e.g., Tr. 7/2/07 at 154; 7/3/07 at 59; 8/13/07 at 36-37.

fact that Hassoun was involved in 'good acts' does not have any bearing on his culpability for independently committed 'bad acts.'  Accordingly, for the reasons set forth in my rulings on this matter during trial, the precluded conversations were properly excluded.[30]  Defendant Hassoun is not entitled to a new trial.

### B.    New Trial Arguments Pertaining Only to Padilla

_____Aside from the adopted arguments of his co-defendants, Defendant Padilla makes one distinct argument in support of a new trial.   Padilla contends that the "evidence in this case preponderates sufficiently heavily against the verdict such that 'a serious miscarriage of justice has occurred,'" thus entitling him to a new trial.  This ground for a new trial has been strongly disfavored by the Eleventh Circuit. See United States v. Martinez, 763 F.2d 1297, 1312-13 (11th Cir. 1985) (reversing district court's decision to grant a new trial).  Consequently, "[c]ourts are to grant them sparingly and with caution, doing so only in those really 'exceptional cases.'" Id.  In Hernandez, the court explained: "The grant of a new trial based on the weight of the evidence is more closely scrutinized than the grant of a new trial on other grounds . . . because we want to assure that the judge does not simply substitute [her] judgment for that of the jury." United States v. Hernandez, 433 F.3d 1328 (11th Cir. 2005).  For the reasons expressed in my simultaneously filed 'Order Denying Defendants' Motions for Judgment of Acquittal' [D.E. 1270], I find that the evidence against Padilla does not preponderate sufficiently against the verdict to order a new trial.  On the contrary, the evidence against Padilla, if credited as it was by this jury, establishes his guilt beyond a reasonable doubt.  Accordingly, the jury's verdict did not amount to a "serious miscarriage of justice" and must stand.  Defendant Padilla is not entitled to a new trial.

---

[30]  Hassoun's argument is further weakened by the fact that he was able to elicit much of the same purported "state-of-mind" evidence through other exhibits and through defense witnesses Awad, Mohammed, Wannous and Kavanaugh.

### C.    New Trial Arguments Pertaining Only to Jayyousi

Jayyousi contends that "[t]he jury engaged in misconduct by refusing to follow the Court's instructions to review all of the evidence prior to rendering a verdict." <u>See</u> Jayyousi's Motion for New Trial at 2.  Other than the fact that the jury did not deliberate for as long as he would have liked, Jayyousi presents no evidence to support this very bold assertion.  Returning a verdict without unnecessary delay does not, by any means, suggest juror misconduct.  Furthermore, while Jayyousi's contention may be applicable to all defendants, it was included in this section because the jury's verdict points to the argument's flaw with specific respect to Jayyousi.  The jury's Count III finding that Jayyousi did not provide material support after October 26, 2001—while finding that the other defendants <u>did</u> provide material support after that date—belies Jayyousi's juror misconduct claim.  The disparate verdicts are not indicative of rush-to-judgment, but rather, careful, individual consideration given to each defendant.  Jayyousi's claim of juror misconduct is not supported by any evidence, and is meritless.  Defendant Jayyousi is not entitled to a new trial.

IV.    CONCLUSION

For all the foregoing reasons, and based upon the record at trial and my previous Orders on matters contested in the motions at issue, the defendants' are not entitled to a new trial. Accordingly, it is hereby:

ORDERED and ADJUDGED that defendant Hassoun's Motion for New Trial on Five Specific Grounds [D.E. 1216] and Hassoun's Omnibus Post-trial Motion for New Trial 'In the Interest of Justice'" [D.E. 1217], both filed on October 1, 2007, are DENIED.

ORDERED and ADJUDGED that defendant Padilla's Motion for Acquittal Pursuant to Federal Rule of Criminal Procedure 29 or for New Trial Under Rule 33 [D.E. 1230], filed on October 11, 2007, is DENIED.

ORDERED and ADJUDGED that defendant Jayyousi's Motion for a New Trial [D.E. 1235], filed on October 12, 2007, is DENIED.

DONE AND ORDERED in Chambers at the United States District Courthouse, Miami, Florida, this 20th day of November, 2007.

_Marcia G. Cooke_
_____
MARCIA G. COOKE
United States District Judge

Copies furnished to:   *All Counsel of Record*

27