UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.  04-60001-CR-COOKE/Brown

UNITED STATES OF AMERICA,

Plaintiff,

vs.

ADHAM AMIN HASSOUN, et al.,

Defendants.
_____ /

ORDER DENYING DEFENDANTS'
POST-TRIAL MOTIONS FOR JUDGMENT OF ACQUITTAL

**THIS MATTER** is before the Court upon defendants' motions for judgment of acquittal,

specifically, defendant Hassoun's 'Post-trial Motion for Judgment of Acquittal' [D.E. 1218], filed on

October 1, 2007; defendant Padilla's 'Motion for Judgment of Acquittal Pursuant to Federal Rule of

Criminal Procedure 29 or for New Trial Under Rule 33' [D.E. 1230], filed on October 11, 2007; and

defendant Jayyousi's 'Motion for Judgment of Acquittal Under FRCrP 29' [D.E. 1236], filed on

October 12, 2007.  The government filed its 'Omnibus Response to Defendants' Fed. R. Crim. P. 29

Motions for Judgment of Acquittal' [D.E. 1248] on October 29, 2007.  Defendants Padilla, Jayyousi

and Hassoun filed their Replies on November 5, 2007 [D.E. 1255, 1257 and 1258 respectively].  This

Court has reviewed these pleadings and finds as follows:

1

I.   FACTS AND PROCEDURAL HISTORY

Following a four-month jury trial,[1] on August 16, 2007, defendants Adham Amin Hassoun, Jose Padilla and Kifah Wael Jayyousi were convicted of the three counts charged in the Fifth Superseding Indictment (hereinafter "the Indictment").[2]   Count One charged the defendants with violating 18 U.S.C. §956(a)(1), conspiring to commit acts of murder, kidnaping or maiming outside of the United States, while committing one or more overt acts in furtherance thereof within the United States.[3]   Count Two charged the defendants with violating 18 U.S.C. §371, conspiring to violate section 2339A (i.e., conspiring to provide material support to terrorists).[4]   Count Three

_____

[1]   Jury selection in this matter commenced on April 16, 2007 [D.E. 1010], opening arguments commenced on May 14, 2007 [D.E. 1054] and the jury reached their verdict on August 16, 2007 [D.E. 1193].

[2]   Eight counts charging solely Hassoun, initially included in the Indictment, have all since been severed.   See Order Adopting Magistrate's Report and Recommendation and Granting Defendant Hassoun's Motion to Sever Count 4 [D.E. 483] and Order Denying Defendant Hassoun's Motion to Dismiss Counts 5-11, the Falsity Counts and Granting Hassoun's Motion to Sever the Falsity Counts [D.E. 901].

[3]   Specifically, 18 U.S.C. §956(a)(1) provides:

> Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnaping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2).

[4]   18 U.S.C. §371 provides, in pertinent part: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."

charged the defendants with violating 18 U.S.C. §2339A, providing material support or resources, or concealing the nature thereof, all while knowing or intending that they be used in preparation for, or in carrying out  a violation of section 956 (i.e., a conspiracy to murder, kidnap or maim on foreign soil).[5]  In other words, the defendants were convicted of committing a section 956 conspiracy (Count One); the substantive 2339A(a) offense, which had as its object the 956 conspiracy (Count Three);[6] and a section 371 conspiracy to commit the substantive 2339A(a) offense (Count Two).

_____

[5]  Specifically, 18 U.S.C. §2339A(a) provides:

> Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section . . . 956 . . . or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

Section 2339A(b) goes on to define "material support or resources" as used in the section, as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials[.]

[6]  The defendants were all convicted of Count Three.  However, only defendants Hassoun and Padilla were found to have continued participating in the offense past October 26, 2001.  This added finding is significant, since this is the date when the maximum penalty for 18 U.S.C. §2339A increased from 10 to 15 years.  The jury's verdict indicated that, with respect to Jayyousi, the government did not adduce sufficient evidence to prove that he provided or concealed material support—as required by section 2339A—past the October 26, 2001 threshold.

3

Prior to the close of trial, defendants twice moved for Rule 29 judgments of acquittal: once after the government's case in chief and once after the defendants rested.  I considered defendants' Rule 29 claims, and denied both the claims made at the close of the government's case and those made at the close of all the evidence.  Following their convictions, the defendants each filed Rule 29 motions for judgment of acquittal.  Each defendant subsequently adopted those portions of their co-defendants Rule 29 motions applicable to them.[7]  Since "[s]ufficiency arguments . . . are too individualized to be generally adopted," defendants are only entitled to adopt co-defendants' discussion of the legal standards under Rule 29.  See United States v. Cooper, 203 F.3d 1279, 1285 n.4 (11th Cir. 2000) (quotations omitted) (holding that sufficiency claims are unique to each defendant and refusing to consider the sufficiency arguments defendant attempted to adopt).  Accordingly, to the extent that any defendants attempted to adopt more than their co-defendants' discussion of Rule 29's legal standard, the motions to adopt must fail.[8]

