UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-60001-CR-COOKE/BROWN

UNITED STATES OF AMERICA

       Plaintiff,

vs.

KIFAH WAEL JAYYOUSI

       Defendant.

_____/

SENTENCING MEMORANDUM
OF KIFAH WAEL JAYYOUSI

**Summary**

    This Court should impose a sentence only after evaluating all of the factors set forth in *18 USC 3553a* equally with, and independently of, the Sentencing Guidelines.

    Kifah Jayyousi objects to the sentencing guideline range reflected in the Pre Sentence Investigation Report.  His objections have been served upon the Court and the Probation Department.  Kifah Jayyousi also objects to the Presentence Report because it fails to discuss non prison options as required by *FRCrP 32(d)(1)* and *18 USC 3661.*  Lastly, Kifah Jayyousi objects to the fact that his objections were not evaluated and resolved by the Probation Department as required by *Federal Rule of Criminal Procedure 32*, but in fact were analyzed and resolved by the United States Attorney's Office and simply adopted by the Probation Office.  The procedure followed unlawfully delegates the responsibility of the Probation Department and violates the

1

principles of separation of powers.

To the extent that his Co Defendants have discussed legal issues in common with those raised by Dr. Jayyousi, for the sake of judicial economy, Dr. Jayyousi incorporates those arguments by reference.

In addition to the objections to the guideline determinations proposed by the Probation Office, Kifah Jayyousi adjustments to the guideline range (formerly known as a departure) as follows:

5K2.0 This case falls outside the heartland of cases considered by the sentencing commission and the guidelines do not adequately satisfy the objectives of  §3553(a).

5K1.1 Substantial Assistance to authorities

5K2.10 Victim Conduct

5K2.11 Lesser Harms

**Argument**

**The Court's obligation to consider an appropriate sentence, generally**

18 USC § 3553(a) requires to Court to impose a sentence after considering the following factors:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or
vocational training, medical care, or other correctional treatment
in the most effective manner;

(3) the kinds of sentences available;

(4) the advisory Guideline range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities; and

(7) the need to provide restitution to any victims of the offense.

**18 U.S.C. § 3553(a).**

District court judges are mandated to determine an  appropriate sentence under § 3553(a)

completely independent of the Guidelines, and to consider nonfrivolous arguments and to impose

a sentence that varies from the guidelines on general policy grounds, case-specific grounds,

guideline-sanctioned departure grounds, or "regardless." *Rita v. United States, 127 S. Ct. 2456*

*(2007).*  The Court is required to impose a sentence that is "sufficient, but not greater than

necessary, to comply with the purposes" of *§ 3553(a)(2). Id.*   Thus, the Court's task is to

"consider" the seven listed factors contained in *§ 3553(a)*, and then to employ those

considerations in arriving at a sentence that is sufficient but not greater than necessary to

accomplish the purposes of sentencing listed in *§ 3553(a)(2)*:

> As we stated in *Koon*, "[i]t has been uniform and constant in the federal judicial
> tradition for the sentencing judge to consider every convicted person as an
> individual and every case as a unique study in the human failings that sometimes
> mitigate, sometimes magnify, the crime and the punishment to ensue." *518 U.S., at*
> *113, 116 S.Ct. 2035.* The Commission has not developed any standards or
> recommendations that affect sentencing ranges for many individual characteristics.
> Matters such as age, education, mental or emotional condition, medical condition
> (including drug or alcohol addiction), employment history, lack of guidance as a
> youth, family ties, or military, civic, charitable, or public service are not ordinarily

3

considered under the Guidelines. See *United States Sentencing Commission, Guidelines Manual §§ 5H1.1-6, 11, and 12 (Nov.2006).*  These are, however, matters that *§ 3553(a)* authorizes the sentencing judge to consider. See, e.g., *18 U.S.C. § 3553(a)(1). Rita 127 SCt at 2472-73.*

All eight justices who affirmed Rita's sentence agreed that a guideline sentence may not properly reflect the § 3553(a) purposes and factors, that the Guidelines may reflect unsound judgment, that the Guidelines may not treat individual characteristics properly, and that the case may warrant a different sentence "regardless."  *Id. at 2465, 2468.*  And they all recognize that the district court must apply the parsimony clause.  *Id. at 2463, 2467; id. at 2482* (Scalia & Thomas, JJ., concurring).

**Offender Characteristics**  –In *Rita,*  Justices Stevens and Ginsburg explicitly note that the Sentencing Commission has created no standards or recommendations based on individual characteristics, i.e., they are "not ordinarily considered under the Guidelines,"  But *3553(a)* "requires" sentencing judges to consider these matters.  In the Sentencing Reform Act Congress directed the Commission to consider the relevance of a variety of offender characteristics, *28 U.S.C. § 994(d)*, and to reflect the "general inappropriateness of considering" education, vocational skills, employment record, family ties and community ties "in recommending a term of imprisonment or length of a term of imprisonment." *28 U.S.C. § 994(e).* Congress explained that the purpose of *§ 994(e)* was "to guard against the inappropriate use of incarceration for those defendants who lack education, employment, and stabilizing ties," but "each of these factors," in *§ 994(d) and (e)*, "may play other roles in the sentencing decision."  *S. Rep. No. 98-225, at 175 (1983).*  Indeed, the Senate Report suggests many ways in which these factors may be relevant to sentencing.  *See id. at 171-75.*

4

**This offense & This offender**– Kifah Jayyousi, who learned the horrors of war first hand as a child in the West Bank , was moved by the plight of other Muslims around the world who were the victims of oppression and persecution.  Armed with the blessings of liberty as a citizen of the United States, he determined to speak out against oppression and injustice and try to help those in need.