The defendants raise essentially two cognizable Rule 29 claims necessitating consideration.  First, defendants assert that the evidence at trial was insufficient to prove their intent, while in the

---

[7]  See  'Defendant Hassoun's Motion to Adopt Portions of Co-defendants' Post-Trial Motions' [D.E. 1238]; 'Jose Padilla's Motion to Adopt [Hassoun's Motion for Judgment of Acquittal]' [D.E. 1219]; 'Jose Padilla's Motion to Adopt [Jayyousi's Motion for Judgment of Acquittal]' [D.E. 1239]; 'Kifah Jayyousi's Corrected Motion to Adopt [Hassoun's Motion for Judgment of Acquittal]' [D.E. 1229]; 'Kifah Jayyousi's Motion to Adopt [Padilla's Motion for Judgment of Acquittal]' [D.E. 1231].

[8]  Hassoun's motion to adopt his co-defendants' motions [D.E. 1238] stated that he "moves to adopt those arguments [of defendants' motions for judgment of acquittal] which amplify, clarify or in any way support the post-trial motions filed by Hassoun."  D.E. 1238 at 1.   Padilla's motion to adopt Jayyousi's motion [D.E. 1239] stated that Padilla sought to adopt the entire motion, while Padilla's motion to adopt Hassoun's motion [D.E. 1219] specified that he only intended to adopt Hassoun's legal argument.  Similarly, Jayyousi's motion to adopt Hassoun's motion [D.E. 1229] specified that he only sought to adopt the legal arguments, while Jayyousi's motion to adopt Padilla's motion [D.E. 1231] stated that Jayyousi intended to adopt the entirety of Padilla's motion.

United States, to murder, kidnap, or maim persons overseas.  Secondly, defendants claim that there was insufficient evidence to prove that the substantive material support offense continued within the United States past October 26, 2001, the date that the crime's penalty increased to 15 years' imprisonment.  The arguments defendants offer to support their Rule 29 claims are unpersuasive.  For the reasons addressed in this Order, the defendants' Motions for Judgment of Acquittal are **DENIED.**

## II.   LEGAL STANDARD

Pursuant to Fed. R. Crim. Pro. 29, the district court must enter a judgment of acquittal if "the evidence is insufficient to sustain a conviction."  When evaluating Rule 29 claims for judgment of acquittal, the court is obligated to view the evidence in the light most favorable to the government, making all reasonable inferences and credibility choices in the government's favor.[9]  See United States v. Ward, 197 F.3d 1076, 1079 (11th Cir. 1999).  The court need only determine "whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt" based on the evidence, and not whether all reasonable hypotheses other than guilt were ruled out at trial.  See United States v. Sellers, 871 F.2d 1019, 1021 (11th Cir. 1989) (citation omitted) (emphasis added).

---

[9]  Throughout this Order, the evidence will be viewed in the light most favorable to the government, in accordance with Rule 29's mandate.  In doing so, I do not imply that this was necessarily my interpretation of the evidence.  This is merely meant to lend conciseness to this Order and avoid repeated reminders of Rule 29's directive.

III.    **ANALYSIS**

      A.    **Hassoun's Rule 29 Motion for Judgment of Acquittal**

           1.    **Specific Intent**

Hassoun claims that the government did not adduce sufficient evidence at trial to find beyond a reasonable doubt that he harbored the specific intent to commit any of the three objects of the conspiracy to murder, kidnap or maim.  Consequently, Hassoun asserts that no reasonable jury could have found, beyond a reasonable doubt, that he possessed the requisite specific intent "which was the essential underpinning of the government's entire case.  See Hassoun's Motion for Judgment of Acquittal at 2-3.  Hassoun correctly recites the well-established legal principle  that a "[c]onspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself."  See United States v. Ross, 131 F.3d 970, 980-81 (11th Cir. 1997) (quoting Ingram v. United States, 360 U.S. 672, 678 (1959)) (emphasis in original).  Thus, to find Hassoun guilty of Count One, the jury needed to find that Hassoun had the specific intent to murder, kidnap or maim.[10]  When viewing the evidence in the light most favorable to the government, a reasonable jury could have found that Hassoun harbored the specific intent to murder, kidnap or maim.

The jury was entitled to consider the evidence, and decide whether Hassoun's actions were

---

[10]  In addition to finding that the defendants harbored the specific intent necessary to commit one of the three substantive offenses, the jury also needed to unanimously agree upon which of enumerated offenses each defendant conspired to commit.  Thus, to find a defendant guilty of Count One, the jury needed to be in unanimous agreement that the defendant possessed the specific intent to murder, kidnap or maim.  See D.E. 1189 at 21 (instructing that "it is not necessary for the government to prove that the defendant willfully conspired to commit all three . . . . substantive offenses" and adding that "in order to return a verdict of guilty, you must unanimously agree upon which of the three offenses the Defendant conspired to commit").