Dr. Jayyousi tried to help in any way he could.  He spoke out against tyranny in the strongest of possible terms.  His tone was confrontational.  He was committed to his faith in Islam and in America.  He helped build Mosques and schools.  He worked to build a hospital in Azerbaijan to serve the hundreds of thousands of individuals displaced by the war in Chechnya (JE 127)

Dr. Jayyousi believed in following the law.  He stated that in every issue of every newsletter he published (GX 801-801, JE 110; Jeremy Collins, 6/5/07). He believed that the work he was doing was legal (testimony of SA Kavanaugh)

Dr. Jayyousi spoke out on both popular and unpopular matters.  At no time did he ever endorse terror or violence as a vehicle for change.  He firmly believed, however, in the right of Muslims under attack to defend themselves.  He believed that he was acting to defend Muslims who were under attack from outside, and whom the world was ignoring (testimony, Jeremy Collins, June 5, 2007; GX 801-803).  None of the relief he supplied was for weapons or other military equipment.  The only possible thing that could have been useful for military use cited by the government, the satellite phones went to a Turkish charity and a Chechen government minister (Testimony SA Kavanaugh).

Dr. Jayyousi became involved in AWR for the purpose of helping provide relief to refugees (Jeremy Collins 6/5/07).  Fifty (50) to seventy (70) percent of the hundreds of thousands of pounds of relief supplies shipped from Erol Bulur's warehouse were the result of Kifah Jayyousi's efforts (Erol Bulur 8/1/07)

When Dr. Jayyousi learned that there were problems with the people he was depending on to deliver relief he sought other avenues. When things did not get better, he stopped, and let others carry the work load (JE 128, 6/30/96)

The sworn testimony in this trial established that Dr. Jayyousi was trusted and worked for the benefit of everyone.  The United States Government entrusted him with the safety of US military personnel.  His work saved US military lives (trial transcript, August 1, 2007).

Two major US school districts entrusted Kifah Jayyousi with the safety and security of their employees and students.  His work made those school districts safer and more effective places for children to learn, and saved those school districts millions of dollars.(trial transcript, August 1, 2007)

Dr. Jayyousi remains loved and respected.  People traveled at substantial inconvenience to themselves to testify on his behalf.  His family stands by him and respects his principles and efforts on behalf of his community.(attached)

*Kifah Jayyousi 1961-1978*

> Born a stateless person in Jordan; lived in Jordan, Egypt, Gaza and Syria as a refugee.

> Older sister died in refugee camp due to lack of medical care and resources
> As a ten (10) year old, he sees a tank shell crash through the house roof & into his bed.

*Kifah Jayyousi 1978-1987*

> Moved to US to attend college,
> When finished college, moved to Bronx and assisted in the family business

*Kifah Jayyousi 1987-1993*

> Enlisted US Navy
> Became US citizen
> Married
> Children

*Kifah Jayyousi  1993-1997*

> full time student at San Diego State in Master's program, at night. Studying for certification as professional engineer.  Working full time .
> Local Mosque activities; divorced women's program
> local religious school
> food bank
> career center; maintained mosque job board
> AIG which was a media outlet for Muslim issues (Jeremy Collins, 6/5/07)
> AWR
> The government has bank records & they show no checks to any terrorist group
> No evidence of any expenditure to help terrorists
> Helped parents and siblings
> > Could have lived in ease and comfort, but took his income to support parents and educate siblings

*Kifah Jayyousi 1997-2003*

6

Deputy Superintendent Detroit Public Schools
Deputy Superintendent Washington D.C. Public Schools
Adjunct Professor of Civil Engineering Wayne State University
Consultant, Sorensen Gross/US Army Corps of Engineers
General Manager & Managing Director PCSI Global Group
Helped parents and siblings
> Could have lived in ease and comfort, but took his income to support parents and educate siblings

**Guidelines Application and Sentencing Below the Guideline Range**

District courts are free to disagree with the Guidelines on general policy grounds, individualized fact-based grounds, or both.   District courts are no longer required, or permitted, to simply defer to the Sentencing Commission's policies.  *Rita, 127 S. Ct. at 2465, 2468* (district court may conclude that the guideline sentence fails to reflect § 3553(a) considerations, reflects an unsound judgment, does not treat defendant characteristics in the proper way, or that a different sentence is appropriate "regardless."); *id. at 2463.*

*Rita* invites arguments that attack the Guidelines head-on.  The district court "may hear arguments by prosecution or defense that the Guidelines sentence should not apply" because "the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply," "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations," or "the case warrants a different sentence regardless."  *Id. at 2465.*  A party may "contest the Guidelines sentence generally under § 3553(a)" by "argu[ing] that the Guidelines reflect an unsound judgment, or, for example, that they do not generally treat certain defendant characteristics in the proper way," or may "argue[] for departure."  *Id. at 2468.*  The district court must subject the Guidelines' advice (or whatever sentence the government or Probation Officer proposes) and the alleged facts to "thorough adversarial testing."  *Id. at 2465*, *FRCrP Rules 32(f),*

*(h), (I) (C) and (i) (D); see also Burns v. United States, 501 U.S. 129 (1991)* (recognizing

importance of notice and a meaningful opportunity to be heard at sentencing)." Put another way,

the sentence cannot be reasonable unless it was subjected to thorough adversarial testing and the

right to a full, formal, adversarial-style hearing.[1]   The Commission's procedural advice to find

facts by a preponderance of the probably accurate information, including hearsay, see *USSG*

*6A1.3*, produces substantial sentencing increases based on unreliable information.   The

Guidelines' procedural advice falls far short of the "thorough adversarial testing" described in

*Burns*, and thus, after *Rita*, cannot produce a "reasonable" sentence. It is the sentencing judge's

obligation to act completely independently of the Guidelines.  Facts that must be found in order

---

[1] According to *Burns*, 501 U.S. at 137-38:

> [T]his Court has readily construed statutes that authorize deprivations of liberty or property to require that the Government give affected individuals both notice and a meaningful opportunity to be heard. *See American Power & Light Co. v. SEC*, 329 U.S. 90, 107-108, 67 S.Ct. 133, 143-144, 91 L.Ed. 103 (1946) (statute permitting Securities and Exchange Commission to order corporate dissolution); *The Japanese Immigrant Case*, 189 U.S. 86, 99-101, 23 S.Ct. 611, 614-615, 47 L.Ed. 721 (1903) (statute permitting exclusion of aliens seeking to enter United States). The Court has likewise inferred other statutory protections essential to assuring procedural fairness. *See Kent v. United States*, 383 U.S. 541, 557, 86 S.Ct. 1045, 1055, 16 L.Ed.2d 84 (1966) (right to full, adversary-style representation in juvenile transfer proceedings); Greene v. McElroy, 360 U.S. 474, 495-508, 79 S.Ct. 1400, 1413-1420, 3 L.Ed.2d 1377 (1959) (right to confront adverse witnesses and evidence in security-clearance revocation proceedings); *Wong Yang Sung v. McGrath*, 339 U.S. 33, 48-51, 70 S.Ct. 445, 453-455, 94 L.Ed. 616 (1950) (right to formal hearing in deportation proceedings).