driven by the sole desire to provide humanitarian support or the violent intent to murder, maim or kidnap.  The government's evidence indicated that Hassoun distinguished between jihad which he defined as "battle for the sake of Allah" and da'wa, which he defined as building schools and teaching people.  GX 83T/83TR.  Moreover, the government presented evidence indicating that Hassoun was committed to a violent form of jihad—which he frequently referred to using the code word "tourism"[11]—and viewed it as paramount to providing humanitarian support.  See, e.g., GX 18T/18TR (distinguishing between humanitarian work and "tourism" and encouraging his co-conspirators to work on "tourism" with him).[12]

It was not unreasonable for the jury to weigh the evidence and  conclude that Hassoun

---

[11]  See Tr. 6/7/07 at 91 (interpreting "tourism" as a codeword for jihad).  Furthermore, Hassoun himself defined "tourism" as jihad.  On a May 10, 1997 telephone conversation with Nasser Moussa, Hassoun explained: "[Tourism] cannot infer many things . . . when 'tourism' was mentioned . . . when 'Jihad' was mentioned . . . whenever 'Jihad' is mentioned in the Holy Qur'an, Sheikh Abdullah Azzam says 'Whenever Jihad is mentioned in the Qur'an, it can only mean that it is a battle for the sake of Allah . . .'" GX 83T/83TR at 8-9.  Hassoun went on to add that building schools and teaching people is not tourism or jihad, but rather "Da'awa."  Id. at 9.

[12]  After explaining to his co-conspirators that their roles in the conspiracy were akin to links in a chain, where "one . . . completes the other," Hassoun explained:

> As to the other issues the Calling [missionary work] . . . the people who work in the Calling, God bless, there are so many of them . . . But the people who work in "tourism," they are just few, you can count them on your fingers . . . So let those people who work in the Calling , let them work in the Calling . . . do their books, newsletters, and matters . . . it's not a problem, as long as they work on it.  But with regard to the field of "tourism," let us work on it . . . this is a very important issue . . . because very few work in "tourism" very few.

GX 18T/18TR.  This discussion evidences that Hassoun appreciated the significance of both "tourism"—defined as jihad—and humanitarian aid.  However, he felt it his duty —along with his co-conspirators—to furnish the latter form of support.

adopted a violent concept of jihad. The government also presented evidence indicating that code words such as 'football,'[13] 'zucchini,'[14] and 'eggplant'[15] used by Hassoun were intended to cover up his participation in illicit violent activities. See, e.g., GX 28T/ 28TR (discussing the "first area"—identified as Afghanistan[16]—and how there are "football courts"[17] ready for whomever wants to train for the game); GX 86T/86TR (inquiring whether the brothers bought "the zucchini and such"); GX 92T/92TR (discussing equipping an al Qaeda affiliate in Lebanon with funds to purchase "zucchini" and "eggplant" for future violent battles).[18] Telephone conversations where Hassoun used this language could reasonably suggest that Hassoun actively sent money, recruits, and equipment overseas for use in future violent jihad conflicts. Hassoun's monetary contributions for 'tourism' must be viewed in the same light. See, e.g., GX 600(h), 600(i), 600(o). When considered in

---

[13] See Tr. 6/7/07 at 90-91 (interpreting "football" as a code word for jihad).

[14] See Tr. 6/28/07 at 91 (defining "zucchini" as weapons and noting that support cells and radical Islamist groups commonly use this terminology).

[15] Dr. Rohan Gunaratna defined "eggplant" as a rocket propelled grenade launcher ("RPG") and explained that he is familiar with this term being used in this regard through his research and study. Id. at 91-92. Dr. Gunaratna added that an RPG is a standup weapon used by militant and terrorist organizations to conduct attacks. Id. at 92. He additionally noted that, the weapon is intended to fire at and destroy its target, be it infrastructure, a vehicle or people. Id.

[16] See Tr. 6/7/07 at 92 (interpreting "first area" as a code word for Afghanistan).

[17] See Tr. 6/28/07 at 133-34 (noting that "football courts" was a code expression for training camps intended to "train people to conduct attacks").

[18] Hassoun also discussed the status of screws—referring to bullets, see Tr. 6/28/07 at 92—during this call. See GX 92T/92TR. Kassem Daher informed Hassoun that there were a million "screws" in Lebanon that "slipped through [their] hands because there's no . . . money." Id. at 4. After Hassoun affirms that he understood what Daher's reference to one-million screws meant, Daher adds that "the dogs . . . the ones who are with the party of the devil" came and took the screws. Id. at 5.

conjunction with the other evidence at trial, these contributions could reasonably be viewed as Hassoun's attempts to equip mujahideen fighters with munitions for future battles. This support for violent jihadist activities—which had as an expected consequence, murder, kidnaping and maiming—was entitled to the jury's consideration when deciding Hassoun's specific intent.