> In this case, were we to read Rule 32 to dispense with notice, we would then have to confront the serious question whether notice in this setting is mandated by the Due Process Clause. . . . [W]e decline to impute such an intention to Congress. *See, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress").

for a sentence to be lawful must be found by a jury beyond a reasonable doubt.  Facts that individual judges choose to make relevant to the exercise of their discretion may be found by judges. *Id. at 2477.*

Judges can make findings based on expert testimony and reports, criminological research, health and sociological studies. They are no longer confined to consulting only the guidelines, policy statements and official commentary of the Commission to determine whether a circumstance was "adequately taken into consideration" such that a departure is warranted, *18 U.S.C. § 3553(b)(1) (2004)*, but must conduct their own assessments in discharging their statutory duties under *§ 3553(a)*.  In fact, *18 U.S.C. § 3661* provides "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."[2]

### *Multiple Guidelines*

USSG §1B1.11. Use of Guidelines Manual in Effect on Date of Sentencing (Policy Statement)

> (a) The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.
> (b)(1) If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the ex post facto clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed.

---

[2] *Williams v. New York*, 337 U.S. 241, 246 (1949) ("Both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law.").

Application Notes:

> Consequently, even in a complex case involving multiple counts that occurred under several different versions of the Guidelines Manual, it will not be necessary to compare more than two manuals to determine the applicable guideline range -- the manual in effect at the time the last offense of conviction was completed and the manual in effect at the time of sentencing.

This case involves activity at various times between October 1993 and December 1997

The jury did not make any factfinding about what dates were involved in the conduct, other than to say it occurred before October 26, 2001.

The guidelines were modified several times substantively regarding the issue of a terrorism enhancement between 1993 and 2001, notably 1995, 1996, 1997 and 2001.

Prior to November 1, 1995 the subject of terrorism was applied only as a departure under 5K2.15

> "§5K2.15. Terrorism (Policy Statement)
>
> If the defendant committed the offense in furtherance of a terroristic action, the court may increase the sentence above the authorized guideline range.".

On November 1, 1995 the guidelines were amended to change how the subject was to be addressed.   §3A1.4 was added and §5K2.15 was deleted.  The new §3A1.4 was applied only to crimes of "international terrorism" *Amendment 526.*

Effective November 1, 1996, the guidelines were again amended to change how the subject of terrorism should be considered by the guidelines.  This time, in response to a Congressional directive, the Commission replaced the term "international terrorism" with the phrase "a federal crime of terrorism" which made the term much more broad than had been

10

previously applied.  This was an temporary, emergency amendment and would expire at the end of the next amendment cycle unless made permanent. *Amendment 539-540.*

The process was repeated on November 1, 1997, when §3A1.4 was made a permanent part of the guidelines scheme.

Effective. October 26, 2001, 18 USC §956 was added as a predicate offense to 18 USC §2332b(g)(5).  Since the jury determined that Dr. Jayyousi was not a part of any offense conduct after this date, its provisions cannot be applied to Dr. Jayyousi without violating the *Ex Post Facto Clause of the United States Constitution*.

These constant changes in the language and scope of the guidelines as they relate to the subject of terrorism demonstrate that the policy commands of 1B1.11 cannot be so easily applied to the case at bar, because it relates to a changing course of conduct which takes it outside the "heartland" of the guidelines and for that reason the sentence in this case must be different from the guideline calculation. The policies which drove the application have changed, the guidelines which authorized that application have changed, and the cases interpreting the guideline all relate to the current guideline, which became effective after the date the jury determined Dr. Jayyousi was not part of this case, not any of its predecessors, which are linguistically and historically different.

The guidelines cannot be applied retroactively, see *US v. Nichols*, 169 F 3d 1255 (10th Cir 1999).  Nor should the Court find that the commentary is merely interpretation that can be applied without reference to the rules that affect guideline interpretation.  In addition to the actual language of the Guidelines, courts must also consider the Guidelines' Application Notes, as they are viewed as "part of the Guidelines themselves, and not mere commentary on them." *United*

*States v. Garcia-Lopez, 375 F.3d 586, 587 (7th Cir.2004); see also Stinson v. United States, 508*

*U.S. 36, 38, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993).*

The Court cannot apply the changed guidelines to the offense conduct in this case, because the Court cannot find which guidelines were in effect on the date of the offense by simply referring to the jury verdict.  Accordingly, the Court should determine the appropriate sentence without reference to the 3A1.4 guideline enhancement.

**The facts of this case establish USSG 3A1.4 should not be applied in this case**

In his objections to the Presentence Report, Dr. Jayyousi has argued that the facts of this case do not warrant application of the 3A1.4 enhancement.  Although Dr. Jayyousi has argued that he has not committed a "federal crime of terrorism" as defined in *18 USC 2332b(g)*, he recognizes that courts have held that the enhancement may be applied without regard to the title of the offense of conviction, *United States v. Mandhai, 375 F.3d 1243, 1247 (11th Cir.2004)*[3].  According to the cases, a defendant must commit an offense that is calculated to influence or effect the conduct of government by intimidation or coercion, or to retaliate against government conduct. The terrorism enhancement is applicable where a defendant is convicted of a federal crime of terrorism as defined by § 2332b(g)(5)(B) or where the district court finds that the purpose or intent of the defendant's substantive offense of conviction or relevant conduct was to promote a federal crime of terrorism as defined by § 2332b(g)(5)(B). *Mandhai, supra*[4]*; United States  v.*

_____

[3]Although Dr. Jayyousi recognizes that courts have held contrary to his position, he does not abandon his assertion.  The enabling legislation of § 3A1.4, makes it clear that Congress intended § 3A1.4 to apply only upon a federal crime of terror conviction as detailed in 18 U.S.C. § 2332b(g)(5)(B)

[4]Mr. Hassoun's counsel has discussed the *Mandhai* case at length in his sentencing memorandum [DE1278].  Rather than repeat Mr. Hassoun's comments, Dr. Jayyousi incorporates them by reference.