Furthermore, with regard to having the intent to murder specifically, the jury was allowed to consider a variety of factors indicative of malice aforethought and premeditation. When drawing inferences in favor of the government, the jury was allowed to consider the lengthy time frame of the conspiracy, and how defendants observed and were informed of how their material support in America generated actual violence in various overseas locations. Furthermore, Hassoun's continued planning and involvement in these activities even after he observed the consequences of his actions is indicative of his premeditation and malice aforethought. Hassoun received news-report and first hand accounts of the jihad theaters to which he contributed , and could have disavowed the violence or extricated himself from the conspiracy if the violence did not comport with his intent.[19] See, e.g., GX 801, 802, 803 (reporting on killing, kidnaping and maiming in various jihad theaters). Hassoun never did this. Nor did he merely acquiesce in the violence perpetrated in these jihad areas. Rather, Hassoun continued to promote the violence in these regions and support the violence with money, equipment and recruits. See, e.g., GX T97/TR97 (discussing sending Padilla to fight in the jihad in Kosovo); GX T100/TR100 (informing Youssef that he will send Padilla, along with $5,000, to join him on the front lines of the Kosovo jihad). Numerous phone calls documented Hassoun's attempts to recruit individuals—including Herbert Atwell, Kamal al Naji, Adel Abdelwahab ("FishFish"),

---

[19] These inferences may be appropriately drawn against all defendants, considering their continued, dedicated and informed involvement in the lengthy conspiracy and their continued participation in achieving its goals.

Mohamed Youssef, and Jose Padilla—to fight in violent jihad conflicts abroad.  See., e.g., GX
101T/101TR (recruiting and persuading Kamal al Naji to join the jihad in Kosovo), GX 102T/102TR
(recruiting and persuading Adel Abdelwahab ("FishFish") to join the jihad in Kosovo).

Additionally, Hassoun discussed dividing the labor among various members of the conspiracy
and specified that "each [member of the conspiracy] has a duty and a mission . . . let him work on it
and perfect it." GX18/TR18.  Statements such as this, when viewed in conjunction with statements
suggesting the nature of the conspiracy could reasonably be perceived by the jury as evidencing
Hassoun's premeditated intent. For instance, on a call with Jayyousi and Daher, Hassoun explains:

> [T]he important thing is that each one of us completes the other . . .
> so if you can't finish something your brother will complete it for you,
> and the other brother will complete it for him, and so on . . . so we are
> all a connected link . . . if someone splits from this link, the link is no
> longer connected, and each one is on their own.  We don't want to get
> to that point . . . especially that tourism work is a good work, because
> there are a lot of tourists and a lot of people who would like to go do
> tourism . . . so we work toward, of course to always inform them of
> the nice places for tourism and so on . . . and 'resort places' and so on
> . . . .

Id. at 12.

Accordingly, the government provided sufficient evidence that Hassoun harbored the requisite
specific intent for Count One.  Furthermore, there was sufficient evidence for a reasonable jury to find
that Hassoun was a party to the section 956 conspiracy charged, and that he additionally conspired
to, and indeed provided material support in furtherance of this conspiracy.

       **2.**      **Offense Time frame**

Hassoun also claims that there was no evidence suggesting that his participation in the
substantive material support offense (Count Three) continued on or after October 26, 2001, the date

when the penalties for that offense increased.  Hassoun's assertion is incorrect.  The government offered the "Afghan relief" check, written by Hassoun on November 1, 2001, to evidence material support provided by Hassoun after the October 26th threshold.  When viewed in conjunction with the government's other evidence, this check alone was sufficient to carry the government's burden with regard to the extended time frame.

First, the check was made out to Global Relief Foundation [hereinafter "GRF"].   The government had already offered evidence indicating that Hassoun had used GRF to funnel money for violent jihad abroad.  See, e.g., GX 600(o) (Hassoun's check to GRF for "Chechen Tourism and Media," with Koranic verse about retribution).  Second, the government offered evidence that the defendants used "relief" as a codeword for jihad.  See, e.g., GX 205F/205FT (facsimile warning co-conspirators not to discuss matters related to "relief" over phone); GX 99T/99TR (conversation in which al Qaeda—"Dr. Ayman's Group"—is referred to as a "relief organization.").  Third, Hassoun placed the duty to fund violent jihad above supporting humanitarian pursuits, further evincing that this was the most likely purpose of his donation.  See, e.g., GX 76T/76TR (Hassoun advising to "allocate for the playing of football with the intention that you want to play football with your money" and noting within the context of charitable giving that "if the playing of football (soccer) is active nothing precedes it").  Hassoun made it clear that funding violent jihad precedes all other duties "[e]ven if the hungry are dying."  Id.  Fourth, the government presented evidence supporting the assertion that violent jihad was being fought in Afghanistan at the time.  Dr. Rohan Gunaratna testified that the United States invaded Afghanistan  in October 2001, and the jury heard testimony that the U.S. forces were still present in Afghanistan in December 2001.  See Tr. 7/10/07 at 122; Tr. 5/15/07 at 56-57.