*Dowell, 430 F3d 1100 (10ᵗʰ Cir, 2005)*; *US v. Arnaout, 431 F3d 994 (7th Cir, 2005)*.  The fact that

the government here changed its allegation from those contained in the indictment and submitted

to the jury, to wit: that Dr. Jayyousi supported groups that opposed existing governments

(indictment ¶ 1) to the broader claim which parrots the language of the case law should be seen as

an admission that the government knows it has not met its burden of proof with regard to the

factual basis for the application of this enhancement.

Dr. Jayyousi has additional support for his position that *§3A1.4* does not factually apply to

this case.  In *United States v. Arnaout, supra,* the district court declined to apply the enhancement

in a case where the defendant pled guilty to racketeering offenses relating to Benevolence

International Fund, and diversion of its charity funds to Bosnian and Chechen mujahideen.

Although the 7ᵗʰ Circuit remanded the case for resentencing on other grounds, it held that the

refusal of the district court to apply the enhancement to a man who had admitted to sending

support to the mujahideen was proper.

> In enhancing a defendant's sentence pursuant to § 3A1.4 where the
> defendant has not been convicted of a federal crime of terrorism,
> however, a district court must identify which enumerated federal
> crime of terrorism the defendant intended to promote, satisfy the
> elements of § 2332b(g)(5)(A), and support its conclusions by a
> preponderance of the evidence with facts from the record. See, e.g.,
> Graham, 275 F.3d at 517. After application of § 3A1.4, the district
> court can then impose a sentence up to the statutory maximum of
> the underlying offense of conviction. U.S.S.G. § 5G1.1(a) ("Where
> the statutorily authorized maximum sentence is less than the
> minimum of the applicable guideline range, the statutorily
> authorized maximum sentence shall be the guideline sentence.");
> Dean, 414 F.3d at 727.
>                    ***
> In this case, the district court found that Arnaout's offense of
> conviction was not included in the exhaustive list of federal

13

offenses set out in 18 U.S.C. § 2332b(g)(5)(B) and, therefore, did not apply § 3A1.4. ...the district court did find that the record did not establish by a preponderance of the evidence that Arnaout attempted, participated in, or conspired to commit any act of terrorism. **The district court also found that the government had not established that the Bosnian and Chechen recipients of BIF aid were engaged in a federal crime of terrorism, or that Arnaout intended the donated boots, uniforms, blankets, tents, X-ray machine, ambulances, nylon or walkie talkies to be used to promote a federal crime of terrorism.** We find all of the district court's findings on this issue consistent with the record, not clearly erroneous, and sufficient to support the district court's refusal to apply § 3A1.4. *Arnaout, at 1002-1003.(emphasis added)*

Although the government has argued here that Dr. Jayyousi intended to support these same groups, it offered no proof that either the groups he supported engaged in "federal crimes of terrorism" or that Dr. Jayyousi intended that they be used to promote "federal crimes of terrorism." Accordingly, this Court should not apply the §3A1.4 enhancement to the facts of this case.

### This Court should impose a sentence below the guideline range

*5K2.0* This case falls outside the heartland of cases considered by the sentencing commission and the guidelines do not adequately satisfy the objectives of *§3553(a)*.

When the commission was creating these guidelines, they weren't thinking of people who were responding to humanitarian crises overseas. They were thinking of bombers like McVey, Nichols and the Nuradin Abdi, the shopping center bomber in Columbus, Ohio.

Even before *Booker*, departures based on the fact that the guidelines overstate the seriousness of the offense were recognized. See *United States v. Restrepo*, 936 F.2d 661 (2d Cir. 1991); *United States v. Alba*, 933 F.3d 1117 (2d Cir.1991); and *United States v. Lara*, 47 F.3d. 60 (2d Cir. 1994).

### Dr. Jayyousi should receive a sentence reduction pursuant to 5K2.10

In making this argument Dr. Jayyousi does not admit that he was involved in any conspiracy to commit murder, nor does he rely on the defense that some people just need killing. He presents this guideline factor to remind the Court of the environment in which all of the activity during the time of the indictment occurred and to prevent the revisionist history argued by the government from being accepted as fact. Documents supporting claims of international tribunal findings and claims will be physically filed separately from this memorandum.

The Sentencing Guidelines allow this Court to take into consideration the conduct of the alleged victims in this case in fashioning a just sentence for Dr. Jayyousi. Indeed, victim misconduct is an encouraged basis for departure, *Koon v. US*, 518 US 81 (1996). While the PSR states that there are "no identifiable victims" who were harmed by Dr. Jayyousi, the same cannot be said for the victims of the so-called class of intended "victims", the Serbian and Russian military forces. It is the actions of those military forces – Dr. Jayyousi's supposed intended victims – that Dr. Jayyousi now asks this Honorable Court to consider in fashioning a just sentence.

Under the heading "**SEEKING INFORMATION AGAINST INTERNATIONAL TERRORISM**," The United States Government now has created a program that seeks the capture of former Serbian military and government officials who are accused of war crimes and crimes against humanity for their actions in Bosnia since 1991. The program is called "Rewards for Justice", and under the "Seeking Information" heading, the United States Government explains the program as follows:

**Crimes Against Humanity**

Since 1991, thousands of residents of the former Yugoslavia have been

15

tortured, murdered, raped or imprisoned.



**(Photo in Original)**

The victims of these crimes against humanity deserve justice. Many of these crimes are serious violations of international humanitarian law, and many of the people who committed them are subjects of criminal indictments by the United Nations International Criminal Tribunal for the Former Yugoslavia. To bring to justice those who have been indicted for these crimes, the United States Government is offering a reward for information. Individuals who furnish information leading to the arrest or conviction in any country, of a war criminal indicted by the International Criminal Tribunal, may be eligible for a reward of up to $5 million and protection of their identities. A reward may also be paid for information leading to the transfer to, or conviction by, the International Criminal Tribunal of an indicted war criminal.

Rewards for Justice, (<http://www.rewardsforjustice.net/english/index.cfm?page=Torture>).