The jury could have reasonably inferred that by writing this check Hassoun sought to fund the Taliban and al Qaeda's violent jihadist efforts in Afghanistan.  The defendants saw the Taliban, and the haven that it created for al Qaeda, as the springboard for a worldwide Islamic state.[20]  GX 2T/2TR (referring to Afghanistan as "the most critical spot in the whole Islamic world" and noting that it was the "key to the return of the Islamic state"); DX89T/89TR (discussing the Taliban sanctioned al Qaeda camps in Afghanistan).  When considered collectively, and in the light most favorable to the government, the jury could have reasonably agreed with the prosecution's interpretation of Hassoun's November 1, 2001 "Afghan relief."  Accordingly, the jury were entitled to conclude that Hassoun provided material support past the October 26, 2001 increased penalty threshold.

### B.     Padilla's Rule 29 Motion for Judgment of Acquittal

### 1.     Participation Within the United States

In his Motion for Judgment of Acquittal Padilla asserts that the government failed to prove the territorial requirements germane to both Counts One and Three.  Specifically, Padilla claims that the government did not adduce sufficient evidence at trial for a reasonable jury to find, beyond a reasonable doubt, that Padilla: a) engaged in a conspiracy to murder, kidnap, or maim while physically

---

[20] Furthermore, Hassoun's espoused ideologies and affiliations lend additional support to the government's claim that by writing this check, Hassoun was funding violent jihadist activity in Afghanistan.  Hassoun expressed his approval of Osama Bin Laden's declaration of violent jihad in a CNN interview.  GX 53T/53TR.  Hassoun introduced himself as a member of Makhtab al Khidmat, an al Qaeda affiliate.  GX 69T/69TR.  Furthermore, other comments made by Hassoun support the claim that Hassoun would not be averse to his funds being used to support al Qaeda and Taliban resistance efforts against the American military in Afghanistan.  See, e.g., Id. (referring to Americans as infidels and stating that they can only be dealt with by the sword); GX 68T/68TR (expressing approval of an al Qaeda affiliate in Somalia attacking Ethiopian forces and American military helicopters).

within the United States, and b) provided or concealed material support to a section 956 conspiracy to murder, kidnap, or maim while physically within the United States.  Padilla claims that the governments purported failure to meet Count One and Three's territorial restrictions entitle him to a judgment of acquittal on these counts.  In support of this contention, Padilla cites the limited number of phone calls he appears on while present in the United States, and the seemingly innocuous nature of these communications.  Padilla's argument misconstrues the scope of the evidence the government may use to prove Count One and Three's territorial requirements.  When viewed in the light most favorable to the government, the evidence presented at trial was sufficient to prove that Padilla engaged in the section 956 conspiracy and provided or concealed support to a section 956 conspiracy while physically within the United States.

In support of his argument, Padilla points to the "scant evidence" directly documenting his activities while in the United States.  See Padilla's Motion for Judgment of Acquittal at 9.  However, it was by no means necessary for the government to limit its case against Padilla in this fashion. Padilla's relevant activities and conversations—within the United States and abroad—were all entitled to consideration when the jury decided whether the territorial requirements were met.  Thus, the jury was allowed to consider Padilla's activities—such as attending an al Qaeda training camp in Afghanistan—and conversations abroad to lend perspective to those conducted while within the United States.  The jury was entitled to use this evidence in forming an opinion about Padilla's reasons for leaving the United States in the first place.  Furthermore, the jury was permitted to consider the conversations and activities of his co-conspirators to shed light on the degree of Padilla's involvement in the crimes while in the United States.  Accordingly, the prosecution was entitled to use the entirety of its evidence to prove that when Padilla initially boarded the plane to Egypt, he did

13

so while already engaged in a conspiracy to murder, kidnap, or maim.  Likewise, the prosecution was granted the same evidentiary parameters to prove that Padilla provided or concealed material support to a section 956 conspiracy to murder, kidnap, or maim while physically within the United States.

The government presented evidence indicating that as far back as 1996, while living in South Florida, Padilla agreed to train and fight in violent jihad.  See GX 58T/58TR (Youssef indicates that Padilla is in agreement and that he wants Padilla to join him on his trip; Hassoun states that he will prepare Padilla);[21] GX 62T/62TR (Youssef and Jayyousi speaking in code words indicating Padilla's agreement to train for violent jihad in Afghanistan).[22]  Padilla was very careful to avoid discussing violent jihad on the telephone.  In a July 28, 1997 call, Padilla, while living in South Florida, reaffirmed his participation in the charged conspiracies.  Padilla ensured Hassoun that "it's gonna happen soon," following a conversation discussing violent jihad.  See GX 88T/88TR.  During this same conversation, Padilla told Hassoun that Youssef talks to much and instructed him not to tell Youssef things over the telephone.  This clandestine behavior and Padilla's extolling the virtues of patience and discipline are indicative of Padilla's premeditated, well thought out plan to engage in the conspiracy's violent jihadist acts.  In the meantime, Youssef had already left for Egypt and joined the

---

[21]    The jury considered this call in conjunction with other evidence indicating that Hassoun had recruited Youssef to fight in various jihad theaters and that Youssef had fought in Kosovo.  In addition to the discussion of Padilla's agreement, during this call, Hassoun also told Youssef that he would need a couple of more weeks before he could tell him where to go.  See GX 58T/58TR.