Today, Dr. Jayyousi, not those sought by the Rewards for Justice program, who is held in a cell in the Special Housing Unit of the Federal Detention Center in Miami, Florida, facing imprisonment for the remainder of his life.  But the evidence, inescapably leads to the conclusion that Dr. Jayyousi's motivation for participating in the acts he stands convicted of, was to stop or minimize the harm caused by the persons who the United States Government has now chosen to categorize as 'International Terrorists,' and others like them.

Although this court ruled that self-defense, justification and defense of others were not available to Dr. Jayyousi as defenses to the charges brought by the Government , the  conduct of the "victims" of the offenses Dr. Jayyousi was convicted of is a relevant consideration for sentencing. Section 5K2.10 is a policy statement explaining that a downward departure is permissible "[i]f the victim's wrongful conduct contributed significantly to provoking the offense behavior."  It reads in full:

If the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense. In deciding whether a sentence reduction is warranted, and the extent of such reduction, the court should consider the following:

The size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant.

The persistence of the victim's conduct and any efforts by the defendant to prevent confrontation.

The danger reasonably perceived by the defendant, including the victim's reputation for violence.

The danger actually presented to the defendant by the victim.

Any other relevant conduct by the victim that substantially contributed to the danger presented.

The proportionality and reasonableness of the defendant's response to the victim's provocation.

U.S.S.G. 5K2.10.[5]  To warrant a reduction pursuant to 5K2.10, the victim need not pose a physical threat to the defendant.  For example, in Koon v. United States, the defendant police officers were convicted of violating the civil rights of an unarmed motorist named Rodney King by use of excessive force.  In Koon, the Supreme Court sustained the district court's section 5K2.10 downward departure despite the district court's finding that at the time of the offense behavior the victim "was no longer resisting arrest. He posed no objective threat, and the defendants had no reasonable perception of danger." Koon, 518 U.S. at 102, 116 S. Ct. at 2048.  The reasoning of the district court in the Koon case is directly in line with the intent of the sentencing commission because as 5K2.10 makes clear, the primary consideration for the court in determining whether or not a defendant should receive a

---

[5]     The version of 5K2.10 citied above is taken from the 2007 sentencing guidelines manual. In 2003, 5K2.10 was amended to include the sixth factor relating to proportionality of the response.  This factor further supports Dr. Jayyousi's request for a departure because as is shown in this motion, Dr. Jayyousi's response to Russian and Serbian atrocities was to attempt to preserve, not destroy, civilian life. See U.S.S.G. 5K2.10, Historical Notes, 2003 Amendments, Part III ("[t]he amendment provides that, in addition to five previously existing factors, the court should consider the proportionality and reasonableness of the defendant's response to the victim's provocation.").

reduction due to the conduct of the victim is whether or not "the victim's wrongful conduct contributed significantly to provoking the offense behavior." This Court, then, should examine the six factors listed to determine the appropriate level of any reduction. See e.g. *United States v. Harris*, 293 F.3d 863, 873 (5th Cir. 2002)("these are factors to be considered in determining the extent of a downward departure rather than whether there should be a downward departure").

The question of whether the victim's wrongful conduct significantly provoked Dr. Jayyousi's behavior involves two distinct questions: (1) was there wrongful conduct, and, (2) did it significantly provoke the offense behavior. The Government has not attempted to argue that Dr. Jayyousi should be held responsible for any conduct that related to any "victims" other than the Serbian and Russian soldiers the Government identified in the Bill of Particulars as victims.

**5K2.10 as it applies to the Serbian and Russian military "victims"**

Much of the information related to the Serbian forces relied upon by Dr. Jayyousi in this section of his Motion is garnered from Judgments of issued by the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia Since 1991 (hereinafter "ICTY"). [4]

**The wrongful acts of the Serbian military forces**

It is hard to imagine anything more wrongful than systematic genocide. That is exactly what the Serbian military undertook as it forged its brutal campaign against the Muslim civilians of Bosnia in the early to mid 1990s. It was only after the intervention, and the use of force, including force

---

[4]      Any Judgments referenced herein are being filed with the Clerk of Court. Those judgments were retrieved directly from the ICTY and bear an original seal of the ICTY attesting to the documents authenticity.

delivered by United States military personnel, that the ongoing mass murder of innocent Muslim

civilians was stopped.

On the 6th and 7th of April 1992, the European Community and the United States recognized

the Republic of Bosnia and Herzegovina.  That republic became a member of the United Nations on

May 22, 1992.  Prosecutor v. Radislav Kristic, Case No. IT-98-33-T, Judgment, August 2, 2001 at

p. xvii (ICTY).  Between March and April of 1993, the United Nations High Commissioner for

Refugees began evacuating Muslims from Srebrenica after threats from Serbian officials that the

Serbian military would attack Srebrenica unless the Muslims surrendered and agreed to be evacuated

from the Srebrenica enclave.  Id.  The United Nations Security Counsel responded by declaring

Srebrenica to be a "safe area" on April 16, 1993.  Id.  United Nations Protection Forces entered

Srebrenica later the same month.  Id.

> Srebrenica was important due to its prominence in the eyes of both the Bosnian
> Muslims and the international community.  The town of Srebrenica was the most
> visible of the "safe areas" established by the UN Security Council in Bosnia.  By
> 1995 it had received significant attention in the international media.  In its resolution
> declaring Srebrenica a safe area, the Security Council announced that it "should be
> free from armed attack or any other hostile act."  This guarantee of protection was re-
> affirmed by the commander of the UN Protection Force in Bosnia (UNPROFOR) and
> reinforced with the deployment of UN troops.  The elimination of the Muslim
> population of Srebrenica, despite the assurances given by the international community,
> would serve as a potent example to all Bosnian Muslims of their vulnerability and
> defenselessness in the face of Serb military forces.  The fate of the Bosnian Muslims
> of Srebrenica would be emblematic of that of all Bosnian Muslims.