[22]    On this June 16, 1996 call, Hassoun and Youssef discussed a "commercial deal" and Hassoun explained that Youssef's "partner" has agreed, despite reservations about the price.  Youssef identified Padilla as his "partner" on a January 6, 1996 call.  See GX 37T/37TR.  Additionally, the jury was free to infer that the "commercial deal" identified was a reference to violent jihad in Afghanistan based on Hassoun's reference to a June 8, 1996 call with Kassem Daher on the same topic.  See GX 60T/60TR.  Furthermore, Agent Kavanaugh also provided evidence indicating that the defendants' reference to a "commercial deal" in this context was a coded reference to "jihad activity."  Tr. 6/8/07 at 44.

violent jihad in Kosovo. Consistent with the sentiments Padilla expressed in the July 28, 1997 conversation, Hassoun later told Youssef that Padilla would be joining him.

Padilla was still in the United States when Hassoun and Youssef spoke on June 25, 1998. GX 97T/ 97TR. During this conversation, Youssef expressed that he and four others were going to provide "humanitarian aid" and "work with the refugees" in Kosovo. Id. The government presented evidence indicating that these were code words for fighting violent jihad. See Tr. 6/8/07 at 149-51. When Hassoun expressed that he wanted to send another individual due to the overwhelming need, Youssef stated "Doctor Ibrahim . . . Ibrahim Padilla." Id. Hassoun then added, "I understand what you mean, he is a good surgeon." A few days later, on July 18, 1998, Youssef and Hassoun speak again, with Youssef confirming that he was in Kosovo and on the front lines. See GX 100T/100TR (Youssef notifying Hassoun that "we entered Kosovo yesterday, under bombing from the Serbs, and we have casualties" from a satellite phone). Hassoun stated that he was sending "Ibrahim"—identified as Padilla—and Youssef explained that he needed a referral to enter. Id. Following a discussion about money, Hassoun assured Youssef that he would send the requested funds with Padilla. When viewed in conjunction, these calls all support the government's claim that when Padilla boarded the airplane in Miami, Florida, in September 1998, he had already formed the intent to train for and participate in violent jihad. Thus, the conspiratorial agreement to murder, kidnap, or maim abroad was reached while Padilla was physically within the United States.[23]

---

[23] When viewed in this light, Padilla's act of getting on the airplane in Miami, Florida, itself satisfies the separate and independent territorial requirement under Count Three's material support charges. The Text of 18 U.S.C. § 2339A(b) specifies that "material support or resources" encompasses "personnel (1 or more individuals who may be or include oneself)." Padilla formed the specific intent to provide himself to fight in violent jihad. Thus, his act of boarding the plane to effectuate this goal satisfied section 2339A's directive requiring provision of material resources "knowing or intending that they are to be used in preparation for, or in carrying out, a violation of

Furthermore, the government adduced evidence of activities and conversations that transpired after Padilla's departure from the United States indicating that his international travels were never intended for innocent purposes.  These discussions suggest that Padilla never expected to stay in Egypt, but rather, viewed it as a first step in a path to jihad.  See, e.g., GX 111T/111TR (Hassoun explaining that Padilla is not to settle in Egypt and that he is going "someplace else"); GX 112T/112TR (Kamal al Naji expressing that he had information about Padilla studying in a different place, and being hesitant to discuss matters over the phone); GX 113T/113TR (Padilla giving Hassoun a phone number where he could be reached in case the "door opens.");[24] GX 116T/116TR (Hassoun encouraging Padilla to be prepared to leave Egypt quickly and to have his finances in order).  Moreover, on an April 10, 2000 call placed three months before Padilla attended an al Qaeda training camp, Hassoun informed Padilla that he is leaving Egypt, and Padilla vowed never to return to the United States.  See GX 117T/117TR.  During this call, Hassoun informs Padilla that, with respect to his stay in Egypt, "you stay there understanding that you're staying there on the aim that next day you're leaving."  Id. at 16.  On the heels of this admonition, Hassoun reminds Padilla that he "prepared [him] psychologically before [he] went [to Egypt]."  Id.  These calls all support the assertion that Padilla's stay in Egypt was always expected to be impermanent, and that he intended to leave for jihad as soon as the opportunity arose.

Padilla correctly argues that the mere presence of a defendant with alleged conspirators is insufficient to support a conviction.  See Padilla's Motion for Judgment of Acquittal at 17 (citing

---

section . . . 956."

[24]    See Tr. 6/12/07 at 105 (interpreting "door open" as a code expression for "[a]n opportunity to travel to a jihad").

United States v. To, 144 F.3d 737, 745-46 (11th Cir. 1998).  However, the evidence at trial, when viewed most favorably to the government, does not merely show Padilla's presence among and association with his co-conspirators.  Rather, the calls, testimony, and the fruit of defendants' effort—Padilla attending an al Qaeda training camp, evinced by his training camp application[25]—prove that Padilla was an integral part of defendants' conspiratorial agreement.  Specifically, the evidence demonstrated Padilla's complicity in a "specific plan to engage in violent jihad, which had as a necessary consequence murder, kidnaping, and maiming."[26]  Gov. Resp. to Def. Motions for Judgment of Acquittal at 9.