Prosecutor v. Radislav Kristic, Case No. IT-98-33-A, Appeal Judgment, April 19, 2004 at ¶ 16

(ICTY)(internal notes omitted).  By the beginning of 1995, the situation in and around Srebrenica had

deteriorated and the Serbian forces were preparing to mount an attack on Srebrenica, which began in

July of 1995.  Prosecutor v. Radislav Kristic, Case No. IT-98-33-T, Judgment, August 2, 2001 at p.

xvii (ICTY).  The United Nations responded by bombing Serbian tanks but was forced to discontinue

the bombing in the face of Serbian threats to kill Dutch troops held in custody by Serbian forces.  Id.

> The events surrounding the Bosnian Serb take-over of the United Nations ("UN")
> "safe area" of Srebrenica in Bosnia and Herzegovina, in July 1995, have become well
> known to the world.  Despite a UN Security Council resolution declaring that the
> enclave was to be "free from armed attack or any other hostile act", units of the
> Bosnian Serb Army ("VRS") launched an attack and captured the town.  Within a few
> days, approximately 25,000 Bosnian Muslims, most of them women, children and
> elderly people who were living in the area, were uprooted and, in an atmosphere of
> terror, loaded onto overcrowded buses by the Bosnian Serb forces and transported
> across the confrontation lines into Bosnian Muslim-held territory.  The military-aged
> Bosnian Muslim men of Srebrenica, however, were consigned to a separate fate.  As
> thousands of them attempted to flee the area, they were taken prisoner, detained in
> brutal conditions and then executed.  More than 7,000 people were never seen again.

Prosecutor v. Radislav Kristic, Case No. IT-98-33-T, Judgment, August 2, 2001 at ¶ 1 (ICTY)(quotes

in original)(notes omitted).  For a detailed account of the atrocities committed by the Serbian forces,

refer to ¶¶ 31 – 87 of the August 2, 2001 Judgment of the ICTY court in Prosecutor v. Radislav

Kristic.  They were horrifying, and of significance to this Court's consideration, were widely known

to the international community. See id. at ¶¶ 88-89.

**The wrongful actions of the Serbian forces provoked Dr. Jayyousi's actions**

As noted above, the atrocities committed against the Bosnian Muslim civilians were well

known in the international community.  The evidence introduced at trial also proves that the wrongful

acts perpetrated by the Serbian forces were known to Dr. Jayyousi.

"Serb aggressors are surrounding Srebrenica and land mined all areas..." Islam Report,

April/May 1994 (GX 803.)  "Serbs, the enemies of humanity and soldiers of Satan, have launched a

cowardly attack on innocent civilians living in what the United Nations declared a safe area in Bihac.

The attack was on the city at all fronts using aircraft, anti-aircraft guns, artillery, tanks, mortars and

missiles.  The United Nations which had been helping the Serbs all along have announced that it was too dangerous to launch air strikes against the aggressor Serb army!  The Serbs are holding hundreds of UN soldiers as hostages, however the UN, the US and Europe have announced that no action will be taken against the Serbs."  Islam Report, December 1994 (GX 801.)

The only theory advanced by the Government that related to Bosnia and Dr. Jayyousi was that Dr. Jayyousi became involved in the conspiracy during the Bosnian conflict, when he began raising funds for Save Bosnia Now, an organization that was founded by Mohammad Zaky, (an unindicted co-conspirator) who the Government claims was a mujahedeen fighter who had fought against the Serbs in Bosnia and was killed fighting the Russians in Chechnya.  The evidence in this case is clear: any fundraising Dr. Jayyousi did for Bosnia was in response to the actions of the Serbian forces. Finally, the Government put into evidence a facsimile that was sent by Dr. Jayyousi to persons the Government claims were members of the "Bosnian Mujahideen."  (PSR at ¶ 42.)  It should be noted that even if the Government's version in the PSR is accurate, Dr. Jayyousi's actions amount to a show of moral support for what the Government claims was an irregular military force – a force that was fighting an organized military that was in the process of committing an organized genocide. However, the facts do not bear out the government version.   In fact, at trial S/A Kavanaugh acknowledged that the "Bosnian Mujahideen" were part of the regular Bosnian army – an army that was defending a country recognized by the United Nations and the United States of America. Prosecutor v. Radislav Kristic, Case No. IT-98-33-T, Judgment, August 2, 2001 at p. xvii (ICTY).

**The actions of the Russian "victims"**

Between November 23 and November 25, 1990, representatives from all of Chechnya's ethnic groups, including Russians and Cossacks, convened for a national conference in Grozny.  After three

days of meetings, on November 25, 1990, those delegates declared Chechnya to be independent from the former Soviet Union – the former U.S.S.R., and a sovereign nation.  On November 27, 1990, the Chechen parliament unanimously ratified the declaration of Chechnya's independence.  On October 27, 1991, in a national referendum, the people of Chechnya approved Chechnya's independence and elected Dzhokhar Dudayev president – Mr. Dudayev received 84% of the popular vote.  Six weeks earlier, on September 7, 1991, the Soviet Union's president, Boris Yeltsin recognized the independence of the "breakaway republics" of Estonia, Latvia and Lithuania – those three nations were admitted to the United Nations that same month.  But the U.S.S.R. refused to recognize Chechnya's independence, or President's Dudayev's election.  On October 11, 1992, President Dudayev was forced to declare a state of emergency because of the buildup of Russian troops on Chechnya's border.  After the dissolution of the U.S.S.R. at midnight on December 31, 1990.  Republics that chose to join the Russian Federation signed a treaty on March 13, 1992.  President Dudayev did not sign the treaty.  On December 9, 1994, when President Yeltzen approved the use of force in Chechnya and 40,000 troops, supported by helicopters, tanks and airplanes, began to advance on Grozny,  Chechnya consented to peace talks with Russia.  On December 11, peace talks began and the next day Russian planes bombarded Chechnya because the parties failed to reach an accord.  At this point, peace talks ended and Russia began preparing to invade Chechnya.

The full invasion of Chechnya began in December of 1994.  The brutality of the Russian invasion drew immediate condemnation from the international community.  In a February 1995 report, Human Rights Watch detailed abuses by Russian forces in Chechnya.  The report was "based on a ten-day field investigation, from February 8-20, by two Human Rights Watch/Helsinki

researchers." Three Months of War in Chechnya, Human Rights Watch, February 1995, Vol. 7, No.