Padilla actively participated in planning the defendants' scheme. He discussed his intentions to train and fight with his co-conspirators, he boarded a plane fully intending to train for and fight in violent jihad abroad, and he ultimately attended an al Qaeda training camp in Afghanistan. Furthermore, Padilla even criticized and instructed his co-conspirators about how jihad should be

---

[25]  See GX 403A-E/403TR A-E.  The government presented evidence of Padilla's mujahideen information form filled out while Padilla attended an al Qaeda training camp in Afghanistan.  The form was included in a binder containing numerous other mujahideen information forms submitted by potential al Qaeda recruits.  The government additionally adduced extensive evidence verifying that exhibit 403 was indeed filled out by Padilla.  See, e.g., GX 404 (Padilla's fingerprint card); GX 406 (Enlargement of two Padilla prints).

[26]  Padilla's active and ongoing participation in the conspiracy distinguishes his case from the caselaw that he cites.  The government's evidence did not document Padilla's mere presence, passive acquiescence or knowledge of the conspiratorial scheme.  Rather, the evidence proffered by the government indicated that Padilla pro-actively made himself a party to the conspiracy by agreeing to further its objectives and taking steps to ensure that these objectives were met.  Thus, Padilla's reliance on To is misplaced.  In To, the court held that the government presented no evidence that the defendant was actively involved in the conspiratorial scheme.  See To, 144 F.3d at 745-46.  Furthermore, the court noted that mere knowledge does not support the conclusion that a defendant "voluntarily participated in the agreement or the accomplishment of its goals."  Conversely, here, the government presented substantial evidence that Padilla was actively involved in planning and furthering the goals of the conspiracy.  Thus, Padilla's voluntary participation constituted more than mere knowledge and distinguishes the circumstances in this case from those in To.

discussed and the attributes necessary to participate in jihad.   Padilla's status as one of the conspiracy's mujahideen recruits further embroiled him in the conspiracy's web by making him an instrument of the scheme itself.  Padilla's involvement in the defendants' agreement went well beyond mere presence.  Padilla voluntarily participated in planning aspects of the conspiracy, participated in the accomplishment of its goals, and took steps to ensure that these goals were effectuated while in the United States.   Accordingly, the jury were entitled to conclude that Padilla engaged in a conspiracy to murder, kidnap, or maim and provided or concealed material support to a section 956 conspiracy to murder, kidnap, or maim, both while physically within the United States.

## 2.    Offense Time frame

Padilla also claims that there was no evidence suggesting that his participation in the substantive material support offense (Count Three) continued on or after October 26, 2001, the date when the penalties for that offense increased.  In support of this contention, Padilla asserts that the operative dates for the Count Three charge are the actual dates upon which Padilla provided or concealed material support to the conspiracy within the time frame of the Indictment.  Furthermore, Padilla argues that there is no indication in the text of 18 U.S.C. §2339A that Congress intended to deviate from the ordinary rule that the doctrine of continuing offenses should be applied in limited circumstances and only when "the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one."  Toussie v. United States, 397 U.S. 112, 115 (1970) (rev'd on other grounds).

The government cites no authority to support its contention that section 2339A is a continuing offense.  Furthermore, there is no explicit language in the statute or indication that Congress intended

this crime to be a continuing one.  See, e.g., United States v. Kramer, 73 F.3d 1067, 1072 (11th Cir. 1996 (holding that money laundering involving concealment is not a continuing offense). Accordingly, I find that the government's argument was insufficient to support the contention that section 2339A is a continuing offense.  The government also advances that Padilla's false and evasive statements made on May 8, 2002 were proof that he was still involved in providing or concealing material support past the October 26th threshold.  Agent Fincher—the FBI agent who interviewed Padilla in Chicago upon his May 8, 2002 return to the United States— testified that Padilla was being evasive and concealing information during this exchange.  See Tr. 7/12/07 at 106.  He noted that Padilla had a good memory and was able to answer questions not related to the charged crimes or his time abroad.  Id. at 97-99.  However, Agent Fincher observed that when the questioning shifted to Padilla's activities in the Middle East, he would not answer the most basic and simple questions. Id. at 101-104.

Agent Fincher explained that, with regard to his time in the Middle East, Padilla concealed information regarding the individuals he associated with, his whereabouts and his activities.  See, e.g., Id. at 105 (stating that he had never traveled to Afghanistan during his time abroad).  For instance, Padilla  stated that his roommate in Egypt was an individual named "Mohamed" in response to questioning.  The government's evidence indicated that this individual was Mohamed Youssef, Padilla's friend and co-conspirator from South Florida.  Despite the close relationship, Padilla stated that he could not remember Mohamed's last name.  Id. at 100.  Padilla's attempts, during this colloquy, to conceal the identity of various individuals, locations, and activities—all associated with his illicit activity abroad—must be viewed in the light most favorable to the government.  Thus, the jury was reasonably entitled to consider this exchange when determining whether Padilla "concealed

. . . the nature, location, source, or ownership of material support or resources,[27] knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section . . . 956" See 18 U.S.C. §2339A.