6. The report documented what Dr. Jayyousi already knew:

> …Russian forces continue to commit gross abuses against the civilian population in the region. In the early weeks of the war, Russian bombs and artillery fire laid waste to Grozny, the capital of Chechnya, and outlying villages, destroying apartment buildings, hospitals, and other civilian objects, and killing, maiming, or injuring thousands of civilians.

Id. at p.1. A study conducted by a member of the Russian Parliament, estimated that 25,000 people, or 6% of the population of Grozny were killed during the Russian attacks on Grozny in the one month between December 25, 1994 and January 25, 1995. Id. at p.4. By the end of the First Chechen War in 1997, it is estimated that 50,000 civilians, or 5% of the Chechnya's 1.1 million people, had been killed. If not clear from the large-scale destruction that was brought upon the county, the fact that the Russian forces were intentionally targeting civilians is made clear by some of the pamphlets that were being distributed at the behest of the Russian government:

> Residents of Shali!
>
> All of Chechnya is watching You! How could it happen that in your proud settlement, without your permission, bandit formations appeared that prepare for nothing more than for your annihilation?
>
> One shot from Shali and return fire will be opened up upon the whole village. Remember how much unhappiness one single anti-aircraft gun parked in the hospital courtyard brought? Tens of innocent people died, and the bandits that fired at the plane escaped….You must immediately kick the bandits out of Shali. In the worst case, great misfortune awaits all residents of Shali….Hurry and make your choice, Residents of Shali. Little time remains….

Id. at p.5 (emphasis in original). Pages 5 – 21 of the February 1995 Human Rights watch report cited herein, contains further details of conduct of the Russian military in the first few months of the

Chechen war, including the destruction of civilian targets, mistreatment and abuse of detainees and looting by Russian forces.

**The wrongful actions of Russia provoked Dr. Jayyousi response**

There can be no question that Dr. Jayyousi was aware of the Russian atrocities being committed upon the civilian population of Chechnya: "Russian air force and artillery launched cowardly terrorist attacks on the heroic city of Grooznei [sic] causing hundreds of civilian deaths. Tens of Thousands of Muslim refugees mostly women and children left to the neighboring Muslim state of Daghestan were they are living in Camps." Islam Report, December 28, 1994. "Russian agression [sic] Crusade forces are continuing their cowardly bombing of Grooznei [sic], surrounding vilages [sic] and even Ingushetia. Hundreds of thousands of cluster bombs, napalm, missiles and rockets have completely destroyed the city and set it on fire." Islam Report, January 9, 1995. The primary acts the government claims Dr. Jayyousi committed to support the "Chechen Jihad" was to purchase two handheld radios and a satellite phone to aid communication efforts in Chechnya. The Government asserts these communication devices were being sent to support the Chechen fighters. The last act the PSR asserts Dr. Jayyousi should be held responsible for, with regard to Chechnya, are his discussions with a Chechen individual regarding the purchase of cellular telephones for communications purposes. This occurred on April 2, 1996. Dr. Jayyousi took no further actions with relation to Chechnya after the First Chechen War ended on May 12, 1997 with the signing of a peace treaty between Russia and Chechnya. Legal scholars have commented that this treaty acknowledged Chechnya as a de facto independent state. See Independent Chechnya: Treaty of peace with Russia of 12 May 1997, Francis Boyle, September 17, 1997 ("it is my conclusion that by means of entering

into this Treaty, the Russian Federation has granted de facto recognition to the Chechen Republic Ichkeria as an independent nation state under international law and practice.")

**Dr. Jayyousi should receive a significant departure based upon the factors listed in 5K2.10.**

As is further discussed below, an analysis of the six factors set forth in 5K2.10 hevily weighs in favor of a significant reduction from the guidelines. Dr. Jayyousi should receive at least, a 75% reduction in his guideline calculation, and in the event this Court imposes a "terrorism" enhancement, an additional horizontal guideline reduction to a Criminal History Category I.

The Relevant Factors are:

(1) The size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant – (5K2.10(1)).

There can be no question that the Serbian and Russian forces massively outnumbered and were better equipped than the military forces they were fighting. As discussed above, estimates of 50,000 civilian casualties in Chechnya and unknown thousands of murdered Bosnian civilians – who were supposed to be under the protection of United Nations and NATO forces, establish that both the Russian army and the Serbian military were grossly more powerful than any group Dr. Jayyousi is accused of conspiring with.

(2) The persistence of the victim's conduct and any efforts by the defendant to prevent confrontation – (5K2.10(2)).

NATO bombing could not stop the Serbian forces from their genocidal conduct, nor could world pressure on Russia prevent Russia's murderous assault on Chechnya. Dr. Jayyousi was never in a position to prevent a confrontation with the Serbian and Russian military forces – despite this fact, Dr. Jayyousi did attempt to prevent those atrocities from occurring by dissemination of information establishing the actions of the Serbian and Russian forces. Dr. Jayyousi did not become

26

involved in Bosnia or Chechnya until the Russian and Serbian forces began to commit atrocities upon civilian populations.

> (3)   The danger reasonably perceived by the defendant, including the victim's reputation for violence – (5K2.10(2)); the danger actually presented to the defendant by the victim – (5K2.10(3)); and, any other relevant conduct by the victim that substantially contributed to the danger presented – (5K2.10(5).

The Serbian forces and their conduct were well known to the world at the time of the Bosnian conflict.  Prior to the genocide at the time of Srebrenica, Serbian nationalists had begun a 40-month siege of Sarajevo in which the regular international news coverage depicted innocent civilians shot dead in the streets by Serbian snipers.[5]  It was certainly reasonable for Dr. Jayyousi to perceive a large threat to the Muslim population of Bosnia based upon the conduct of the Serbian forces.  The same can be said for the threat posed by the Russian forces.  Recently having been born from the U.S.S.R., a global superpower, referred to by Ronald Regan as the "evil empire."   Russia's actions in Afghanistan had concluded in the years leading up to its invasion of Chechnya, there was no effective way for the international community to control its use of force.

The fact that despite United Nations and NATO military action against the Serbian forces had failed to curb the attack on the civilian Muslim population of Bosnia attests to the reality of the danger faced by their innocent civilian victims.  During the course of the war tens of thousands of innocent civilians were murdered for no other reason than their religious and ethnic identity.  Chechnya are not

---

[5] "The 44-month siege of the Bosnian capital -- the longest such blockade in post-war Europe -- began in April 1992 and turned into what prosecutors here described as a "medieval hell".