### C.   Jayyousi's Rule 29 Motion for Judgment of Acquittal

_____Jayyousi's Motion, while ostensibly a Rule 29 Motion for Judgment of Acquittal, focuses almost entirely upon purported trial errors and contentions with my Orders and rulings. These claims focus on procedural infirmities and not, as required by Rule 29, sufficiency of the evidence. Accordingly, to the extent that Jayyousi's claims exceed the scope of Rule 29, they will not be considered here.[28]

Jayyousi's general assertion that "a reasonable jury could not have returned a verdict of guilty, based solely upon the evidence presented at trial," Jayyousi's Motion for Judgment of Acquittal at 2, is not supported by argument in Jayyousi's Motion, and does not reflect the evidence presented at trial. The government's evidence documented Jayyousi's participation in the conspiracy and furtherance of its goals. Similarly to Hassoun, the government adduced evidence indicating that Jayyousi subscribed to a violent form of jihad. See, e.g., GX 801, 802, 803 (publishing his Islam Report where his "jihad news" bulletins consistently included reports of killing, kidnaping, and

---

[27]   18 U.S.C. §2339A defines material support or resources to include inter alia "lodging, training, expert advice or assistance, safehouses, false documentation or identification . . . [and] personnel (1 or more individuals who may be or include oneself) . . . ."

[28]   Many of these claims were included in Jayyousi's Rule 33 Motion for a New Trial. See D.E. 1235. These arguments are all addressed in my 'Order Denying Defendants' Motion for New Trial,' filed simultaneously with this Order. See D.E. 1269.

maiming);[29] GX 203 (expressing his support for Fathi Shishani's—commander of Chechen mujahideen—violent interpretation of jihad); GX T9/TR9 (praising news from Bosnia indicating that two individuals were beheaded by perpetrators attempting "to get closer to Allah"). The government also provided significant evidence indicating Jayyousi's complicity in the conspiratorial scheme, including participation in phone calls discussing funding violent jihad, utilizing code words to cover up illicit activity and recruiting mujahideen. See, e.g., GX 18T/18TR (discussing how each member of the conspiracy has a distinct role, similar to links in a chain, and discussing the importance of their continued work in "tourism"); GX 12T/12TR (discussing funding "football" and how "the brothers are ready to play football"); GX 28T/ 28TR (discussing the "first area" and how there are "football courts" ready for whomever wants to train for the game); GX 31T/31TR (inquiring whether "football" was being played in a specific area and whether or not there was a "playground" available).

Furthermore, the government provided evidence documenting Jayyousi's efforts to secure communications equipment and to fund the travels of mujahideen recruits destined for training in Afghanistan or fighting in Chechnya. See, e.g., GX 17T/17TR (expressing that mujahideen fighters were being killed because they lacked communications equipment); GX 43T/43TR (talking about the need to acquire cellular phones for Chechen mujahideen); GX 10T/10TR (discussing raising money to fund brothers who "would like to go for tourism"); GX 12T/12TR (discussing playing "football" and assuring Daher that he has the "preparation funds"). This evidence documented Jayyousi's ongoing, methodical and calculated complicity in the object of the conspiracy. Accordingly, the jury

---

[29] Jayyousi's First Amendment argument with regard to these materials, misconstrues the purpose of the evidence in question. There was never any indication that Jayyousi's publications were criminalized or his right to free speech squelched. Jayyousi was not on trial for his writings or his publications. Rather, the writings and publications were offered as evidence of Jayyousi's interpretation and conception of jihad, and were by no means, in and of themselves, evidence of guilt.

were entitled to conclude that Jayyousi engaged in a conspiracy to murder, kidnap, or maim and provided or concealed material support to a section 956 conspiracy to murder, kidnap, or maim, both while physically within the United States.

IV.    **CONCLUSION**

For all the foregoing reasons, and based upon the record at trial and the entirety of evidence presented by the government in this case, the defendants are not entitled to judgments of acquittal on any of the three counts in the Indictment.

Accordingly, it is hereby**:**

**ORDERED and ADJUDGED** that defendant Hassoun's 'Post-trial Motion for Judgment of Acquittal' [D.E. 1218], filed on October 1, 2007, is **DENIED**.

**ORDERED and ADJUDGED** that defendant Padilla's 'Motion for Judgment of Acquittal Pursuant to Federal Rule of Criminal Procedure 29' [D.E. 1230], filed on October 11, 2007, is **DENIED**.

**ORDERED and ADJUDGED** that defendant Jayyousi's 'Motion for Judgment of Acquittal Under FRCrP 29' [D.E. 1236], filed on October 12, 2007, is **DENIED**.

**DONE AND ORDERED** in Chambers at the United States District Courthouse, Miami, Florida, this 20th day of November, 2007.

_Marcia G. Cooke_
MARCIA G. COOKE
United States District Judge

Copies furnished to:   *All Counsel of Record*