It played out in front of the television cameras while the international community and UN peacekeepers were unable to stop the horrors.

According to the judges, the criminal Serbian troops, commanded by Galic, deliberately targeted civilians who suffered almost daily shelling and shooting from Serb snipers.

Human rights organizations estimate that nearly 12,000 people including 1,500 children died during the siege." Bosnia News, (<http://www.worldtopix.com/bosnianews1dec2006.html>).

different.  While Russia has never been formally charged with the crime of genocide for its actions in the First Chechen War, it is clear that Russia intentionally, and effectively, inflicted civilian casualties upon the Chechen people in an attempt to prevent Chechnya from retaining its independence.

(4) The proportionality and reasonableness of the defendant's response to the victim's provocation.

Even if this Court accepts 100% of the Government's claims about Dr. Jayyousi's conduct, the Government would have shown that with regard to Bosnia, Dr. Jayyousi pledged his support to a Bosnian military mujahideen commander who was fighting the Serbian forces and that he sent communications equipment in the form of two (2) walky-talkies, one (1) satellite phone, and cellular telephones to aid Chechen mujahideen fighters.  Such actions by Dr. Jayyousi certainly are not a disproportionate response to indiscriminate mass murder.  When Dr. Jayyousi's actions are compared with those of the United Nations and NATO, along with the United States, which when faced with the actions of the Serb forces, bombed Serbian targets, Dr. Jayyousi's response is not only reasonable, but minimal.  The same holds true for his response to the actions of the Russian forces.  Not long before the Chechen war, the United States Government was sending billions of dollars in military assistance, including missiles, to the Afghani resistance fighters in response to Russian aggression. It was not unreasonable or disproportionate for Dr. Jayyousi to send communications equipment, civilian clothing and moral support to the Chechen resistance fighters in light of the mass murder that was being perpetrated by the Russian forces in Chechnya.

**Other grounds recognized by the guidelines for a reduced sentence**

5K2.11 Lesser Harm. This was recognized by the 11th Circuit as a valid consideration for reduction in *United States v. Hadaway*, 998 F2d 917 (11th Cir, 1993). The validity of its application to terrorism cases was cited by the court in *United States v. Mahdi, supra.* That issue was discussed at length in Mr. Hassoun's Sentencing Memorandum [DE 1278}. To the extent that its legal principles apply here, Dr. Jayyousi will adopt those comments by reference, and not repeat them

**Conditions of Confinement**

Can expect not much different a life than he currently experiences at FDC Miami. By BOP regulations, he will be designated to a maximum, or super maximum factility. There he will experience:

> Isolation
> Mail delays (Currently not received any mail from his mother in 4 months)
> He currently receives no mail in Arabic, even a Quaran
> His English language mail is delayed one month

**Sentencing disparities**

§ 3553(a) requires a sentencing court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In Dr. Jayyousi's case, the sentences of similarly situated persons weigh heavily in favor of his request for a lower sentence.

Attached is a chart based upon US DOJ statistics showing comparative sentences. The chart demonstrates that individuals who have been convicted of the same crime as Dr. Jayyousi, but who lack similar backgrounds for public service have received sentences far less than the life sentence sought by the government here. Their average sentence has been less than five years. Mr. Padilla's counsel has also done a substantial analysis of individuals and their sentences to demonstrate the issue

of sentencing disparity between the government's request in this case and its agreements in other substantial cases[DE 1279-1].  Dr. Jayyousi wishes to incorporate that discussion by reference.

Also, Oscar Wyatt man pled guilty to violating laws relating to sanctions against Iraq and for violation of the Oil for Food program, enriching Saddam Hussein and his cronies at American expense . He corruptly dealt directly with Saddam.  The US government agreed to guidelines of less than 24 months.  He was actually sentenced to a year and a day because the judge was impressed by his friends. Greed was his only motive (attached)


Just this past week,  Nuradin Abdi, of Columbus, Ohio who pled guilty to conspiring to blow up shopping centers in Columbus and elsewhere received a ten year sentence which the United States agreed to in his plea agreement (attached)

**Conclusion**

Although angered by the actions and inactions of others, Dr. Jayyousi never advocated nor engaged in violence.  He has always made the wellbeing of others the focus of his life.  He knows all too well, the burden on refugees and their need for the basics of life.  He knows that there will always be a 10 year old boy on the other end of that random missile fired in anger.

One of the motivating factors in his decision to stop publishing *Islam Report* was the increasing violence undertaken by those who claimed to be acting on behalf of Islam.  He stopped his charitable efforts when it became clear to him that he could not insure that  the supplies he was sending were getting to the people who needed them.  Although a Palestinian, he never supplied or supported any Palestinian fighting group, and, when peace came to Egypt and Israel, he gladly toasted to the new dawn.

Dr. Jayyousi has done more for his country than all of his accusers combined.  He has served in military, religious and civil roles.   His has been a life of public service.  Even when employed in the private sector, Dr. Jayyousi worked on matters of significance to the wellbeing of his community and country.  He is a religious man, whose faith has gotten him through this ordeal and will sustain him during the fight to come.

Dr. Jayyousi respectfully requests that the Court impose a sentence, pursuant to 18 U.S.C. §3553(a), that is "sufficient, but not greater than necessary, to comply with the purposes" of the statute.  Dr. Jayyousi should receive no more than a probationary sentence.

Respectfully Submitted,
s/ William W. Swor
WILLIAM W. SWOR  (P21215)
Attorney for Defendant Jayyousi
3060 Penobscot Building
645 Griswold Street
Detroit, Michigan 48226
(313) 967-0200
E-MAIL: wwswor@wwnet.net

s/ Marshall Dore Louis
Marshall Dore Louis
Florida Bar No. 512680
SINCLAIR,  LOUIS,  HEATH,  NUSSBAUM  &
ZAVERTNIK, P.A.
Alfred I. duPont Building
169 East Flagler Street, Suite 1125
Miami, FL 33131TEL: (305) 374-0544
FAX: (305) 381-6869
E-MAIL: mdl@sinclairlouis.com

Dated:  November 30, 2007